Dale M. Cendali
Melanie Bradley
Courtney Schneider
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: 212-446-4800
Fax: 212-446-4900

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X
                                          :

THOIP (A Chorion Limited Company)     :
                                          :

               Plaintiff,            :      08 Civ. 6823 (SAS)
                                          :

       - against -              :      ECF Case
                                          :

THE WALT DISNEY COMPANY, DISNEY     :
CONSUMER PRODUCTS, INC. and DISNEY     :
DESTINATIONS, LLC,                    :
                                          :

             Defendants.          :
                                          :
----------------------------------------------------------- X

## **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF DR. GARY FORD**

# Table of Contents

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND ..............................................................................................2
    A.    THOIP's T-Shirts.....................................................................................2
    B.    The Accused T-shirts ..............................................................................2
    C.    The Ford Survey ......................................................................................4
            1.    Survey Structure...........................................................................4
            2.    Operation of the Survey ...............................................................5
    D.    Dr. Ford's Results/Coding ......................................................................7

ARGUMENT .......................................................................................................................8

I.    DR. FORD'S SURVEY SHOULD BE EXCLUDED UNDER FEDERAL
    RULES OF EVIDENCE 702 and 403 ......................................................................8

II.    THE FORD SURVEY FAILED TO APPROXIMATE MARKETPLACE
    CONDITIONS..........................................................................................................9
    A.    The Ford Survey Improperly Created Artificial Awareness Among Survey
            Respondents .....................................................................................10
    B.    The Ford Survey Served as a Test of Conditional Probability as Opposed
            to Actual Confusion ........................................................................12
    C.    The T-shirts at Issue are Not "Proximate"...........................................13
    D.    The Ford Survey Did Not Make Use of Hang Tags or Neck Labels on Any
            of the T-Shirts in the Array..............................................................16
    E.    Dr. Ford's Array Was Made Up of Fake T-Shirts That Did Not Exist In
            Reality .............................................................................................17

III.    THE FLAWED DESIGN AND STRUCTURE OF THE FORD SURVEY
    GAVE RISE TO UNRELIABLE AND MISLEADING RESULTS .........................18
    A.    The Ford Survey Employed Leading Questions and Suffered From Strong
            Demand Effects.................................................................................18
    B.    The Results Indicate That the Ford Survey Functioned as a Matching
            Game ................................................................................................21
    C.    The Ford Survey Had No Control.......................................................23

CONCLUSION ..................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
    447 F. Supp. 2d 266 (S.D.N.Y. 2006) ............................................................... 25

*American Footwear Corp. v. General Footwear Co. Ltd.,*
    609 F.2d 655 (2d Cir. 1979) ............................................................................... 10

*Beverage Marketing USA, Inc. v. South Beach Beverage Corp.,*
    2002 WL 1162789 (2d Cir. June 3, 2002) ......................................................... 18

*Conopco, Inc. v. Cosmair, Inc.,*
    49 F. Supp. 2d 242 (S.D.N.Y. 1999) ........................................................... 20, 27

*Cumberland Packing Corp. v. Monsanto Co.,*
    32 F. Supp. 2d 561 (E.D.N.Y. 1999) ...................................................... 21, 24, 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ............................................................................................ 9

*Franklin Resources Inc. v. Franklin Credit Mgt. Corp.,*
    988 F. Supp. 322 (S.D.N.Y. 1997) .................................................................... 24

*GEICO v. Google, Inc.,*
    77 U.S.P.Q.2d 1841 (E.D. Va. 2005) ..................................................... 19, 25, 26

*GMA Accessories v. Croscill,*
    2008 WL 591803 (S.D.N.Y. Mar. 3, 2008) ...................................................... 14

*Juicy Couture, Inc. v. L'Oreal USA, Inc.,*
    2006 WL 1012939 (S.D.N.Y. April 19, 2006) ................................................. 18

*Kargo Global, Inc. v. Advance Magazine Publrs., Inc.,*
    2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ................ 9, 10, 12, 14, 15, 16, 17, 19, 20, 21

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................. 8

*Nabisco v. Warner-Lambert Co.,*
    32 F. Supp. 2d 690 (S.D.N.Y. 1999) ................................................................. 26

*National Distillers v. Refreshment Brands, Inc.,*
    198 F. Supp. 2d 474 (S.D.N.Y. 2002) ................................................. 12, 14, 18, 19

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Oddzon Products, Inc. v. Just Toys, Inc.*,
    122 F.3d 1396 (Fed. Cir. 1997) ........................................................................... 23

*Simon Prop. Group L.P. v. mySimon, Inc*.,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ........................................................... 16

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 286 (2d Cir. 1999) ............................................................................... 9

*Sunbeam Corp. v. Equity Industries Corp*.,
    635 F. Supp. 625 (E.D. Va. 1986) ................................................................... 22

*WE Media v. GE*,
    218 F. Supp. 2d 463 (S.D.N.Y. 2002) ........................................................ 10, 13

## OTHER AUTHORITIES

McCarthy on Trademarks § 23:21 (4th ed. 2002) .......................................................... 10

McCarthy on Trademarks § 32:174 (4th ed. 2002) ........................................................ 17

Shari Seidman Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL
    ON SCIENTIFIC EVIDENCE  (Federal Judicial Center 2000) ............................... 25

## RULES

Fed. R. Evid. 403 ....................................................................................................... 1, 9, 27

Fed. R. Evid. 702 ....................................................................................................... 1, 9, 27

## PRELIMINARY STATEMENT

Dr. Ford's survey should be excluded under Fed. R. Evid. 702 and 403 as the quintessential biased survey contrived to inflate "actual confusion." Indeed, there can be no doubt that Dr. Ford's efforts to manufacture confusion are evidenced by each choice that he made in designing his array survey:

1) Despite Dr. Ford's sworn testimony that he was informed that brand awareness of the THOIP product was "low," Dr. Ford designed an array survey that artificially created 100 percent awareness of Plaintiff's purported mark;

2) Dr. Ford purposely tested specific pairs of THOIP and Disney T-shirts without their neck labels or hang tags, even though in the actual market such tags and labels would have provided consumers with information as to the source of origin of the shirts;

3) Dr. Ford chose to test pairs of shirts, not because they were sold together in the actual marketplace, but rather based on his belief that they were the most similar and would thus garner the highest rate of confusion;

4) In each test cell of his survey, Dr. Ford placed the allegedly infringing Disney T-shirt right in the middle of the array, precisely where the respondent was directed to stand;

5) Dr. Ford placed the Disney shirt in a line-up consisting of completely fabricated "Filler" shirts that did not exist in the marketplace;

6) Such "Filler" shirts shared no similarities with the THOIP or Disney shirt;

7) The structure of Dr. Ford's array and the leading nature of the survey questions pushed respondents to believe that a connection existed between the products and to guess;

8) Consistent with a survey designed to manufacture confusion, Dr. Ford chose not to disclose in his report that many respondents he counted as confused in fact picked *all* the shirts in the array; nor did he discount such responses from his "confusion" results; and

9) Despite a methodology that led to rampant guessing, Dr. Ford chose a mirage of a control that subtracted nothing from his confusion results.

