Paul M. Fakler (PF-0249)
Martin Schwimmer (MS-7011)
Kandis Koustenis (KK-4213)
Amanda J. Schaffer (AS-2004)
MOSES & SINGER LLP
405 Lexington Avenue
New York, New York 10174-1299
Tel.: 212-554-7800
Fax: 212-554-7700
pfakler@mosessinger.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                                      :

THOIP (A Chorion Limited Company),         :
                                                      :

                   Plaintiff,     :     08 Civ. 6823 (SAS)
                                                   :        ECF Case

     - against -                     :

                                                     :

THE WALT DISNEY COMPANY, DISNEY    :
CONSUMER PRODUCTS, INC. and       :
DISNEY DESTINATIONS, LLC,         :

                                                     :

               Defendants.     :
----------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE**
**THE PROPOSED EXPERT TESTIMONY OF DR. MYRON J. HELFGOTT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL HISTORY ...................................................................................... 2

ARGUMENT ........................................................................................................... 3

I.  APPLICABLE LEGAL STANDARD ............................................................. 3

II.  DR. HELFGOTT'S SURVEY IS UNRELIABLE AND LIKELY TO MISLEAD THE JURY ..................................................................................................... 5

    A.  Dr. Helfgott's Survey Did Not Replicate Marketplace Conditions ..................... 6

    B.  Dr. Helfgott's Survey Asked Questions Designed To Avoid Discovery Of Confusion ................................................................................................ 11

    C.  Additional Biases In Dr. Helfgott's Questions, Methodology And Analysis Render His Survey Unreliable ...................................................................... 15

    D.  Dr. Wind's Replication Study Illustrates Flaws In Dr. Helfgott's Survey .......... 17

III.  DR. HELFGOTT'S TESTIMONY IS ADDITIONALLY EXCLUDABLE BECAUSE HE DESTROYED EVIDENCE ................................................... 18

CONCLUSION ...................................................................................................... 20

## Table of Authorities

### FEDERAL CASES

*Am. Footwear Corp. v. Gen. Footwear Co.*,
    609 F.2d 655 (2d Cir. 1979) ............................................... 9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ............................................... 4

*Campbell v. McMillin*,
    83 F. Supp. 2d 761 (S.D. Miss. 2000) ............................... 19

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*,
    830 F.2d 1217 (2d Cir. 1987) ............................................ 11

*Daubert v. Merrell Dow Pharms Inc.*,
    509 U.S. 579 (1993) ........................................................... 3

*Fleming v. City of New York*,
    No. 01-8885, 2007 WL 4302501 (S.D.N.Y. Dec. 7, 2007) ........... 19

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................... 4, 5, 10, 16

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*,
    Nos. 02-3691, 03-707, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) .............. 4

*Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*,
    724 F.2d 357 (2d Cir. 1983) ............................................ 6, 7

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
    317 F.3d 209 (2d Cir. 2003) ............................................... 9

*Patsy's Italian Rest., Inc. v. Banas*,
    531 F. Supp. 2d 483 (E.D.N.Y. 2008) ............................... 4

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
    970 F. Supp. 279 (S.D.N.Y. 1997) .................................... 10

*Star Indus., Inc. v. Bacardi & Co.*,
    No. 02-4239, 2003 WL 23109750 (S.D.N.Y. Dec. 31, 2003) ......... 9

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 286 (2d Cir. 1999) ........................................... 4, 5

*Storck USA, L.P. v. Farley Candy Co.,*
    797 F. Supp. 1399 (N.D. Ill. 1992) ................................................................ 10

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,*
    559 F. Supp. 1189 (E.D.N.Y. 1983) ............................................................ 17

*Troublé v. Wet Seal, Inc.,*
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) ........................................................... 6

*Union Carbide Corp. v. Ever-Ready, Inc.,*
    531 F.2d 366 (7th Cir. 1976) ................................................................. 12, 13

*Vista Food Exch., Inc. v. Vistar Corp.,*
    No. 03-5203, 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005) ......................... 16

*WE Media Inc. v. Gen. Elec. Co.,*
    218 F. Supp. 2d 463 (S.D.N.Y. 2002) ........................................................... 6

## FEDERAL STATUTES

Fed. R. Civ. P. 26(a)(2)(B)(ii) ............................................................................ 19

Fed. R. Civ. P. 37(c)(1) ..................................................................................... 19

Fed. R. Evid. 403 ........................................................................................ 3, 4, 5

Fed. R. Evid. 702 ........................................................................................ 3, 4, 5

## SECONDARY AUTHORITIES

Itamar Simonson, *The Effect of Surviving Method on Likelihood on Confusion Estimates:*
    *Conceptual Analysis and Empirical Test,* 83 Trademark Rep. 364 (1993) .................... 11

6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION
    (4th ed. 2008) ..................................................................................... 6, 7

Plaintiff THOIP (A Chorion Limited Company) ("THOIP"), respectfully submits this memorandum of law in support of its motion in limine to exclude the testimony of Defendants' expert Dr. Myron J. Helfgott.