Many of these flaws, in and of themselves, would be an appropriate basis for excluding Dr. Ford's survey. The cumulative effect of such biased choices, however, makes it clear that Dr. Ford's survey should be excluded in its entirety.

## FACTUAL BACKGROUND

### A.    THOIP's T-Shirts

THOIP claims rights in a purported mark consisting of "Little Miss" in big, bold letters with an adjective and a character on a T-shirt.  (7/15/09 Hearing Tr. at 11:1-15).  According to THOIP, the purported mark was first used in the United States on a series of children's books. Second Amended Complaint dated February 11, 2009 ("SAC") ¶¶ 11-12.  T-shirts bearing the purported mark were sold by THOIP's licensee, Junk Food Clothing Inc. ("Junk Food"), along with other THOIP T-shirts in a variety of formats and fonts, beginning in August 2006. Declaration of M. Bradley dated October 23, 2009 ("Bradley Dec."), Ex. 3 (Ward 24:18-24; 26:3-20).  There is no evidence that the purported mark has been used on T-shirts in the United States prior to 2006.  *Id.* ¶ 8.

THOIP T-shirts are sold at specialty retailers, such as Urban Outfitters, and at national retail chains, such as Macy's.  *Id.*, Ex. 3 (Ward 39:7-21).  THOIP's T-shirts were not sold at the Disney theme parks or at World of Disney stores, with only one limited exception.  Two THOIP T-shirts, "Little Miss Sunshine" and "Little Miss Giggles," were sold in the U.K. Pavilion (one of several country-specific areas within the World Showcase) at Epcot Center.  *Id.*, Ex. 4 (Guy 29:22-30:19).  THOIP T-shirts also were sold at a trendy boutique called Vault 28 in the Downtown Disney shopping mall in Anaheim, California.  *Id.*, Ex. 5 (Coleman 29:21-30:11; 33:21-35:15).  Vault 28 sells Disney and non-Disney branded merchandise.  *Id.*

### B.    The Accused T-shirts

THOIP alleges that its purported mark has been infringed by two different lines of Disney character T-shirts.  SAC ¶¶ 1-3.  The first line, the "Little Miss Disney" T-shirts, were sold by Disney Destinations LLC ("DDL") exclusively inside the Disney theme parks and at the World of Disney store in Manhattan.  Bradley Dec., Ex. 5 (Coleman 77:16-78:11).  Thus, the "Little

Miss Disney" T-shirts were never sold in the same stores as THOIP's T-shirts.[1]  Beginning in February 2008, four different "Little Miss Disney" T-shirts were sold -- each bearing a famous Disney character -- namely, "Little Miss Bossy" with Daisy Duck, "Little Miss Perfect" with Minnie Mouse, "Little Miss Sassy" with Tinkerbell, and "Little Miss Wicked" with the Wicked Queen from Snow White.  *Id.*, Ex. 5 (Coleman 100:20-101:1).  THOIP puts out a "Little Miss Bossy" shirt with one of its characters, but has not used "Perfect," "Sassy," or "Wicked" in connection with a "Little Miss" character.  SAC ¶ 32, Ex. 2.

The second line, the "Miss Disney" T-shirts, were put out by a licensee of Defendant Disney Consumer Products, Inc. ("DCP") and were sold in national retail chains and some specialty stores, although not necessarily at the same time as the THOIP T-shirts.  Bradley Dec., Ex. 6 (Teglas 77:1-11).  As noted by Dr. Michel Pham, retailers generally sell Disney-branded merchandise in groups and/or separate sections of their stores.  *See* Expert Report of Dr. M. Pham ("Pham Report") ¶ 73.[2]  THOIP's rebuttal expert, Dr. Yoram Wind, does not dispute Dr. Pham's description of the Disney selling environment.  Beginning in October 2007, four different types of "Miss Disney" shirts were sold -- each bearing a famous Disney character, namely, "Miss Chatterbox" with Minnie Mouse, "Miss Fabulous" with Minnie Mouse, "Miss Attitude" with Tinkerbell, and "Miss Adorable" with Marie the Cat.[3]  Bradley Dec., Ex. 6.

---

[1]  The "Little Miss Disney" T-shirts were not sold at or near the U.K. Pavilion, but were only sold at the entrance to Epcot where general Disney merchandise is sold.  Bradley Decl., Ex. 5 (Coleman Dep, 113:18-114:17)

[2]  Dr. Pham's report is annexed to the Declaration of Dale M. Cendali dated October 23, 2009 ("Cendali Dec.") as Exhibit 1.  For the Court's convenience, all expert reports on which Defendants rely are attached to the Cendali Dec.  Defendants will cite directly to these expert reports rather than the declaration.

[3]  Both the "Little Miss Disney" and "Miss Disney" lines of T-shirts were pulled from the shelves in August of 2008 pending the outcome of this lawsuit, after having been sold in

(Teglas 63:12-64:17). THOIP puts out a "Little Miss Chatterbox" T-shirt with one of its characters, but has not used "Fabulous," "Attitude," or "Adorable" in connection with a "Little Miss" character. SAC ¶ 32 , Ex. 2. THOIP also does not use "Miss" alone. Bradley Dec., Ex. 7 (Karp 44:12-21).

All of Defendants T-shirts were sold with neck labels and hangtags identifying their source as Disney and bearing the Disney trademark. Pham Report ¶ 44, 50, 75. Similarly, the THOIP T-shirts are sold bearing the neck labels of its licensees, such as Junk Food. Pham Report, ¶¶ 44.