<u>**PRELIMINARY STATEMENT**</u>

Dr. Helfgott's testimony is neither reliable nor sufficiently probative to assist the jury and must be excluded. Perhaps the single most important requirement for a valid likelihood of confusion survey is that the survey design must adequately replicate the actual marketplace conditions in which consumers encounter the parties' products. Dr. Helfgott's survey failed to meet this fundamental requirement.

Dr. Helfgott conducted his survey using an unusual variation of the monadic "Eveready" format, which only exposed respondents to Defendants' infringing T-shirts and then asked them to identify the name of the company who "put out" or authorized the shirt. Even the standard version of the Eveready survey design is inappropriate, however, to test confusion where (as in this case) the parties sell the same type of goods and consumers are likely to encounter both products in the marketplace. Only a properly designed sequential line-up survey, exposing respondents to both parties' products, is appropriate to assess confusion in such instances. Even Disney's expert, Dr. Simonson, agrees that when the parties are selling the same type of product and those products are sold in the same stores or otherwise are likely to be encountered by consumers in close shopping proximity to one another, the Eveready design is inappropriate and a sequential line-up design must be used. In this case, it is undisputed that the parties' T-shirts were sold in the same stores and in stores within close shopping proximity to one another. Because Dr. Helfgott's survey used the wrong design, which does not adequately reflect true marketplace conditions, that survey is unreliable and unduly prejudicial.

The unreliability of Dr. Helfgott's testimony is amplified by his unusual deviation from the standard Eveready design, which could only have been done to eliminate any possibility of detecting actionable confusion, as well as various biases in his questions, methodology and analysis of the survey results.  Further, Dr. Helfgott admittedly destroyed and did not produce important documents that he relied upon in preparing his report.  Accordingly, the testimony of Dr. Helfgott should be excluded.  Even if each of these serious flaws, taken alone, were insufficient to justify exclusion, their cumulative weight is such that any limited probative value of Dr. Helfgott's survey is far outweighed by its potential for undue prejudice.

## PROCEDURAL HISTORY

On  July 22, 2009, Defendants served the expert report of Dr. Myron J. Helfgott entitled "The Results Of A Likelihood Of Confusion Survey Concerning Disney T-Shirts" ("Helfgott Report").[1]  The Helfgott Report describes the methodology and findings of a consumer confusion survey designed by Dr. Helfgott, which utilized four Disney T-shirts and four control shirts. (Helfgott Report Summary, p.4).  Dr. Helfgott's survey was conducted by Suburban Marketing Research ("Suburban").  Dr. Helfgott's survey utilized a monadic design, also known as an "Eveready" design.  The survey only exposed respondents to Defendants' infringing T-shirts and required them to identify the name of the company who put out or authorized the T-shirts, to support Dr. Helfgott's conclusion that there is no likelihood of confusion between the THOIP marks and the Disney T-shirts. (Helfgott Report pp. 9, 11, 15; Helfgott Tr. 29:15-23).

On August 13, 2009 Plaintiff served the rebuttal expert report of Dr. Yoram (Jerry) Wind entitled "Rebuttal Report of Yoram (Jerry) Wind Evaluating Dr. Myron J. Helfgott's July 2009

---

[1] A copy of the Helfgott Report is attached as Exhibit 1 to the declaration of Martin Schwimmer ("Schwimmer Decl.").

Likelihood of Confusion Survey Concerning Disney T-shirts." ("Wind Report").[2]  As part of his

rebuttal analysis, Dr. Wind designed a replication study that empirically demonstrated certain of

the major flaws of Dr. Helfgott's survey (the "Replication Study").  (Wind Report ¶¶4, 6).  The

Replication Study copied Dr. Helfgott's design, but substituted a new test stimulus – a T-shirt

that combined one of the famous Disney characters, Mickey Mouse, with another famous

children's character, Clifford the Big Red Dog ("Clifford"). (Wind Report ¶4).

THOIP deposed Dr. Helfgott on September 9, 2009.[3]

## ARGUMENT

## I.  APPLICABLE LEGAL STANDARD

Expert testimony must be excluded if (i) it is unreliable (pursuant to Fed. R. Evid. 702),

or (ii) its relevance is outweighed by its unduly prejudicial effect on the jury (pursuant to Fed. R.

Evid. 403).  The reliability requirement for expert testimony is governed by Fed. R. Evid. 702,

which provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

The proponent of the expert testimony must prove by a preponderance of the evidence that it is

reliable.  *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 590 (1993).