## C.    The Ford Survey

THOIP contends that both lines of T-shirts are likely to cause confusion with THOIP's purported mark. SAC ¶¶ 1-3, 55-61. THOIP has no evidence of actual consumer confusion in the marketplace. As a proxy for actual confusion, THOIP seeks to offer Dr. Gary T. Ford's likelihood of confusion survey (the "Ford Survey"). Dr. Ford testified that his survey solely measures forward confusion and no other type of confusion. Bradley Dec., Ex. 9 (Ford II 125:12-126:3).

### 1.    Survey Structure

Dr. Ford conducted a two-room array survey using eight different "cells" of respondents. Expert Report of Dr. G. Ford (Amended) ("Ford Report") ¶¶ 15-20.[4] Cells 1, 3, 5 and 7 were "test" cells in which a THOIP T-shirt was compared to an array of T-shirts including a purportedly infringing "Little Miss Disney" or "Miss Disney" T-shirt. Id. Dr. Ford testified that he paired a specific THOIP T-shirt with a purportedly infringing Disney shirt because they

---

stores for seven and ten months respectively. See supra, p. 2 and Bradley Dec., Exs. 5 and 6 (Coleman 148:10-24, Teglas 144:3-6).

[4]    Dr. Ford's expert report is annexed to the Cendali Dec. as Exhibit 2.

looked the most similar. Bradley Dec., Ex. 8 (Ford I 107:18-108:5). Photos of the "test" pairs are annexed to the Bradley Dec. at Ex. 1. Dr. Ford testified that his opinion with respect to any "confusion" was specific to the exact pairs of shirts tested. *Id.*, Ex. 8 (Ford I 106:11-107:17).

Cells 2, 4, 6 and 8 purport to be "control" cells each of which corresponds to a test cell. Ford Report ¶¶ 17-20. In the "control" cells, a THOIP T-shirt was compared to an array of T-shirts where the purportedly infringing T-shirt from the test cell was replaced with a T-shirt bearing the same Disney character without the words. *Id.* ¶¶ 17-20. For example in Cell 2, the "Little Miss Bossy" with Daisy Duck T-shirt from Cell 1 was replaced with an image of Daisy Duck posing. *Id.* ¶ 17. Photos of the "control" pairs are annexed to the Bradley Dec. at Ex. 1.

  2.  Operation of the Survey

In the first room, participants who were screened as being in the relevant purchasing group were shown a specific THOIP T-shirt. Ford Report ¶ 39. The respondents were told to take as much time as they needed to examine the THOIP T-shirt and to look at it as if they were considering purchasing it. *Id.* When the respondent was finished looking at the shirt, the interviewer asked three short questions to "clear the mind," and then brought the respondent into a second room where they were shown an array of five shirts. *Id.* ¶¶ 40-41. As an example, the array from Cell 1 was presented as follows:





As shown above, in addition to the purportedly infringing shirt, the array consisted of four additional T-shirts depicting:  (1) a Disney character without any words; (2) "Lucy" from Peanuts with the word "Lucy" above her image; (3) "Dora the Explorer" with the words "Dora the Explorer" above her image; and (4) the "Hello Kitty" character without any words.  Ford Report ¶ 17.  Dr. Ford testified that the "Lucy," "Dora," Disney Image (without words), and "Hello Kitty" shirts (the "Filler Shirts") were fabricated by Dr. Ford and counsel solely for this survey and thus did not exist in the marketplace.  Bradley Dec., Ex. 8 (Ford I 117:12-25).  Dr. Ford also testified that the Filler Shirts were non-infringing.  *Id.*, Ex. 9 (Ford II 131:9-25).  None of the T-shirts in Dr. Ford's survey (including the THOIP shirt) contained a neck label, hangtag or any other indicia of origin.  *Id.*, Ex. 8 (Ford I 73:14-21).

The purportedly infringing shirt (or the control shirt) was always in the middle of the display and the order of the shirts was not rotated.  *Id.*, Ex. 8 (Ford I 92:15-21).  Respondents were directed to stand in the middle of the table bearing the array, in front of the allegedly infringing shirt.  Ford Report, Appendix H, p. 2.  Respondents were then asked a series of questions to determine if they thought one or more of the shirts in the array emanated from, was associated with, or permitted by THOIP.  *Id.* ¶¶ 42-44.

### D.    Dr. Ford's Results/Coding

According to Dr. Ford's report, respondents were classified as confused as to source, association, or permission if they identified one of the following reasons for selecting the test shirt: "a) Because the shirt said Little Miss Bossy, Miss Chatterbox or Little Miss Splendid … or some variant of those terms; b) Because the shirt said "Little Miss" or "Miss;" c) Because the Shirt said the same name, or same wording in both, same slogan or a similar phrase; or d) Because the shirt [sic] the same lettering, the lettering looks the same, or a similar response related to the lettering or writing on the shirt." *Id.* ¶ 53.

*Thus, because the "control" shirts did not have any lettering on them, none of the respondents who selected the "control" shirt were subtracted from the overall confusion estimate.* Bradley Dec., Ex. 9 (Ford II 181:4-16). This was not disclosed in Dr. Ford's report. Rather, Dr. Ford's report only disclosed the percentages of respondents he coded as "confused" (and their verbatim responses) and simply indicated that "none" of the respondents from the control group were confused. Ford Report ¶¶ 55-56, 58-59, 61-62 and 64-65.

Based on his coding, 27.5% of respondents who were first made aware of the "Little Miss Bossy" THOIP shirt were confused by the "Little Miss Bossy" Disney shirt[5]; 25.3% of respondents who were first made aware of the "Little Miss Chatterbox" THOIP shirt were confused by the "Miss Chatterbox" (Disney) shirt; 14% of respondents who were first made aware of the "Little Miss Splendid" THOIP shirt were confused by the "Miss Fabulous" Disney

---

5    Dr. Ford's report contains an error. On page 3 of his report, Dr. Ford indicated that the confusion rate for Cell 1 was 28.2%, but on page 18 of his report, Dr. Ford indicated that the confusion rate was 27.5%. *Cf.* Ford Report ¶ 11 with ¶ 55. Dr. Ford testified at his deposition that he did not know which was the correct number. Bradley Dec., Ex. 9 (Ford II 266:17-267:18). Counsel for Defendant recalculated the confusion estimate in Cell 1 and the 27.5% number is the accurate number. Bradley Dec. ¶¶ 2-3.

shirt; and 14.6% of respondents who were first made aware of the "Little Miss Splendid" THOIP
T-shirt were confused by the "Little Miss Perfect" Disney shirt.  *Id.* ¶ 11.