An expert's opinion "often carries special weight with the jury even when unwarranted,"

and the Supreme Court has "directed district courts to ensure that any and all scientific testimony

---

[2] A copy of the Wind Report is attached as Exhibit 1 to the declaration of Dr. Wind ("Wind Decl.").
[3] Referenced portions of Dr. Helfgott's deposition testimony are attached to the Schwimmer Decl. as Exhibit 2 and are hereinafter referred to as "Helfgott Tr."

3

or evidence admitted is not only relevant, but reliable." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (internal citations omitted).  This potential for unwarranted influence on the jury is particularly acute in trademark cases, requiring strict oversight and gatekeeping by the Court: "In cases arising under the Lanham Act, the Court's gatekeeper function is of heightened importance … and courts have been advised to carefully scrutinize survey evidence particularly where a jury rather than a bench trial is contemplated." *Id*.

Where a purported expert has failed to meet the requirements of Rule 702, courts have not hesitated to exclude the expert's testimony at trial.  *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296-97 (2d Cir. 1999) (holding District Court did not err in excluding confusion survey evidence); *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, Nos. 02-3691, 03-707, 2004 WL 326708, at *7-10 (S.D.N.Y. Feb. 23, 2004) (excluding confusion survey pursuant to Rules 403 and 702 of the Federal Rules of Evidence).  *Accord Amorgianos v. Nat'l R.R.  Passenger Corp.*, 303 F.3d 256, 265-70 (2d Cir. 2002) (holding district court did not abuse its discretion in granting Daubert motion); *Patsy's Italian Rest., Inc. v. Banas*, 531 F. Supp. 2d 483, 485-86 (E.D.N.Y. 2008) (excluding expert testimony, in part because expert's methodology for determining likelihood of confusion was "suspect").

Fed. R. Evid. 403 provides another check on the admissibility of expert testimony.  Even if marginally admissible under the Rule 702 standard, Rule 403 states that relevant evidence "'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'  'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more

control over experts than over lay witnesses.'" *Malletier,* 525 F. Supp. 2d at 566 (internal

citations omitted).

If a survey's flaws are very significant, either individually or cumulatively, the survey

should be excluded because any marginal relevance is outweighed by the potential for unduly

prejudicial effect on the jury. *Id.* at 563. "'[T]here will be occasions when the proffered survey

is so flawed as to be completely unhelpful to the trier of fact . . . .' and 'its probative value is

substantially outweighed by its prejudicial effect.'" *Id.* (internal citations omitted).

> [T]he Second Circuit Court of Appeals and the lower courts within
> this Circuit provide support for the exclusion of survey evidence
> primarily under Rule 403 but also under Rule 702 where flaws are
> deemed to cumulatively undermine its relevance and reliability.
> *See, e.g., Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 296-98 (2d
> Cir. 1999) (affirming district court's exclusion of survey as
> irrelevant in trademark infringement case where survey did not test
> for or demonstrate likelihood of confusion and any probative value
> was outweighed by prejudicial effect).

*Malletier,* 525 F. Supp. 2d at 563-64 and n.21 (other citations omitted).

## II.   DR. HELFGOTT'S SURVEY IS UNRELIABLE AND LIKELY TO MISLEAD THE JURY

To assess the admissibility of survey evidence, the Court should consider whether a

survey approximates marketplace conditions and whether:

> (1) the proper universe was examined and the representative
> sample was drawn from that universe; (2) the survey's
> methodology and execution were in accordance with generally
> accepted standards of objective procedure and statistics in the field
> of such surveys; (3) the questions were leading or suggestive; (4)
> the data gathered were accurately reported; and (5) persons
> conducting the survey were recognized experts.

*Malletier,* 525 F. Supp. 2d at 580 (internal citations omitted).

Dr. Helfgott's Eveready survey failed to replicate true marketplace conditions.

Moreover, even if a monadic design had been appropriate in this case (it was not), Dr. Helfgott

modified the standard Eveready format by omitting the only questions that could have detected confusion in a case such as this, where consumers are not aware of the plaintiff's corporate name.  Dr. Helfgott's survey was also infected with various other biases and defects which, taken cumulatively, render his testimony wholly unreliable.  Any slight probative value is strongly outweighed by the potential for unduly prejudicial impact.