As shown in Dr. Simonson's rebuttal report, however, numerous respondents picked the
Filler Shirts even when it made no sense to do so, suggesting a high level of guessing.  Rebuttal
Report of Dr. I. Simonson ("Simonson Report") ¶ 31, Ex. D.[6]  As further evidence of guessing, a
large portion of the respondents that Dr. Ford counted as "confused" believed that all of the
shirts in the array -- including the Filler Shirts designed to be non-infringing --  emanated from,
were associated with, or were permitted by THOIP.  In Cell 1, 29% of the respondents Dr. Ford
counted as confused selected <u>all</u> of the shirts in the array; in Cell 3, 13% of "confused"
respondents selected <u>all</u> of the shirts; in Cell 5, 24% of "confused" respondents selected <u>all</u> of the
shirts; and in Cell 7, 18% of the "confused" respondents selected <u>all</u> of the shirts in the array.
Bradley Dec. ¶ 5.  Nevertheless, Dr. Ford did not disclose the fact that so many respondents
selected the Filler Shirts, and did not reduce the confusion rate he found, even when the
respondent selected all of the shirts as emanating from THOIP.  Ford Report ¶¶ 55-56, 58-59, 61-
62, and 64-65.

## **ARGUMENT**

## I.    **DR. FORD'S SURVEY SHOULD BE EXCLUDED UNDER FEDERAL RULES OF EVIDENCE 702 AND 403**

As the "gatekeeper" of expert evidence, this Court has the ability and the grounds to
exclude the fatally flawed array survey conducted by Plaintiff's expert, Dr. Gary Ford.  *See Louis
Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 561-62 (S.D.N.Y. 2007).  As
expert testimony can be quite misleading, the Court should exercise more control over experts
than over lay witnesses.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595

---

6    Dr. Simonson's report is annexed to the Cendali Dec. as Exhibit 3.

(1993).  In addition, where, as here, a trademark action contemplates a jury trial rather than a bench trial, the Court should scrutinize survey evidence with particular care.  *Kargo Global, Inc. v. Advance Magazine Publrs., Inc.*, 2007 WL 2258688, *6 (S.D.N.Y. Aug. 6, 2007).  Federal Rule of Evidence 702 provides that expert testimony concerning technical or specialized knowledge is admissible to assist the trier of fact only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.  Thus, "[t]o be admissible, expert testimony must be both relevant and reliable." *Daubert*, 509 U.S. at 589.

As discussed below, Dr. Ford's survey cannot meet this standard.  Nor can Dr. Ford's survey overcome the additional hurdle of Federal Rule of Evidence 403, which serves as yet another check on the reliability of expert evidence, stating that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ."  Fed. R. Evid. 403.  As Dr. Ford's survey would undoubtedly mislead the jury and unfairly prejudice Defendants, it should be excluded.  *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296-98 (2d Cir. 1999) (affirming district court's exclusion of survey where any probative value was outweighed by prejudicial effect); *Kargo Global, Inc.*, 2007 WL 2258688, at *12 (finding Jacoby Survey so flawed that its probative value was substantially outweighed by its potential for unfair prejudice and the likelihood that it would confuse or mislead the jury).

## II.    THE FORD SURVEY FAILED TO APPROXIMATE MARKETPLACE CONDITIONS

A proper survey should "compare the impressions the marks have on potential customers under marketplace conditions."  *WE Media v. GE*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002).

Survey evidence is only useful in providing evidence of "actual" confusion where it "mirrors the real world setting which can create an instance of actual confusion."  McCarthy on Trademarks § 23:21, at 23-13 (4th ed. 2002).  A survey's failure to approximate marketplace conditions can provide grounds for the survey's exclusion.  *Kargo*, 2007 WL 2258688, at *7; *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 fn. 4 (2d Cir. 1979) (survey defective "for failure to conduct it under actual marketing conditions").  Here, the Ford Survey's design did not replicate marketplace conditions and thus does not serve as a reliable indicator of actual confusion and should be excluded.

### A.    The Ford Survey Improperly Created Artificial Awareness Among Survey Respondents

Although Dr. Ford admittedly was aware that the THOIP product had low brand awareness, rather than attempting to test for confusion under actual marketplace conditions, Dr. Ford designed an array survey that artificially created 100 percent awareness of the THOIP T-shirts among survey respondents.  Bradley Dec., Ex. 8 (Ford I 59:7-19).  As demonstrated by his deposition testimony, Dr. Ford knew that the THOIP product had low brand awareness:

> Q:  Well, you said earlier that you believed that the plaintiff's shirts, the THOIP shirt, had low brand awareness, right?
>
> A: I did.
>
> Q: And --
>
> A: From representations from counsel.
>
> Q: Right, counsel told you it was low brand awareness and you accepted that?
>
> A: Right.

*Id.*, Ex. 8 (Ford I 60:9-19; *see also* 34:14-25, 37:7-38:3).

Yet, rather than designing a survey that replicated, or at least did not alter, the low awareness level of the THOIP T-shirts, Dr. Ford chose a methodology that artificially elevated

the awareness to 100 percent.  *Id.*, Ex. 8 (Ford I 59:7-19).  While such a distortion of the actual

marketplace conditions is in and of itself grounds for exclusion, worse yet, Dr. Ford's choice to

use an array survey, rather than an *Eveready* format, was consciously motivated out of a desire to

achieve higher confusion results.  Dr. Ford repeatedly testified in his deposition that he chose not

to conduct a standard *Eveready* survey because he believed that such a format would return

lower confusion results.

> Q: And is it fair to say that the reason you didn't do an *Eveready* study was in light of the
> low brand awareness you had been told about, an *Eveready* study probably wouldn't have
> come up with very good confusion results?
>
> A: And coupled with the fact that the shirt were sold, if not together, relatively closely,
> yes.

*Id.*, Ex. 8 (Ford I 60:20-61:4; *see also* 34:14-25).  Thus, from its inception, the Ford Survey was

biased, designed not to approximate marketplace conditions, but rather to maximize the

confusion results.