### A.    Dr. Helfgott's Survey Did Not Replicate Marketplace Conditions

Perhaps the single most important requirement for an admissible consumer confusion research study is that the survey design adequately replicates the actual marketplace conditions under which consumers would encounter the parties' products.  Disney's own experts testified that replication of marketplace conditions is a fundamental necessity for a valid survey.  (Helfgott Tr. 52:24-53:7; Simonson Tr. 58:17-23, 96:2-4).[4]  Commentators and the courts agree. The leading trademark treatise, McCarthy on Trademarks and Unfair Competition, states that "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:163 at 32-333 (4th ed. 2008).  *See also WE Media Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) ("[g]ermane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions") (internal citations omitted); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) ("a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions") (internal citations omitted); *Mattel, Inc. v. Azrak-Hamway Int'l., Inc.*, 724 F.2d 357, 361 (2d Cir. 1983)

---

[4] Referenced portions of the deposition testimony of Defendants' expert Dr. Itamar Simonson are attached to the Schwimmer Decl. as Exhibit 3 and are hereinafter referred to as "Simonson Tr."

(noting consumer confusion is often shown by "some form of survey of consumer attitudes under actual market conditions").

Dr. Helfgott's Eveready design is inappropriate for the specific marketplace conditions of this case. (Wind Report ¶7). The two most commonly accepted designs used for likelihood of confusion surveys are the monadic "Eveready" design and the sequential line-up design. Each design has its own strengths and flaws and each is therefore appropriate in certain instances and not in others. In an Eveready survey, respondents are only shown the defendant's allegedly infringing product, and then typically asked to identify the source of the product. MCCARTHY, *supra*, § 32:174 at 32-368. In the sequential array format, respondents are first shown the plaintiff's product, then asked a series of unrelated questions to clear short term memory, then moved to a different room to replicate an extended shopping experience and shown a line-up consisting of the defendant's product and several non-infringing products of the same type. The respondents are then asked to select which, if any, of the products in the line-up are put out by or associated with the same company that put out the product displayed in the first room. *Id.* § 32:177 at 32-377-78.

Both of Disney's survey experts have used both the Eveready and sequential array designs, selecting one over the other primarily based upon which design more accurately replicates marketplace conditions. (Simonson Tr. 96:2-4; Helfgott Tr. 39:5-42:4). The key determinant of whether the Eveready design or the sequential line-up design is appropriate is whether consumers are likely to encounter both parties' products in the marketplace. Indeed, Disney's own expert, Dr. Simonson, testified that if the parties are selling the same type of goods in some of the same stores, an array format should be used and an Eveready format "would not be justified." (Simonson Tr. 86:2-18). Dr. Simonson admitted that the "key questions" to ask

when deciding what type of survey format to use are "how are [goods] sold, where are they sold, [and] is there significant overlap between the two?" (Simonson Tr. 94:4-95:3). Dr. Simonson also stated that "marketplace conditions is [sic] the most important criterion for selecting the survey method." (Simonson Tr. 96:2-4).

The real world shopping environment in this case is one in which both products (the Disney and THOIP T-shirts) are displayed in close shopping proximity. (Wind Report ¶7). Disney shirts featuring "Miss" plus a character attribute (the "Miss Disney Shirts") were sold in a number of stores also selling the THOIP licensed "Little Miss" shirts (the "THOIP Shirts"). (Schwimmer Decl. ¶11; Millard Decl. ¶3; Wind Report ¶7). When Disney shirts and THOIP Shirts are sold in the same store they are sometimes sold right next to one another. (Schwimmer Decl. ¶12; Millard Decl. ¶¶4-6).



Indeed, Disney shirts are frequently displayed alongside non-Disney character T-shirts at retail. (Schwimmer Decl. ¶12; Millard Decl. ¶¶4-6; Moore Decl. ¶¶5-10).

Disney shirts featuring "Little Miss" plus a character attribute (the "Little Miss Disney Shirts") and the THOIP Shirts were sold within the same Disney theme parks. (Schwimmer Decl. ¶¶8-9; Millard Decl. ¶9). The Little Miss Disney Shirts were also sold at the New York World

of Disney store, which is within close walking distance to several stores selling the THOIP

Shirts.  (Millard Decl. ¶8; Schwimmer Decl. ¶¶8, 10).  Consequently, it was very likely that

consumers shopping for T-shirts would encounter the THOIP T-shirts and Disney T-shirts in the

same shopping trip.  *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 218 (2d Cir. 2003)

(finding it likely that consumers shopping for gourmet sauce would encounter both parties'

products in the marketplace, even though defendant only sold its sauce in its own branded

restaurants, because those restaurants were in the same geographic area as stores selling

plaintiff's sauce).  The sequential array format, which simulates a shopping trip or trips in which

both products are encountered (though not necessarily at the same time), very closely replicates

the real marketplace environment in which consumers encountered the THOIP and Disney T-

shirts.

 Dr. Helfgott's survey did not simulate real-world shopping conditions in any way and

bore little resemblance to how consumers are exposed to the THOIP and Disney shirts in the

marketplace, as required by proper survey methodology.  *See, e.g., Am. Footwear Corp. v. Gen.

Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (affirming district court's rejection of survey

evidence, stating that "the critical defect in [the] survey was the failure to conduct it under actual

marketing conditions").  Survey participants never saw samples or even images of THOIP's

shirts, despite the fact that both parties' shirts are sold in the same and/or proximate locations.

(Wind Report, ¶7).  Dr. Helfgott's survey did not test for situations where consumers see both

parties' shirts in the same or nearby stores as part of a single shopping experience.  When the

parties' products are encountered together in the marketplace, the monadic Eveready design used

by Dr. Helfgott may greatly underestimate the likelihood of consumer confusion.  *See Star

Indus., Inc. v. Bacardi & Co.*, No. 02-4239, 2003 WL 23109750, at *4 (S.D.N.Y. Dec. 31, 2003)

(holding that defendant's Eveready survey was flawed and not compelling when only

defendant's product and not plaintiff's product were shown to survey participants), *aff'd*, 412

F.3d 373 (2d Cir. 2005); *Simon & Schuster, Inc. v. Dove Audio, Inc*., 970 F. Supp. 279, 291

(S.D.N.Y. 1997) (consumer survey evidence had only very limited probative value in

determining actual confusion because survey measured "top-of-mind" awareness and may have

significantly underestimated likelihood of confusion).

Only a sequential line-up survey, also known as an array format, exposing respondents to

both parties' products, adequately replicates the true marketplace conditions and is appropriate to

assess confusion in this case.  (Wind Report ¶7).  *Malletier v. Dooney & Bourke, Inc*., 525 F.

Supp. 2d 558, 574 and n.120 (S.D.N.Y. 2007) (excluding survey for, *inter alia*, failing to employ

a "methodology involving sequential presentation or 'line-up' of stimuli which better

approximates marketplace conditions") ("The use of the 'Eveready' method of presentation -- at

least its exclusive use -- diminishes the reliability and probative value of the survey and

correspondingly raises the risk of jury confusion and prejudice."); *see also Storck USA, L.P. v.

Farley Candy Co*., 797 F. Supp. 1399, 1409 (N.D. Ill. 1992) (an array survey provided evidence

of confusion when the products at issue were both candy and were sold in the same or similar

retailers).  In fact, both Dr. Helfgott and Dr. Simonson have previously used an array format to

assess likelihood of confusion in situations where the marketplace conditions resembled the

conditions in this case.  (Helfgott Tr.  40:16-42:10, 44:2-46:21; Simonson Tr. 106:25-112:20,

119:17-120:23).

Despite his belief that an array survey is appropriate when consumers see products near

one another at the point of sale, Dr. Helfgott did not bother to investigate how THOIP's and

Disney's products were displayed in the marketplace before he designed his survey.  (Helfgott

Tr. 41:24-42:4, 48:10-14, 50:18-24).  Indeed, he did not even consider the actual marketplace conditions for the THOIP Shirts and Disney Shirts in determining to use an Eveready format instead of an array format.  (Helfgott Tr. 51:20-53:15).

Accordingly, given the marketplace conditions in this case, the use of an Eveready format was inappropriate and Dr. Helfgott's survey results are unreliable.

### B.    Dr. Helfgott's Survey Asked Questions Designed To Avoid Discovery Of Confusion

In addition to the incompatibility with marketplace conditions discussed above, the fact that consumers do not typically know THOIP's corporate name also renders use of an Eveready survey unreliable.  (Wind Report ¶9).  THOIP's branding and marketing strategy has been to focus on and promote the Mr. Men and Little Miss family of characters as a brand, and not to identify its licensed goods with a corporate name as the source of origin.  *Id.*  Trademark law protects this kind of brand association, where consumers associate goods bearing the mark with a common, even if anonymous, source.  *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1221-2 (2d Cir. 1987). The Eveready format is ill equipped to test for such confusion, because it directs respondents to specifically name the company that owns the trademark.  Dr. Simonson himself has acknowledged that an Eveready format is "less likely to reveal confusion if respondents ... do not know the name…of the company that puts out the senior mark."  *See* Itamar Simonson, "*The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test*," 83 Trademark Rep. 364, 369 (1993).

After displaying one of Disney's accused T-shirts, Dr. Helfgott's survey only asked the following questions about source and affiliation (followed by a "why" question if someone gave a company name):

(1)     "What company do you think puts out this T-shirt, or don't you know?"

(2)     "Do you think the company that puts out this T-shirt puts it out themselves, or in association with some other company, or don't you know?  What other company would that be?"

(3)     "Do you think the company that puts out this T-shirt got permission from some other company, or did not get permission form some other company, or don't you know?  What other company would that be?"