Courts have criticized surveys that improperly created artificial awareness.  In *National

Distillers v. Refreshment Brands, Inc.*, for example, the court held that plaintiff's survey, which

similarly "acquaint[ed] [survey respondents] with a product they would almost certainly have

been unfamiliar with otherwise," could not be relied upon to establish confusion as the survey

did not reflect the actual marketplace.  198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002).  Similarly, in

*Kargo*, the court excluded plaintiff's survey, criticizing the survey for making respondents

artificially aware of defendant's *Cargo* magazine instead of properly approximating actual

market conditions.  2007 WL 2258688, *8.  The court stated that, rather than making

respondents artificially aware of a product using the array methodology, "[a] survey that utilizes

the 'Eveready' format, by displaying only a single party's mark and attempting to discern

whether respondents are confused as to the source of the mark, 'is much more reliable because it

more accurately approximates actual market conditions' by ensuring that respondents are not made 'artificially aware' of the other party's trademark." *Id.* (citing *National Distillers*, 198 F. Supp. 2d at 484). The Ford Survey similarly fails to reflect the actual market conditions and therefore warrants exclusion.

**B.    The Ford Survey Served as a Test of Conditional Probability as Opposed to Actual Confusion**

Dr. Ford admitted that, at best, his survey tested "conditional probability," i.e., only the *potential* rate of confusion amongst the limited subset of people who were *already* aware of THOIP's claimed mark, not the *actual* likelihood of confusion among the far broader universe of potential consumers who are not. Bradley Dec., Ex. 8 (Ford I 67:20-70:3). Dr. Ford admitted that his survey did not test for confusion among the target demographic of potential consumers:

> Q: So is it fair to say that you didn't -- your study did not test what the level of confusion would be in the target demographic group if those folks were not aware of plaintiff's products?
>
> A: That's correct. It's only -- it's by definition people who have been shown the THOIP product.

*Id.*, Ex. 8 (Ford I 69:20-70:3).

The relevant test for confusion, however, is whether the potential consumers for Defendants' product would be confused, not simply those who are actually aware of the plaintiff's product. *See WE Media*, 218 F. Supp. 2d at 474. Dr. Ford's results are thus irrelevant as they apply only to a small, biased subset of the target demographic, not potential consumers of Defendants' product as a whole.

As Dr. Simonson explained in his deposition, in order to get a sense of the actual confusion levels, one must discount from Dr. Ford's results the number of respondents who would not have been aware of the THOIP T-shirts to begin with and, thus, could not be confused upon seeing the allegedly infringing Disney T-shirts. Bradley Dec., Ex. 10 (Simonson 26:16-

28:17).  As Plaintiff has not conducted a secondary meaning survey to measure the actual

awareness level of the THOIP products, it is impossible to know the actual level of brand

awareness.  Generously assuming, however, that the awareness level is 10%, in order to

approach actual market conditions, Dr. Ford's results must be reduced by 90%.  This brings the

"confusion" levels for the four test cells down to 2.75% for Cell 1; 2.53% for Cell 3; 1.4% for

Cell 5; and 1.46% for Cell 7.[7]   Thus, Dr. Ford's survey results are drastically inflated and are

misleading.

### C.     The T-shirts at Issue are Not "Proximate"

Array surveys are frequently criticized by courts as failing to accurately replicate market

conditions, especially where, as here, the products at issue are not sold together.  *See Kargo*,

2007 WL 2258688, at *9; *National Distillers*, 198 F. Supp. 2d at 484.  As Dr. Helfgott explained

in his deposition, the expert is able to make many choices in constructing an array survey, and

thus has many opportunities to slant the results.  Bradley Dec., Ex. 12 (Helfgott 17:12-23:9).

Thus, the *Eveready* methodology, which in contrast does not give an expert the opportunity to

insert biases, is the standard survey methodology, as THOIP's own expert Dr. Wind admits.  *Id.*,

Ex. 11 (Wind 177:12-178:17).

Without citing to any legal authority to support the proposition, THOIP attempts to

justify Dr. Ford's use of an array format by claiming that the products at issue were sold in

"proximity."  In fact, Plaintiff goes so far as to argue that *only* an array survey would be

appropriate in this case.  Courts, however, have routinely accepted *Eveready* surveys, even in

those situations where the products at issue could have been encountered sequentially.  *See GMA*

*Accessories v. Croscill*, 2008 WL 591803, *8 (S.D.N.Y. Mar. 3, 2008) (accepting *Eveready*

---

[7] Interestingly, these results are not far from the .008% confusion rate reflected in the Helfgott
survey.

survey when parties' goods were sold in same stores); *National Distiller Prods.*, 198 F. Supp. 2d

at 482 (accepting *Eveready* where parties' goods sold in same stores).

Leaving aside the dubious legal support for Plaintiff's proposition that proximity justifies

using an array methodology, even in a case such as this one where Plaintiff's mark has low brand

awareness an array survey still is not justified as the products are <u>not</u> sold in proximity.  As

explained above, the "Little Miss Disney" shirts were sold only in Disney stores selling only

Disney products, namely at the Disney theme parks and the World of Disney store in Manhattan.

Bradley Dec., Ex. 5 (Coleman 77:16-78:11).  Such T-shirts never appeared in the same stores as

the THOIP T-shirts.  With respect to the "Miss Disney" T-shirts, such T-shirts may at some point

have been sold at some of the same stores as THOIP's T-shirts.  *Id.*, Ex. 6 (Teglas 77:1-11).

THOIP, however, has not presented any evidence to support the claim that these shirts were sold

next to one another, let alone anywhere near one another in such stores.

In fact, as Dr. Pham explained in his report, and tellingly Dr. Wind did not rebut, the

"Miss Disney" T-shirts would have been displayed in their own Disney section exclusive to

Disney products, separate and apart from other products.  Pham Report ¶ 73.  The likelihood of

proximity in such stores, moreover, would also be further lessened as such retailers sell hundreds

of different T-shirts in different locations throughout the store, displayed on various racks,

amongst countless other apparel items and promotional displays, all scattered amidst crowds of

shoppers.  Simonson Report ¶ 31.  As Dr. Simonson pointed out, the chance that a consumer

would encounter a THOIP T-shirt and then moments later come across a Disney shirt is highly

improbable, and thus not the proper basis on which to design a survey.  Simonson Report ¶ 30.