All three of these questions ask the respondent to answer with a company name.  It is undisputed, however, that consumers are not significantly aware of THOIP's company name or that of its corporate parent, Chorion.  Consequently, Dr. Helfgott's survey could not possibly (other than accidentally) uncover any potential confusion of consumers who are familiar with THOIP's products and the Mr. Men and Little Miss family of character marks, but not the company name THOIP.

As noted above, the standard Eveready format inherently minimizes confusion results in situations where consumers are unaware of the trademark owner's corporate name.  Dr. Helfgott made this inherent flaw even worse, indeed fatal, by deviating from the standard Eveready format in a way calculated to destroy any real possibility of accurately measuring confusion.  In the standard Eveready survey format, a second question is asked after each of the three confusion questions, which allows the respondent to potentially demonstrate confusion even if he or she does not know the senior user's corporate name.  For example, in the seminal case from which the Eveready format takes its name, *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), after being asked who put out the defendant's product in that case, respondents were asked, "Please name any other products put out by the same concern which puts out the [product] shown here."  *Id.* at 385.  The purpose of that question in the Eveready format is to allow some way for respondents to demonstrate true confusion even if they do not know the plaintiff's

company name.  (Simonson Tr. 72:14-73:19).  Indeed, by including this question in the survey in *Union Carbide*, the percentage of people who were counted as confused rose from .6% (percentage of people who said that Union Carbide put out the product at issue) to 54.6% (percentage of people who did not know what company put the product out but merely listed other products made by Union Carbide).  *Union Carbide Corp.*, 531 F.2d at 385.

Dr. Helfgott deleted this crucial question, which might have uncovered confusion in this case because, much like Union Carbide, THOIP does not market its corporate name to consumers.  Although Dr. Helfgott acknowledged that "[consumers] can be confused even if they don't know the company that owns the mark," he did not include any survey questions to capture this confusion.  (Helfgott Tr. 92:23-93:5).  The "other products" question from the standard Eveready format at first glance appears to resemble question #15 from Dr. Helfgott's survey; however, upon closer inspection Dr. Helfgott's question is very different.

As noted above, the Eveready "other products" question allows people who are not familiar with a company name to still demonstrate confusion if they can name other products that they associate with the plaintiff trademark owner.  The question only serves its purpose where a respondent does not know the plaintiff's company name.  Turning the purpose of the "other products" question on its head, question #15 in Dr. Helfgott's survey was never asked unless the respondent had already given a specific company name in response to one of the confusion questions.  Such a respondent was then asked, at the very end of the survey, "In this interview, you have mentioned one or more company names in response to my questioning.  I will read these names to you one at a time.  For each one, please tell me all of the products, that you know of, which this company puts out."  Dr. Helfgott admits that the sole purpose of this question was not to detect confusion missed by the company name questions (the purpose in the standard

Eveready design), but rather to *exclude* confusion responses by respondents who had given a company name.  Dr. Helfgott used question #15 solely to eliminate any results where respondents "fought" the wording of the company name questions and gave "Little Miss" or "Miss" (which of course are not company names) as an answer if the respondents could not accurately name other products licensed by THOIP.  (Helfgott Tr. 103:5-106:14).  The improper effect of this question would be to artificially lower the number of respondents who were counted as confused, because if respondents could not think of any products other than T-shirts, they would not be counted as confused.  There is simply no basis for this flawed question, which creates a double hurdle for respondents to be considered confused.

Further departing from the standard Eveready format, Dr. Helfgott's questions asked respondents to give the name of only one company in response to the questions and didn't allow respondents to list multiple companies.  Dr. Helfgott's focus on a single company, coupled with the presence of the famous Disney character on the T-shirt and the fame of the Disney company name, was calculated to elicit the natural top-of-mind response of "Disney."  Because "Disney" as a company name is famous and "THOIP" is relatively unknown, there is an extremely low chance that consumers would have answered "THOIP" in response to any of Dr. Helfgott's questions.  Given the power of the Disney company name, it is not surprising that the respondents were led by the question to focus only on the first company that came to mind – Disney.  (Wind Report ¶9).  This "Disney effect," where the fame of the Disney characters and company name overwhelm any other brand in a co-branding context and which is aggravated by the modified Eveready format used by Dr. Helfgott, is further demonstrated by the Replication Study designed by Dr. Wind and discussed below.

In sum, the improper wording of Dr. Helfgott's survey questions, including his improper variations from the standard Eveready format, further undermine the reliability of his results and warrant exclusion of his testimony.