Significantly, in *Kargo*, the court excluded a survey that was similarly designed around

the unlikely situation (like the one presented here), that consumers would encounter the parties'

marks moments apart.  There, the court explained that the survey's *seriatim* presentation failed to reflect marketplace conditions as plaintiff had "offered no data or other evidence to support the proposition that prospective consumers were likely to encounter Kargo's trademark a short time after seeing *Cargo* magazine."  2007 WL 2258688, at \*7.  Despite speculation by plaintiff's expert that "under some circumstances there is this opportunity for people to see the two [marks] in close temporal proximity," the court found it highly doubtful that a non-negligible number of prospective consumers of plaintiff's products would see defendant's magazine "followed a minute or less later," and thus concluded that such a survey methodology was improper to accurately test the likelihood of confusion.  *Id.*  Similarly, in *Simon Prop. Group L.P. v. mySimon, Inc.*, the court excluded plaintiff's survey where its "proposed survey method depart[ed] from and distort[ed] that experience in the marketplace" as it presented respondents with the parties' two home pages together in isolation, when such sites would rarely if ever appear together.  104 F. Supp. 2d 1033, 1044 (S.D. Ind. 2000).

    Here, Dr. Ford similarly distorted the actual consumer experience.  Dr. Ford's unrealistic array of just five T-shirts (four of which were made up) simply does not approximate the marketplace for the parties' T-shirts.  *See id.* (criticizing survey that "removes entirely the confusion one encounters with scores, hundreds, or thousands of responsive websites, and it removes the inevitable need for some effort on the part of the Internet user to sort through the responses . . . The obvious effect of these distortions would be to exaggerate any confusion that might be detected").  In contrast to Dr. Ford's conjured array, an *Eveready* survey would not have altered the marketplace or juxtaposed products that would never be encountered together, but rather would have gauged whether, upon encountering a particular product, respondents were confused.  *Kargo*, 2007 WL 2258688, at \*8; McCarthy § 32:174, at 32-354.

15

Lest there be any doubt that Dr. Ford was more interested in manufacturing confusion than replicating the real marketplace, it is important to note that Dr. Ford admitted that he chose the four specific pairs of THOIP and Disney T-shirts that he tested, not because they were sold in proximity to one another, but because of all the different versions of Plaintiff's shirts these pairs looked the most alike. Bradley Dec., Ex. 8 (Ford I 107:18-108:5). With respect to the pairs of shirts that he tested, Dr. Ford admitted that he did not know whether they had ever been sold in the same store. *Id.*, Ex. 8 (Ford I 31:8-20). With respect to the "Little Miss Disney" shirts, Dr. Ford admitted that he knew that such T-shirts were never sold in the same stores as THOIP's shirts. *Id.* In addition, with respect to the "Miss Disney" shirts, Dr. Ford did not deny that such shirts were sold in separate Disney sections, along with other Disney products. *Id.*, Ex. 8 (Ford I 26:18-27:4). Defendants can only assume that if THOIP had any real evidence that the T-shirts in question were truly sold in proximity to one another, it would have shared such information with Dr. Ford -- and, if Dr. Ford would have wanted to conduct a proper survey, he would have paired the T-shirts accordingly.

**D.    The Ford Survey Did Not Make Use of Hang Tags or Neck Labels on Any of the T-Shirts in the Array**

Although in reality, T-shirts are sold bearing hang tags and neck labels, providing consumers with information as to the source of their origin, the Ford Survey was designed so that such tags and labels were not included on the T-shirts in the array. Simonson Report ¶ 53(d); Pham Report ¶ 50; Bradley Dec., Ex. 8 (Ford I 73:14-21). This is another example of a methodological choice to boost confusion. In reality, certainly all of the Disney T-shirts would include hang tags and neck labels bearing Disney trademarks, and all of the THOIP T-shirts would include tags and labels bearing the trademark of the T-shirts' manufacturer. Pham Report ¶¶ 44, 50, 75; Simonson Report ¶ 31. By not including the tags or labels, the Ford Survey failed

16

to approximate marketplace conditions as respondents were prevented from receiving key information regarding the source of the shirt that otherwise would have been available to them.[8]

Courts have criticized surveys for failing to present respondents with the product at issue in the manner that the consumer would actually encounter it. For example, in *Beverage Marketing USA, Inc. v. South Beach Beverage Corp.*, the Second Circuit affirmed the lower court's finding that removing the labels from the products in the survey was improper. 2002 WL 1162789, *14-15 (2d Cir. June 3, 2002). Similarly, in *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, the court criticized plaintiff's survey for failing to replicate marketplace conditions where the survey did not portray defendant's cosmetics as they typically appeared with signage and packaging identifying Lancome as the source of the products. 2006 WL 1012939, *25 (S.D.N.Y. April 19, 2006). In addition, in *National Distillers*, the court determined that plaintiff's survey was not a reliable indicator of actual confusion where respondents were shown empty bottles of defendant's coolers rather than full bottles, preventing respondents from seeing the unique coloring of each beverage and differentiating it from plaintiff's clear vodka. *Id.* Dr. Ford's failure to include hang tags and neck labels similarly discredits the Ford Survey.

### E. Dr. Ford's Array Was Made Up of Fake T-Shirts That Did Not Exist In Reality

The array constructed by Dr. Ford is further removed from any possible "marketplace reality" as the other T-shirts included in the array never existed in the marketplace. Rather, adding to the completely contrived nature of the survey, Dr. Ford and counsel for Plaintiff designed T-shirts bearing the characters "Dora the Explorer", "Lucy" and "Hello Kitty"

---

[8] As he admitted in his deposition, Dr. Ford has criticized other experts for failing to replicate market conditions. Bradley Dec., Ex. 8 (Ford I 80:14-22). In fact, in one case, Dr. Ford criticized the opposing party's expert for showing survey respondents only the front of a package and not allowing respondents to view the back or sides, which he argued would have provided clues to the consumers that the products were unrelated. *Id.*, Ex. 8 (Ford I 80:23-81:18).

specifically to be used in his confusion survey.  Bradley Dec., Ex. 8 (Ford I 117:12-25).  Such shirts would therefore never have appeared in *any* stores in reality, let alone alongside -- or in proximity to -- the Disney T-shirts.  The completely artificial nature of the Ford Survey thus reveals <u>nothing</u> in terms of actual confusion in the marketplace.

## III.  THE FLAWED DESIGN AND STRUCTURE OF THE FORD SURVEY GAVE RISE TO UNRELIABLE AND MISLEADING RESULTS

Leaving aside the fatal errors surrounding the Ford Survey's failure to approximate market conditions, the Ford Survey suffered from several other critical methodological errors which render it inadmissible.