### C.    Additional Biases In Dr. Helfgott's Questions, Methodology And Analysis Render His Survey Unreliable

The unreliability of Dr. Helfgott's testimony is further increased by various additional biases in his questions, methodology and analysis of the survey results.  For example:

- Dr. Helfgott utilized biased and leading screening questions that included the sequential repetition of four questions mentioning "a t-shirt with an image of a cartoon character."  (Wind Report ¶8).  Dr. Helfgott's survey focused the respondents' and interviewers' attention on cartoon characters, "priming" the respondents to think about cartoon characters and not the entire trademark.  (Wind Report ¶7).  The combination of the fame of the Disney company name and characters, the monadic design and the continual focus on "cartoon character" in the screening questions created a classic case of priming, further predisposing respondents to answer "Disney" when asked for a company name in connection with the T-shirt stimulus.  *Id.*

- Dr. Helfgott's survey used the wrong universe.  (Wind Report ¶12).  He focused on consumers who purchased a T-shirt with a cartoon character on it in "the past 12 months" or who are "likely to purchase it in the next 12 months."  *Id.*  12 months is too long a period for a frequently purchased product such as a T-shirt, especially given the known fact that a longer purchasing time horizon leads to a less reliable sample and, consequently, less reliable results.  *Id.*  The correct time

period would have been the three month period used by THOIP's survey expert Dr. Gary Ford in his study.  *Id.*

- Dr. Helfgott's intent to bias the survey design is also reflected in his decision to count respondents who answered "Miss" or "Little Miss" as confused only if those respondents also stated that they associate "Miss" or "Little Miss" with certain undisclosed products other than T-shirts.  (Wind Report ¶10; Helfgott Report p.10).  Although this flaw did not ultimately affect the results of Dr. Helfgott's survey, it does demonstrate his bias in designing the survey.

- In contrast to common research practices, there was no reference to interviewer briefings or practice interviews in either the Helfgott Report or the field instructions.  (Wind Report ¶12).  Dr. Helfgott admitted that only supervisors were given minimal instructions (consisting of one to four pages) about how to conduct the survey; the interviewers themselves were not given any instructions provided by Dr. Helfgott.  (Helfgott Tr. 151:17-152:16).

- Dr. Helfgott did not read all the survey verbatims himself and instead relied on an employee of Suburban Marketing Research to decide for him which verbatims were relevant.  (Helfgott Tr. 146:12-25).

While each of these flaws on their own may not merit exclusion, when viewed cumulatively (together with the other flaws discussed above), these flaws and biases require exclusion of Dr. Helfgott's testimony.  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 563 (S.D.N.Y. 2007) ("questions of weight, when sufficiently accumulated, become so serious as to require exclusion") (internal citations omitted); *see also Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-5203, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005) (finding survey inadmissible

because of a variety of survey flaws including failure to use proper universe); *Toys "R" Us, Inc.*
*v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189 (E.D.N.Y. 1983) (excluding survey found to be
untrustworthy due to flaws in data collection, coding and compilation).

   **D.    Dr. Wind's Replication Study Illustrates Flaws In Dr. Helfgott's Survey**

   The Replication Study empirically demonstrates the "Disney effect," whereby the fame
of the Disney characters and company name overwhelm any other brand when combined in a co-
branding context, and that the combination of the Disney effect with the modified Eveready
format created by Dr. Helfgott for this case practically guaranteed that any co-branding (or
authorization) confusion would go undetected.  (Wind Report ¶¶4, 6).  The Replication Study
copied Dr. Helfgott's design but substituted a new test stimulus – a T-shirt that combined the
Clifford character mark with one of Disney's famous characters, Mickey Mouse.  (Wind Report
¶4).  Clifford was chosen because it is an unquestionably strong brand (significantly better
known than THOIP's Mr. Men and Little Miss characters), yet Norman Bridwell, the actual
owner of the Clifford trademark, is not well known.  (Wind Report ¶¶4, 6; Schwimmer
Decl.¶13).

   The Replication Study used the same survey design, universe, sampling and questions as
Dr. Helfgott's survey.  *Id.*  The Replication Study proved that even when consumers were shown
a Disney character adjacent to Clifford (an extremely well known non-Disney character brand),
75% of respondents still mentioned only Disney in response to Dr. Helfgott's survey questions
pertaining to confusion.  (Wind Report ¶13).  These results are comparable to those of Dr.
Helfgott's survey.  *Id.*  Given the strength of the Clifford brand, getting such similar results
demonstrates that the results are a function of the biased and leading research design of Dr.
Helfgott's survey and not due to any lack of confusion.  *Id.*  In the Replication Study, only
approximately 3% of the respondents indicated confusion by mentioning "Clifford" or "whoever

makes Clifford." *Id.*  This is a very low number considering the popularity of Clifford.  One hundred percent (100%) of the respondents in the Replication Study who gave Disney as their answer mentioned the character as the reason for their answer.  (Wind Report ¶13).  Not one respondent in the Replication Study mentioned Clifford's actual trademark owner – Norman Bridwell.  This is identical to the results of Dr. Helfgott's study, which found no references to THOIP or Chorion – the actual trademark owners of the Little Miss brand.  *Id.*  This study further indicates that Dr. Helfgott's results are a function of a biased survey design and are unreliable.