### A.  The Ford Survey Employed Leading Questions and Suffered From Strong Demand Effects

The results of Dr. Ford's survey reveal that it suffered from leading questions and undeniable demand effects.  "Demand effects" exist where a survey impermissibly creates the "suggestion of an existence of a connection between the products that the respondents would not have made on their own."  *Kargo*, 2007 WL 2258688, at *8.  As explained in *GEICO v. Google, Inc.*, "[a] demand effect results when the interviewer's questions or other elements of the survey design influence participants' responses by suggesting what the 'correct' answers might be or by implying associations that might not otherwise occur to participants."  77 U.S.P.Q.2d 1841, 1847 (E.D. Va. 2005).

Where, as here, Plaintiff's and Defendants' T-shirts are presented back-to-back, followed by questions that asked respondents if they believed the T-shirts were related, such questions are leading, suggesting to respondents that they *should* believe that a connection existed between the companies' marks.  *Kargo*, 2007 WL 2258688, at *9.  Such demand effects are evidenced by the responses to the Ford Survey, revealing rampant guessing among respondents due to the leading nature of the questions.  For example, in Cell 1, 31% of respondents picked the shirt bearing the

name and image of "Dora the Explorer" as being affiliated with the THOIP shirt, 31% picked a shirt bearing the names and image of "Lucy" from Peanuts, 37% of respondents selected a shirt bearing just an image of "Hello Kitty" (without any words), and 32% of respondents selected a shirt bearing an image of "Minnie Mouse" (with no words at all).  Simonson Report, Ex. D. Such results would suggest that respondents were "confused" with respect to all of these shirts. This is completely illogical, however, as the shirts did not share any similarities with the THOIP T-shirt, aside from the fact that they contained a cartoon character that looked nothing like the THOIP character.  What these numbers do reveal, however, is that rather than communicating any degree of alleged "confusion" through their answers, the survey's strong demand effects caused respondents to simply guess.  A properly conducted consumer confusion survey, however, is one that is designed to discourage guessing.  *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 255 (S.D.N.Y. 1999) (criticizing survey that was "designed to exacerbate confusion by encouraging participants to guess"); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 575 (E.D.N.Y. 1999) (surveys flawed for not discouraging guessing).

As noted by Dr. Simonson, such an anomalous result is similar to the *Kargo* case where 80% of the survey's control group indicated that they believed there was a connection between the control and plaintiff's product, regardless of the fact that the control was clearly not similar and not infringing.  Simonson Report ¶ 41; Bradley Dec., Ex. 9 (Ford II 131:9-25).  The court stated that, "The only plausible explanation for this statistic, which [plaintiff's expert] Jacoby did not include in his report, is that the Jacoby Survey was designed (successfully) to lead its respondents to infer that a connection existed between the parties' products."  *Kargo*, 2007 WL 2258688, at *9.  Moreover, the *Kargo* court specifically explained that such demand effects were the result of the survey's "back-to-back presentation of the parties' marks, followed by questions

19

that asked respondents if they believed the marks were related," which "suggested to respondents that they *should* believe that a connection existed between the companies' marks." *Id.* As in *Kargo*, here the overwhelming selection of completely unrelated shirts by respondents in the Ford Survey demonstrates that the survey's similar back-to-back structure and leading questions influenced respondents to improperly believe that connections existed between the products.

A further look at the responses also confirms rampant guessing as opposed to any true "confusion" between THOIP's and Disney T-shirts. The results in each of the four test cells show that, rather than solely identifying the allegedly infringing Disney T-shirt as being connected to the THOIP shirt, as one would expect if there was truly a likelihood of confusion to support Plaintiff's claim, respondents frequently selected other wholly unrelated shirts in the array as well. For example, in Cell 1, 49% of those respondents that Dr. Ford counted as "confused" also selected at least one other T-shirt in the array. Bradley Dec. ¶ 4. In Cell 3, 34% of those counted as "confused" also selected at least one other shirt. In Cell 5, that percentage rose to 52% and in Cell 7, 55% of those "confused" respondents also selected at least one other T-shirt in the array. *Id.* In fact, many of those respondents whom Dr. Ford classified as "confused" selected *all* of the T-shirts in the array as coming from the same source. *Id.* ¶ 5. For example, in Cell 1, 29% of the "confused" respondents selected all five shirts in the array as being affiliated with the THOIP T-shirt. *Id.* In Cell 3, that figure was 13%, for Cell 5, it was 24% and for Cell 7, it was 18%. *Id.* But Dr. Ford did not disclose these results in his report, nor did he use them to discount his rate of confusion findings, despite the fact that they clearly indicate that consumers did not distinguish between the shirts.

These results are remarkable given the fact that Dr. Ford populated the array with other Filler Shirts that looked nothing like either the THOIP shirt or the Disney shirt, encouraging

respondents to "match" the THOIP T-shirt with the Disney T-shirt. The only commonality between the products in the array was the fact that they were all T-shirts bearing images of cartoon characters. Two of those shirts -- "Hello Kitty" and "Minnie Mouse" -- contained no words whatsoever. The other two T-shirts -- "Dora the Explorer" and "Lucy" -- contained only the names of the characters. Thus, the Ford Survey improperly created a situation where the Disney T-shirt "stood out like a bearded man in a lineup with four clean-shaven men." *Sunbeam Corp. v. Equity Industries Corp.*, 635 F. Supp. 625, 634 (E.D. Va. 1986); *see also Oddzon Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1408 (Fed. Cir. 1997) ("The mistaken association of two footballs with tails and fins in a line-up composed of three additional balls that lacked these essential features is not probative of trade dress infringement."). This is particularly true as, contrary to what Dr. Wind admitted was normal practice, Dr. Ford did not rotate any of the shirts in his array, but rather placed the allegedly infringing Disney shirt in the center of the array, right in front of where the respondent was directed to stand, as shown on Dr. Ford's survey diagram.[9] Bradley Dec. Exs. 8, 11 (Ford I 92:15-21); (Wind 225:3-226:10).

**B.    The Results Indicate That the Ford Survey Functioned as a Matching Game**

It also is clear from the results that what the respondents matched was not the mark at issue in this case -- Little Miss in big, bold letters with an adjective and a character on a T-shirt -- but the specific descriptive term on the THOIP T-shirt, such as "Chatterbox" or "Bossy". For example, the Disney "Little Miss Bossy" T-shirt with an image of Daisy Duck had a purported confusion rate of 27.5% (when compared to the THOIP "Little Miss Bossy" T-shirt), whereas the Disney "Little Miss Perfect" T-shirt bearing an image of Minnie Mouse had a purported

---

[9] While the so-called control shirts were also placed in the middle of the array, as discussed below, Dr. Ford's control was inadequate as he subtracted nothing from his "confusion" results, despite obvious guessing.

confusion rate of only 14.6% (when compared to the THOIP "Little Miss Splendid" T-shirt).