**III.    DR. HELFGOTT'S TESTIMONY IS ADDITIONALLY EXCLUDABLE BECAUSE HE DESTROYED EVIDENCE**

Although Dr. Helfgott's testimony should be excluded because his survey is unreliable and unduly prejudicial, his testimony is also excludable because he destroyed and failed to produce important evidence relied upon in forming his opinions.

During his deposition, Dr. Helfgott admitted that he destroyed work papers he created and these papers were never produced to THOIP.  (Helfgott Tr.139:16-141:11).  Specifically, Dr. Helfgott destroyed his notes pertaining to whether certain stores given as answers by respondents sold Disney Shirts, THOIP Shirts, or both.  *Id.*  These notes were the basis for Dr. Helfgott's chart produced at TWDC0096826 which provided an analysis of certain verbatim responses.  (Helfgott Tr. 127:11-128:3, 138:4-139:15).  During Dr. Helfgott's deposition, THOIP's counsel asked Dr. Helfgott what he did with this list and Dr. Helfgott responded:  "I don't know.  It's gone.  After I type a report, I get rid of the papers that I don't need beyond it."  (Helfgott Tr. 140:4-6).

THOIP's counsel also asked Dr. Helfgott if there were any additional work papers that Dr. Helfgott used in preparing his report that he also destroyed and Dr. Helfgott responded:

"Everything that I don't need after I write a report.  After all I write a report that has a lot of stuff in it.  I take what I need."  (Helfgott Tr. 140:10-16).  It is impossible for THOIP to determine the extent of Dr. Helfgott's destruction of evidence since Dr. Helfgott was unable to remember if there were additional working papers that he destroyed and did not produce to THOIP.  (Helfgott Tr. 140:18-141:11).  Dr. Helfgott also failed to produce, and presumably destroyed, a memo he received from Suburban Marketing Research analyzing verbatim responses, even though that memo was his main source of information with respect to the verbatims.  (Helfgott Tr. 144:16-145:6, 146:12-25, 147:2-21).

Dr. Helfgott had an obligation to preserve and produce his working papers; an expert witness is required to disclose all information and data he considers in forming his opinions.  *See* Fed. R. Civ. P. 26(a)(2)(B)(ii).  He certainly knew or should have known that THOIP had requested production of these documents and was entitled to receive them.  As a sanction for a party's failure to comply with these expert disclosure requirements, the Court may exclude the testimony of that expert.  *See* Fed. R. Civ. P. 37(c)(1);  *see also Fleming v. City of New York*, No. 01-8885, 2007 WL 4302501, at *3 (S.D.N.Y. Dec. 7, 2007) (granting motion to exclude expert testimony based on data sets that were not disclosed pursuant to Rule 26)[5]; *Campbell v. McMillin*, 83 F. Supp. 2d 761, 765 (S.D. Miss. 2000) (expert testimony barred under Fed. R. Civ. P. 37(c)(1) for failure to submit a detailed and complete report pursuant to Rule 26).

The notes Dr. Helfgott discarded relate to information he received from Defendants, which he used to form his opinions.  It is especially troubling that Dr. Helfgott did not produce the aforementioned verbatim memo since he relied on Suburban to tell him which verbatim

---

[5] While the Court in *Fleming* noted that a non-disclosing party must have violated a court order to produce before sanctions can be imposed pursuant to Rule 37, a court order to produce would have been futile in this case since the documents that were not produced to THOIP were destroyed.

responses were relevant and Dr. Helfgott's interpretation of the verbatim responses is an important component of his testimony. (Helfgott Tr. 146:12-25). It is also problematic that he destroyed his notes pertaining to the stores that sell both the THOIP and Disney shirts since this evidence could help support Plaintiff's argument that Dr. Helfgott should have used an array format because it better replicates marketplace conditions in this case. Accordingly, Dr. Helfgott's testimony should be excluded.

## **CONCLUSION**

For the foregoing reasons, THOIP respectfully requests that the Court exclude the testimony of Defendants' expert Dr. Myron J. Helfgott.


Dated: October 23, 2009
      New York, New York

                                          Respectfully submitted,

                                          MOSES & SINGER LLP


                                          By:    s/ Paul M. Fakler
                                          Paul M. Fakler (PF-0249)
                                          Martin Schwimmer (MS-7011)
                                          Kandis Koustenis (KK-4213)
                                          Amanda J. Schaffer (AS-2004)
                                          405 Lexington Avenue
                                          New York, New York 10174-1299
                                          Tel.: 212-554-7800
                                          Fax: 212-554-7700

                                          *Attorneys for Plaintiff,*
                                          *THOIP (A Chorion Limited Company)*