These results are significant as they show that the Ford Survey effectively functioned as a matching game, where respondents were matching the specific descriptive terms on the shirts. Surveys that are essentially matching games do not serve as an indicator of actual confusion. *Franklin Resources Inc. v. Franklin Credit Mgt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) ("Surveys which do nothing more than demonstrate the respondents' ability to read are not always probative on the issue of likelihood of confusion.").[10]

As the Ford Survey was designed to encourage respondents to match specific descriptive terms which are not a part of THOIP's alleged mark as Plaintiff has defined it, Dr. Ford's "confusion" rates lack probative value as THOIP is not claiming exclusive rights to such descriptive terms.  In other words, THOIP could have brought a case claiming that it had rights in the phrase "Little Miss Chatterbox", for example, but instead THOIP chose to frame its mark more abstractly, presumably because it knew that most of the Disney shirts used different descriptive terms than THOIP.  The obvious matching of specific descriptive terms not part of the Plaintiff's alleged mark further undermines the reliability of Dr. Ford's survey.[11]

---

[10] Only two of the eight Disney shirts at issue make use of the same descriptive term as does THOIP -- "Bossy" and "Chatterbox".  The Ford Survey findings thus cannot be generally applied to the other four Disney shirts which Dr. Ford did not test -- Little Miss Sassy, Little Miss Wicked, Miss Attitude and Miss Adorable -- as such T-shirts each bear distinct descriptive terms which THOIP does not make use of and which could return disparate results.

[11] Similarly, the verbatims of those Dr. Ford counted as confused in Cell 3, testing THOIP's "Little Miss Chatterbox" against Disney's "Miss Chatterbox", reveal that respondents frequently said that they believed there was an association between the shirts because both the THOIP and Disney shirt contained an image of a character holding a telephone.  The image of the character, however, whatever it might be holding, is not part of the mark that Plaintiff chose to litigate. Ford Report, Table 2.

### C.     The Ford Survey Had No Control

Contrary to proper procedure for conducting a reliable survey, Dr. Ford's survey effectively did not have a control.  *Cumberland Packing Corp.*, 32 F. Supp. 2d at 574-75 ("In a test of a causal proposition the appropriate use of controls is crucial.").  "Proper controls will approximate 'background noise,' the amount of confusion existing due to reasons unrelated to similarities" between the marks at issue.  *Id*.  In designing a control, "the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." Shari Seidman Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 258 (Federal Judicial Center 2000); *see also GEICO*, 77 U.S.P.Q.2d at 1846 (stating that, "an effective control should have removed from the page viewed by the test group the allegedly infringing elements for which GEICO wanted to measure confusion . . . while keeping other elements as constant as possible."); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 280 (S.D.N.Y. 2006) (finding that control was too different to serve as proper control).

The Ford Survey failed to include a proper control.  Here, Dr. Ford's purported control was a T-shirt depicting a Disney character without any words.  First, as noted above, a good control is one that changes the allegedly infringing product as little as possible.  Dr. Ford's purported control, however, did not closely mirror the Disney T-shirt as it contained no words at all and was simply a T-shirt bearing a Disney character, making it unlikely that someone would select it.

Second, even assuming, *arguendo*, that such a shirt could serve as an adequate control, Dr. Ford's methodology ensured that in practice his "control" would not account for any "background noise."  *See Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y.

1999).  As Dr. Ford only counted as confused those respondents who made some reference to the words or the style of the lettering on the shirt, as described above, it was therefore impossible under Dr. Ford's methodology for someone to have selected the control shirt in a way that Dr. Ford would have counted as relevant.  Ford Report ¶ 53; Bradley Dec., Ex. 9 (Ford II 181:4-16).  Thus, none of the "control" respondents were classified as confused and nothing was subtracted from Dr. Ford's "confusion" results.  In other words, despite obvious rampant guessing throughout the survey, Dr. Ford subtracted absolutely nothing from his claimed confusion findings.  *Id*.

It should not be overlooked that in an attempt to validate the Ford Survey, Dr. Wind stated in his report that Dr. Ford's confusion results were significant as they were "net" numbers after the control had been subtracted.  Wind Report ¶ 18(a).  Dr. Wind, however, admitted in his deposition that he failed to catch the fact that Dr. Ford actually had not subtracted anything from his confusion results and agreed with Dr. Simonson that the control used was ineffective.  Bradley Dec., Ex. 11 (Wind 213:3-214:12; 215:22-216:4).

Having been similarly criticized in *GEICO v. Google, Inc.* for conducting a survey using an improper control, here Dr. Ford once again employed a method that essentially ensured that his control cells would not lower with his manufactured confusion rate.  77 U.S.P.Q.2d at 1846-47.  The lack of an adequate control alone, especially given obvious evidence of widespread guessing brought on by the demand effects of the survey, is in and of itself sufficient grounds to exclude the Ford Survey.  *See Simon Property Group L.P.*, 104 F. Supp. 2d at 1045 (finding that, "the absence of adequate controls to test for legally relevant confusion provides another independent reason for excluding" survey).

## <u>CONCLUSION</u>

Despite all of the steps that Dr. Ford took to skew the survey results in favor of confusion, two cells of the survey resulted in confusion rates of less than 28%, while the other two cells resulted in even lower confusion rates of less than 15%. Such low confusion results only reinforce the conclusion, as determined by Defendants' expert, Dr. Helfgott, who performed a proper *Eveready* survey returning a confusion rate of .008%, that there is no actual confusion between the THOIP T-shirts and the Disney T-shirts at issue in this case. *Conopco, Inc.*, 49 F. Supp. 2d at 255 ("Despite employing a methodology blatantly designed to skew the survey's results in favor of confusion, the resulting confusion rate was only 24 percent. Such a confusion rate is relatively low for such a flawed survey."). The Ford Survey would therefore serve only to mislead the jury and impermissibly prejudice Defendants and thus should be excluded under Rules 702 and 403.

Date: October 23, 2009                      Respectfully submitted,

     *s/ Dale M. Cendali*
Dale M. Cendali
Melanie Bradley
Courtney Schneider
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: 212-446-4800
Fax: 212-446-4900

ATTORNEYS FOR DEFENDANTS