Paul M. Fakler (PF-0249)
Martin Schwimmer (MS-7011)
Kandis Koustenis (KK-4213)
Amanda J. Schaffer (AS-2004)
MOSES & SINGER LLP
405 Lexington Avenue
New York, New York 10174-1299
Tel.: 212-554-7800
Fax: 212-554-7700
pfakler@mosessinger.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                :
THOIP (A Chorion Limited Company),                              :
                                                                :
                    Plaintiff,                                  :        08 Civ. 6823 (SAS)
                                                                :           ECF Case
        - against -                                             :
                                                                :
THE WALT DISNEY COMPANY, DISNEY                                 :
CONSUMER PRODUCTS, INC. and DISNEY                              :
DESTINATIONS, LLC,                                              :
                                                                :
                    Defendants.                                 :
--------------------------------------------------------------- X

## DECLARATION OF YORAM (JERRY) WIND IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF DR. MYRON J. HELFGOTT

I, YORAM (JERRY) WIND, declare, pursuant to 28 U.S.C § 1746, as follows:

1.      My name is Yoram (Jerry) Wind.  I am over the age of twenty-one, I am

competent to make this Declaration, and the facts set forth in this Declaration, which I submit in

support of Plaintiff's Motion To Exclude The Proposed Expert Testimony Of Dr. Myron J.

Helfgott, are based on my personal knowledge.

2.    I have been retained as an expert in this matter by plaintiff THOIP (A Chorion Limited Company) ("THOIP"), and have provided a rebuttal expert report entitled "Rebuttal Report of Yoram (Jerry) Wind Evaluating Dr. Myron J. Helfgott's July 2009 Likelihood of Confusion Survey Concerning Disney T-shirts" (hereinafter, the "Wind Report").  A true and correct copy of the Wind Report is attached hereto as Exhibit 1.  I affirm that the statements made in the Wind Report are true and correct.

3.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 22, 2009
New York, New York

_____
Yoram (Jerry) Wind

# EXHIBIT 1

Yoram (Jerry) Wind
Wind Associates, Inc.
1041 Waverly Road
Gladwyne, PA  19035
(610) 642-2120
windj@wharton.upenn.edu

**Rebuttal Report of Yoram (Jerry) Wind Evaluating Dr. Myron J. Helfgott's July 2009 Likelihood of Confusion Survey Concerning Disney T-shirts**

## I. Objectives

1.  Objectives.  I, Yoram (Jerry) Wind was asked by counsel to THOIP (A Chorion Limited Company) to evaluate Dr. Helfgott's Study of July 2009 and summary statement (the Helfgott Study).

## II. Qualifications

2.  I am the Lauder Professor and Professor of Marketing at the Wharton School of the University of Pennsylvania.  I joined the Wharton staff in 1967, upon receipt of my doctorate from Stanford University.

    (a)  Publications – I have been a regular contributor to the marketing field,[1] including 22 books and over 250 papers, articles and monographs. My books and articles, which are frequently cited by other authors, encompass marketing strategy, marketing research, new product and market development, consumer and organizational buying behavior, and global marketing strategy.

    (b)  Editorships – I have served as the editor-in-chief of the *Journal of Marketing*, as a guest editor of numerous marketing journals, on the policy boards of the *Journal of Consumer Research* and *Marketing Science*, and have been on the editorial boards of the major marketing

---

[1]  Marketing, according to the American Marketing Association, is the process of planning and executing the conception, pricing, promotion and distribution of ideas, goods and services to create exchanges that satisfy individual and organizational goals. (P.D. Bennet ed. Dictionary of Marketing terms, Chicago AMA 1988, p.54)

journals.  I am the founder of Wharton School Publishing and served as its first Wharton editor from 2004 to 2008.

(c)  <u>Teaching and Consulting</u> – I have taught MBA, Ph.D. and executive development courses on a wide range of marketing topics.  I also have consulted extensively for many Fortune 500 firms, including major consumer goods firms. In my teaching, consulting, editorial and university positions I have designed, conducted and evaluated thousands of marketing and consumer research studies.

(d)  <u>Expert Witness</u> – I have conducted and evaluated marketing and consumer research in a litigation context, have been qualified as a marketing and survey research expert and testified in trial in a number of federal courts.

(e)  <u>Awards</u> – I have received various awards, including the four major marketing awards – The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007).  I also received the first Faculty Impact Award by Wharton Alumni (1993).  I was elected to the Attitude Research Hall of Fame in 1984.  I have also been honored with a number of research awards, included two Alpha Kappa Psi Foundation awards.  In 2001, I was selected as one of the ten grand Auteurs in Marketing and in 2003 I received the Elsevier Science Distinguished Scholar Award of the Society for Marketing Advances.

(f)  <u>Complete Resume and Compensation</u> – My resume is attached to this declaration as Appendix A.  It includes a list of my publications (pages 4 – 24) and legal cases in which I have consulted or testified as an expert (pages 31 – 35).  My total compensation for review and analysis of the relevant material and preparation of this expert report is based on my regular consulting rate (of $1,000 an hour).

2

### III.  Approach

3.  <u>Approach and criteria for evaluation</u>.  In preparing this Rebuttal Report, I reviewed the

Helfgott Study and summary statement and related materials.  In evaluating the soundness

and appropriateness of the research methodology employed, I relied on the standards

employed in marketing and consumer research (a) as reflected in the professional

literature and as taught by me and others at Wharton and other leading universities, (b) as

practiced by me and other leading professionals in conducting and evaluating marketing

and consumer research, for academic peer reviewed publications, and for management

and courts as input to their decisions, and (c) as reflected in the standards and criteria

suggested by the Manual for Complex Litigation (Section 11.493), and the Shari Seidman

Diamond "Reference Guide on Survey Research".  These standards are consistent with

the professional marketing research literature.[2]

4.  <u>Empirical testing of the biased research design</u>.  Given the clever way in which the Helfgott

design biased the results, I decided to augment my evaluation of the design (paragraphs 5

- 12) with empirical evidence.  The empirical test was based on a replication of the Helfgott

design for a new test stimulus – a t-shirt which <u>combines</u> one of the Disney characters

used by Helfgott with an unquestionably strong brand presented with equal prominence.

The brand I selected is "Clifford the Big Red Dog" who based on the Children's Brand

Health Check USA has an extremely high level of awareness among parents -- 100% in

---

[2] See for example marketing research texts such as:
- Aaker, David A., V. Kumar and George S. Day, <u>Marketing Research</u> (Eighth Edition), 2004, Wiley, New York.
- Churchill, Jr., Gilbert A. and Dawn Iacobucci, <u>Marketing Research: Methodological Foundations</u> (9th ed.), 2005, Fort Worth, TX: Harcourt.
- Green, Paul E., Donald S. Tull and G. Albaum <u>Research for Marketing Decisions</u> (5th ed.), 1990, Prentice Hall.
- Lehmann, Gupta and Joel Steckel, <u>Marketing Research</u>, 1998, Addison-Wesley
- Rosenthal, Robert and Ralph L. Rosnow, <u>Essentials of Behavioral Research</u>, 2nd ed., 1991, McGraw-Hill.
- Shadish, William R., Thomas D. Cook, and Donald T. Campbell, <u>Experimental and Quasi-Experimental Designs for Generalized Causal Inference</u>, 2002, Houghton Mifflin Company.

2007 and 88% in 2008.[3]  These findings are supported by research reported on the

Scholastic website which indicates that the brand awareness of "Clifford the Big Red Dog"

in 2009 among parents was 96% (mediaroom.scholastic.com/node/156).   A photo of the

stimulus is included in Figure 1.

<u>**Figure 1**</u>

**Photo of the Stimulus Used in the Replication Study – a T-shirt with Mickey Mouse and
"Clifford the Big Red Dog"**



---

[3] This level of awareness is higher than that of the Disney Princesses – 90% in 2007 and 83% in 2008 – and significantly higher than that of "Mr. Men Little Miss" with 20% in 2007 and 24% in 2008.  These findings are based on Children's Brand Health Check: Key Findings, USA 26 February 2007 (THOIP 2584-2624) and 3 March 2008 (THOIP 2625-2641).

This replication study using the same universe, sampling and questions as the Helfgott study was concluded among 160 consumers in 12 cities (randomly selected from the fifteen cities used in the Helfgott Study) with a constraint of having three cities from each of the four Census Regions.  The data collection was conducted by Target Research Group from August 7 – 9, 2009.  Appendix B includes the full details of the study design, the questionnaire, the field instructions, the results of the survey and verification questionnaire. The hypothesis driving this replication study is that if the results for such a strong co-brand as "Clifford the Big Red Dog" are not significantly different from those of the Helfgott study, the results of the Helfgott study are a result of the biased and leading research design and not the true consumers' perceptions of the stimuli tested.

### IV.  Conclusions

5.    The Helfgott Study has a number of critical and interrelated flaws that prevent one from relying on it.  The major flaws include:

(a) <u>The Eveready 1976 monadic design is inappropriate for the unique conditions of this case</u>                                      (Paragraph 7)

(b) <u>Biased and leading screening questions priming the respondents to focus on cartoon characters</u>                              (Paragraph 8)

(c) <u>Tested for the wrong trademark, i.e. focusing on a company when the case involves a composite brand</u>                        (Paragraph 9)

(d)  <u>Inappropriate and biased coding</u>                          (Paragraph 10)

(e) <u>Inappropriate analysis and conclusions</u>                   (Paragraph 11)

In addition, the Helfgott study has a number of other less critical flaws:(Paragraph 12)

(i)      <u>Wrong universe</u>

(ii)     <u>Non-projectable sample</u>

(iii)    <u>Questionable research procedures</u>

6.  <u>The results of the replication study</u>.  The key results of the replication study are:

    (a) 75% of the respondents mentioned Disney in response to the three confusion

        questions.  This percentage is comparable to those of the Helfgott study -- 71% for

        "Little Miss Bossy," 85% for "Miss Chatterbox," 75% for "Miss Fabulous" and 85% for

        "Little Miss Perfect" for an average of 79% for the four t-shirts. (see paragraph 13 (a))

    (b) Not one respondent mentioned in response to the three confusion questions the name

        of Norman Bridwell – the actual owner of the "Clifford the Big Red Dog" trademark.

        (see paragraph 13 (c))  These are identical results to those of the Helfgott study where

        no one mentioned THOIP or Chorion, the actual owner of the trademark – "Little Miss +

        personality/charter traits + a cartoon character."

    (c) Even with the fame, longevity and recognition of "Clifford the Big Red Dog" only 15%

        mentioned any of the companies associated with it – Scholastic, PBS and a vague

        response "whoever makes Clifford."

These results strongly demonstrate the major flaws of the Helfgott study and that the

responses are a function of the biased and leading nature of the design and not the stimuli.

(For a more complete discussion of the results of the replication study, see paragraph 13

and Appendix B.)

### V.  The flaws of the Helfgott Study

7.  <u>The ever-ready 1976 monadic design is inappropriate for the unique conditions of this case</u>

due to five fundamental and interrelated factors:

    (a) <u>The real world shopping environment</u> is one in which both products (the Disney <u>and</u>

        THOIP licensed "Little Miss" t-shirts) are available in close shopping proximity.

        Contrary to Dr. Simonson's arguments (in his criticism of the Ford study), the THOIP

        licensed "Little Miss" t-shirts and the Disney shirts in this case are found together in the

        two specific shopping situations:

(i)     Disney shirts featuring "Miss" plus character attribute are sold in a number of

stores selling also the THOIP licensed "Little Miss:" Figure 2 lists a number of

these retail outlets

**Figure 2**
**Illustrative Retailers Selling Both the Disney T-shirt Featuring "Miss" Plus**
**Character Attribute and the THOIP "Little Miss" T-shirts**

- Bloomingdale's
- Disneyland (Vault 28)
- Dillards
- Hot Topic
- Macy's
- Nordstrom

- Saks Fifth Avenue
- Urban Outfitters
- Von Maur
- Target
- JCPenney's
- Sears

--- and numerous online retailers ---

(ii)    Disney shirts featuring "Little Miss" plus character attribute are sold in stores

within close walking distance to stores selling the THOIP licensed "Little Miss" t-

shirts; an illustrative list of such stores is included in Figure 3.1 and geographical

proximity of the NYC stores is illustrated in the mapquest map in Figure 3.2

**Figure 3.1**

**Illustrative Retailers who Sell the "Little Miss" T-shirts in Proximity to**
**Stores Selling the Disney Little Miss T-shirts**

- World of Disney NYC sold LMD shirts (which is at 5th Ave and 55th St)
  - Gap/ Gap Kids - 5th and 54th (essentially across the street); Madison and 55th – sold MMLM shirts
  - Saks 5th Avenue - 5th and 50th – sold MMLM shirts
  - Carson Pirie Scott - 5th and 50th – sold MMLM shirts
  - Barnes & Noble - 5th and 46th – sold MMLM shirts
  - Lord and Taylor -5th and 39th. – sold MMLM shirts
  - Bloomingdale's 59th and Lexington – sold MMLM shirts
  - Ricky's-57th bet. 8th and 9th -- sold MMLM shirts
  - Urban Outfitters-59th and 3rd – sold MMLM shirts
  - Zitomer-57th bet 5th and 6th -- sold MMLM shirts
- Disneyland – various retail locations sold LMD shirts
  - Vault 28-Downtown Disney in Disneyland -- sold MMLM shirts
- Epcot -- Mouse Gear at Epcot sold LMD shirts
  - World Showcase at Epcot – sold MMLM shirts
- Disney World – various retail locations sold LMD shirts
    Virgin in Downtown Disney at Disney World sold MMLM shirts

**Figure 3.2**

**Illustrative Geographic Proximity of the NYC Disney Store and
Other Retailers Selling the "Little Miss" T-shirts**



(b) <u>the context</u> – the real world context that has to be reflected in the research design is on the one hand the very high <u>global recognition of the Disney company name and characters</u> and on the other hand the relatively unknown THOIP or Chorion Company name and the <u>significant but more limited recognition of the unique combination of the composite trademark -- "Little Miss" + a personality /character trait + a cartoon character"</u>.

(c)  the co-branding nature of Disney's co-branded use of the "Little Miss" brand with their own character as an integrated design

(d)  the biased and leading nature of the Helfgott study which focused the respondents and interviewers attention only on the <u>cartoon characters</u> priming the respondents to think about cartoon characters and not the entire trademark (see paragraph 8 below) and the biased focus on a <u>company</u> in a case that focuses on a composite brand and not a company (see paragraph 9).

(e) the biased and leading monadic Helfgott design which coupled with the way it was designed, biased and primed the respondents to focus on the Disney character to the exclusion of the other parts of the(co branded) trademark.

In contrast the Ford study which utilized the array design is the more appropriate design for the context of this case and any similar co branded situation in which the parties have (i) different trademark assets -- in this case Disney who own the cartoon characters, and "Little Miss" who own the unique combination of "Little Miss + personality/character traits + a cartoon character" presented as a variable family of designs (ii) when one of the brands is much better known than the other and especially in an unaided awareness context (iii) both products are available in close shopping proximity in a number of real world shopping environments.

9

8.   <u>Biased and leading screening questions</u>.  The screening questionnaire included four

questions regarding "a t-shirt with an image of a <u>cartoon character</u>."  The research design

provided each respondent with one Disney t-shirt with a famous Disney cartoon character

always with the words "Miss" or "Little Miss" followed by a word describing a character trait

– "Bossy" or "Chatterbox" or "Fabulous" or "Perfect."  The combination of the fame of the

Disney company name and characters, the monadic design[4] and the continuous focus on

"cartoon character" in the screening questions is a classic case of "<u>priming</u>" (see box).  It is

not surprising, therefore, that the focus of the respondents was primarily on the Disney

character.  Ignoring the design elements which were appropriated by Disney – the words

and their typeface

This is evident when examining the responses to question 12b "What, in particular, about

this shirt makes you think it is put out by … Disney?," the response to question 13b "What

in particular about this t-shirt makes you think it was put out in association with some other

company … Disney?," the response to question 14b "What, in particular, about this t-shirt

makes you think that they got permission from some other company … Disney?" The

responses to these questions focus almost exclusively on "Disney characters," "cartoon

character from Disney" or the name of the specific character name.  This is also

recognized in Dr. Helfgott's conclusions (see page 15 of his report) that states:

"…consumers correctly identify the t-Shirts with Disney, and that this is due, … to the

widespread recognition that the cartoon characters on the t-shirts are Disney characters."

---

[4] While Dr. Ford used the same screening criteria, given that he used an array design, his screening question was less likely to bias the results.  Furthermore, since the array included the famous characters of Disney, Dora the Explorer and Hello Kitty, the focus of the screening questions on cartoon characters would have benefited Disney and the other brands and not "Little Miss."

**A Note About Priming**

Priming in psychology occurs when an earlier stimulus influences response to a later stimulus. For example, when a person reads a list of words including the word TABLE, and is later asked to complete a word starting with TAB, the probability that subject answers TABLE is higher than for non-primed people. [Priming (psychology) in *Wikipedia*.] Another example of priming effect is the study by Berger and Fitzsimons "How Environmental Cues influence product evaluation and choice" [reported in *MIT Sloan Management Review* in Summer 2007 under the heading "what you see affects what you Get".] In this study 59 students were each shown one of two slogans – "live the healthy way, eat five fruits and veggies a day" or – "each and every dining hall tray, needs five fruits and veggies a day". The results: those who saw the second slogan and ate in dining halls that used trays ate more fruits and vegetables in the week after they saw the slogan. According to John Bargh in his seminal paper "What have we been priming all these years? On the development, mechanisms, and ecology of nonconscious social behavior" [*European Journal of Social Psychology* 36,147-168 (2006)] "Priming effects are ubiquitous in the social psychological literature these days. Nearly all forms of social representation can be primed, it seems – activated incidentally or unobtrusively in one context, to influence what comes next without the person's awareness of this influence."

This is the case in the Helfgott design that primes the respondents to focus on "cartoon character" through the repetitive focus on these words in the screening questions. This priming condition is followed by a stimulus – a t-shirt with a famous Disney cartoon character (and some other writing which is ignored given the priming effect of the screening questions). Given this priming and that the series of questions asks for the name of a company (see paragraph 9), the only answer that meet all these conditions is Disney—the name associated with the cartoon character and that is also the name of a company.

In addition this focus on "cartoon characters" and the repeated interviewer instructions centering on the words "cartoon character" coupled with the Disney characters as the stimulus may have lead to a loss of the <u>double blind requirement</u> by suggesting to the interviewer that the focus is only on the cartoon character.

9. <u>Testing for the wrong trademark</u>. The opening question (Q 12a) asked: "I'd like you to suppose you were thinking of buying a t-shirt and came across this t-shirt. What <u>company</u>

11

do you think puts out this t-shirt, or don't you know?"  Similarly the follow up questions also focus on a <u>company</u>: Q13 "Do you think the <u>company</u> that puts out this T-shirt puts it out themselves, or in association with some other <u>company</u>, or don't you know?"  Q13a "What other <u>company</u> would that be?"  Q13b "What in particular about this T-shirt makes you think that it was put out in association with some other <u>company</u>?" and Q14 "Do you think the <u>company</u> that puts out this T-shirt got permission from some other <u>company</u>, or did not get permission from some other <u>company</u>, or don't you know?"  Q14a "What other <u>company</u> would that be?"  Q14b "What in particular about this T-shirt makes you think they got permission from some other <u>company</u>?"

These questions (with ten mentions of the word <u>company</u>) have two fundamental flaws:

(a) THOIP/Chorion's strategy has been to focus on and promote the brand "Little Miss + personality/character trait +a cartoon character" and not to identify it with a corporate name. This is a common branding strategy used by many companies including P&G, Unilever, General Motors and others. Given this focus on the brand and not its corporate parent, all the Helfgott questions, which focused on a "company" name, are incapable of capturing the relevant consumer's beliefs and perceptions. Even in cases in which consumers are fully familiar with the brand "little Miss + personality/character trait + a cartoon character" the questionnaire does not allow them to answer it correctly since the questions focus on the non promoted company name, which is not at issue in this case.  Consequently, the Helfgott study tested for the wrong trademark.

It is not surprising, therefore, that the responses focused on company names such as Disney and other:

- <u>Media companies</u> – Warner Bros. and Cartoon Network

- <u>Manufacturers</u> – Hanes / Fruit of the Loom, Motorola

- <u>Mass Merchandise Retailers</u> – Walmart / Target / Kohls / Sears / Penneys

- <u>Other Retailers</u> – No Boundaries, Junk Food, Delia's

(b) Given that the t-shirt represents a co-branding situation of both the Disney character <u>and</u> "Little Miss" plus "personality/character trait," the focus of the question on a single company (versus the more customary question of "what company or companies") is biasing and leading by focusing the respondents' attention on a single company. Given the "power" of the Disney's company name, it is not surprising that the respondents are led by the question to focus only on the first company that comes to mind – Disney.

The question focusing only on one company coupled with the previous priming on cartoon characters (see Paragraph 8 above) and the fame of the Disney company name and cartoon character, is leading the respondents to focus only on the Disney character and respond Disney when asked about the company name.

10. <u>Inappropriate and biased coding</u>. The criteria used to identify likelihood of confusion (Helfgott report section IX) is inappropriate and biased for three reasons

(a) The exclusion  of "Miss" or "Little Miss" if the respondent did not identify books among the "other products made by the company" is unacceptable and biasing since it creates a double hurdle which is not an acceptable criteria in confusion studies. One does not condition the response on having also identified correctly the other products made by the company mentioned by the respondent.  The exclusion of "Miss" or "Little Miss" from the criteria of confusion (while did not affect the actual results) is inappropriate and shows the biased nature of the Helfgott design.

(b) The focus on THOIP and CHORION is biased in this case since as discussed in paragraph 9 above the trademark at issue in this case and the one promoted in the marketplace is "Little Miss plus personality/character trait plus cartoon character" and <u>not</u> the company name.

13

(c)  Omitted from the criteria are three other categories, which would have allowed respondents to answer with a <u>company</u> name.

    (i)    <u>Junk Food</u> – the manufacturer of the "Little Miss" t-shirts

    (ii)    <u>Retail stores</u>[5] such as Delia's, Gap, Gap Kids, Hot Topic, JC Penney's, Journeys, Kids R Us, Kmart, Kohl's, Limited Too, Sears, Shoprite, Spencer's, Steve and Barry's, Target, Urban Outfitters, and Walmart, which sell the "Little Miss" t-shirts

    (iii)    <u>Cartoon Network</u> on which the "Little Miss" show appears

11.  <u>Inappropriate analysis and conclusions</u>.  The three fatal flaws of this study – the inappropriate design (paragraph 7 above), the "biased and leading screening questions" (paragraph 8 above) and the "testing of the wrong trademark" (paragraph 9 above) -- cannot be corrected.  Thus the conclusions of Dr. Helfgott are invalid and cannot be accepted.  Correcting the biased coding (paragraph 10 above) shows that despite the biased nature of the design (paragraphs 8-10) 16.2% of the respondents were in fact confused and respondents to Q 12a, 13a and 14a with companies linked to "Little Miss." These responses are summarized in Figure 4.

---

[5] The list of stores selling THOIP licensed "Little Miss" t-shirts is based on the company records.

**Figure 4**

**Consumers Perceptions of Companies Associated
with the "Little Miss" Brand in the Helfgott 4 Test Groups**

|  | Little Miss Bossy (N=150) | Miss Chatterbox (N=150) | Miss Fabulous (N=150) | Little Miss Perfect (N=150) |
|---|---|---|---|---|
| **Manufacturer Junk Food** | # | # | # | # |
| 12a | 1 | 1 | - | 1 |
| 13a | - | - | - | - |
| 14a | - | - | - | - |
| NET total | 1 | 1 | - | 1 |
| **Retail Stores Carrying the Little Miss Product** |  |  |  |  |
| 12a | 14 | 10 | 6 | 19 |
| 13a | 13 | 13 | 5 | 11 |
| 14a | 5 | 2 | - | - |
| NET total | 32 | 25 | 11 | 30 |
| **Cartoon Network** |  |  |  |  |
| 12a | - | - | - | - |
| 13a | 1 | - | - | - |
| 14a | 1 | - | - | 1 |
| NET total | 2 | - | - | 1 |
| **Little Miss** |  |  |  |  |
| 12a | - | - | - | - |
| 13a | - | - | 1 | - |
| 14a | - | - | - | - |
| NET total | - | - | 1 | - |
| **GRAND NET** # | 29 | 25 | 12 | 31 |
| **OVERALL GRAND NET** | 97=16.2% | | | |

12. <u>Other design flaws</u>.  In addition to the fatal flaws discussed above (paragraphs 8 - 11) the study design had a number of other problems including:

(a) <u>Wrong universe</u>.  The focus on consumers who purchased a t-shirt with a cartoon character on it in "the past 12 months" or who are "likely to purchase it in the next 12 months" is likely to include respondents who are not in the target universe.  12 months is too long a period for a product such as t-shirt and especially given the known fact

15

that the longer the time horizon the less reliable the responses.  The correct time period

would have been the three month period used by Dr. Ford in his study.

(b)  Non projectable sample.[6]  The sampling procedure employed in the Helfgott Study

does not allow projecting the results to the relevant universe due to the following

problems:

(i)      the cities and malls with interviewing facilities were not selected randomly;

(ii)     the respondents were not screened in all parts of the shopping mall and thus

the selected respondents represent only those who happen to go by the

interviewing location;

(iii)    no significant percentage of interviewing was done on evenings or weekends. A

critical factor to assure the inclusion of working adults;

(c)  Questionable research procedures.  The Helfgott study included a number of unusual

and unacceptable research procedures:

(i)      The follow up telephone call, in the first wave of the study, asking: "please tell me

all the products, that you know of, which this company puts out" (Helfgott report

page10) is unacceptable.  Over the years I have seen hundreds of confusion

study and conducted and evaluated a large number of confusion studies but

have never seen a study that followed up with a telephone interview (with its

associated extra costs) to ask an additional question (and especially a critical

question designed as a key criterion for the determination if consumers are

confused or not).  I see no legitimate research design consideration that will

suggest excluding the question from the regular questionnaire.   Obviously, the

Helfgott Study was not concerned about including the question since in later

---

[6] Since the Helfgott Report does not specify these critical aspects of the sampling procedure, it is assumed that he did not undertake these safeguards to assure the projectability of the sample.

waves the question was included at the end of the questionnaire.  And being at the end of the questionnaire the inclusion of the question could not have influenced the response to any of the previous questions.

(ii)    Another unusual aspect of the study is the indication at the end of the screening questionnaire that "S10 and S11 intentionally left blank" and the main questionnaire started with question 12. This is very unusual. Why were S10 and S11 left blank? Where there two additional questions that were deleted?  I can see no research design rationale for leaving two blank questions "intentionally."

(iii)    Inappropriate assignment to the quota groups -- interviewers were instructed to assign respondents to a quota after response for QS 4 and QS 5 (purchased in the past 12 months).  They were again instructed to assign them to a quota after response to QS 6 and QS 7 (likely to purchase in next 12 months).  There were no instructions how to assign respondents who said cartoon character in both QS 4 and QS 6.

(iv)    In contrast to common research practices, there was no reference in the report or the field instructions to interviewers and supervisors briefings or practice interviews.

### VI.  The Empirical Evidence Regarding the Biased Design of the Helfgott Study

13.    <u>The results of the Replication Study</u>.  The results of the Replication Study in comparison to those of the Helfgott Study are presented in Figure 5.

**Figure 5**

**A Comparison of the Results of the Replication Study with
"Clifford the Big Red Dog" <u>and</u> Those of the Helfgott Study**

<u>% Mentioning Disney</u>

| | | |
|---|---|---|
| Clifford the Big Red Dog  (N = 160) | �юбар | 75% |
| The test cells of the Helfgott Study: | | |
| Little Miss Bossy    (N = 150) | | 71% |
| Miss Chatterbox    (N = 150) | | 85% |
| Miss Fabulous    (N = 150) | | 75% |
| Little Miss Perfect  (N = 150) | | 85% |

Examination of all the results including the verbatim responses of the Replication Study, which are included in Appendix B, show the following:

(a) The dominant response to the stimuli is Disney – 75% of respondents mentioned Disney as the company.  These results, as seen in Figure 5 and Figure 6, are comparable to those of the Helfgott study.  Given the strength of the "Clifford the Big Red Dog" brand, getting such similar results demonstrate that the results are a function of the biased and leading research design (the priming on cartoon characters and focus on company name) and not the stimuli.

18

**Figure 6**

**% of Consumers Mentioning Disney in the Helfgott Study
(Combined 4 Test Groups) and the Replication Study[7]**

| Base: Total Respondents | Replication Study (N = 160) % | The 4 Test Groups of the Helfgott Study (N = 600) % |
|---|---|---|
| Company puts out T-shirt | 63 | 64 |
| Company puts out T-shirt in association with another company | 8 | 7 |
| Company that puts out T-shirt got permission from another company | 11 | 8 |
| **Net % of consumers mentioning Disney across all 3 questions** | **75** | **79** |

No significant differences between the two studies.

(b) The dominant reason for responding with the name Disney to questions 12, 13 and 14 is the "Disney cartoon characters" or specific name of cartoon character (Mickey Mouse). 100% of those mentioning Disney mentioned the character as the reason for their answer.

(c) Not one respondent mentioned the actual trademark owner – Norman Bridwell. This is identical to the results of the Helfgott study that found no references to THOIP or Chorion – the actual trademark holders of "Little Miss + personality/charter traits + a cartoon character".

---

[7] Questions:

12a.    I'd like you to suppose you were thinking of buying a t-shirt and came across this t-shirt. What company do you think puts out this t-shirt, or don't you know?

13.    Do you think the company that puts out this t-shirt puts it out themselves, or in association with some other company, or don't you know?

14.    Do you think the company that puts out this t-shirt got permission from some other company, or did not get permission from some other company, or don't you know?

(d) Only two respondents (I.D. 8601 and 8610) mentioned the full name "Clifford the Big Red Dog" and only 3% of the respondents mentioned "Clifford" or "whoever makes Clifford."

(e) Despite the widespread awareness and recognition of "Clifford the Big Red Dog", only 15% mentioned companies associated with it.  The full results are included in Figure 7.

**Figure 7**

**The 24 Respondents who Mentioned Companies Linked with "Clifford the Big Red Dog"[8]**

|  | # of Mentions | | | % of Respondents |
| --- | --- | --- | --- | --- |
|  | Source | Association | Permission | Net Total |
|  | Q 12 | Q 13 | Q 14 | (Q 12, 13, and 14) |
| Whoever makes Clifford | 2 | 3 | 1 | |
| Scholastic | 1 | 1 | 1 | |
| PBS (WHYY) | 1 | 12 | 8 | |
| Total | 4 | 16 | 10 | **15%** |

Examination of these results show that only three respondents mentioned companies linked with "Clifford the Big Red Dog" in response to Q 12.  Fifteen linked the brand to its companies in response to Q 13 and 10 respondents linked the brand to companies in response to Q 14.  These 29 mentions were made by 24 respondents.  This is an extremely low percentage for a strong and widely recognized brand as "Clifford the Big Red Dog."  It is also important to note that most of the links were to PBS which has been airing the "Clifford the Big Red Dog" continuously from 2000 with high viewership.  A comparison of these results to those of the Helfgott study are presented in Figure 8.

---

[8] The I.D. #s of the respondents are: 202, 205, 301, 310, 311,312, 1904, 2805, 2806, 3403, 3405, 3406, 3413, 4303, 4307, 4309, 5310, 6806, 6812, 8601, 8602, 10607, 10611, 10613.

**Figure 8**

**A Comparison of the Results of the Replication Study and the Helfgott Test Groups
(Across the 3 Confusion Questions)**

| | The Replication Study *Clifford the Big Red Dog* (N = 148) | Little Miss Bossy (N = 150) | The Helfgott Test Groups | | |
|---|---|---|---|---|---|
| | | | Miss Chatterbox (N = 150) | Miss Fabulous (N = 150) | Little Miss Perfect (N = 150) |
| Disney | 74% | 71% | 85% | 75% | 85% |
| Mickey Mouse (no me... | 2% | | | | |
| | Overall = 79% | | | | |
| Companies Related to Clifford the Big Red Dog[9] | 15% | | | | |
| Companies Related to Little Miss Brand[10] | | 19.3% | 16.7% | 8% | 20.7% |
| | Overall = 16.2% | | | | |
| Unrelated Companies | 12% | | | | |
| Don't Know | 1% | | | | |

Examination of these results show that there are no significant differences between the two studies, despite the fact that (a) the "Clifford the Big Red Dog" has much higher awareness than the "Little Miss"and (b) that it was presented with equal prominence to that of Disney.  Thus, it is obvious that the Helfgott results are a function of the biased survey design and not an accurate capturing of consumers' perceptions of the stimuli.

---

[9] Companies related to *Clifford the Big Red Dog*:
        Whoever makes Clifford
        Scholastic
        PBS/WHYY
[10] Companies related to the "Little Miss" brand:
        Junk Food (the manufacturer)
        Retailers carrying "Little Miss" brand shirts (see paragraph 10 c ii)
        Cartoon Network

## VII.  Summary

14.  <u>Summary</u>.  The Helfgott study results cannot be relied on given the biased and leading nature of the study.  The main biasing factors include:

(a) The inappropriate Ever-ready monadic design given the five unique and interrelated conditions of this case:

    (i)     both the Disney t-shirts in question and the THOIP brand "Little Miss" t-shirts are found in close shopping proximity

    (ii)    the unique context of this case -- the fame of the Disney company name and character vs the relatively unknown THOIP and Chorion Company name and significant but more limited recognition of the unique combination of the composite trademark "Little Miss + Personality/character trait + a cartoon character"

    (iii)   The unique co-branding and integrated design which are the subject of this case

    (iv)    the biased and leading design of the Helfgott study (paragraphs 8 – 12)

    (v)   The combined effect of the monadic design and the other elements of the biased design (the priming and focus on the company)

(b) The priming of the respondents to focus on the Disney cartoon part of the t shirt design (see paragraph 8)

(c) The misleading focus on a <u>company</u> in a situation in which the composite trademark in question is not a company but rather "Little Miss + personality/character trait +a cartoon character"(paragraph 9)

(d)  The focus on a single company in a situation in which the case focuses on co-branding situation (paragraph 9)

(e) Inappropriate coding biased in favor of Disney by excluding legitimate responses of "Miss"/"Little Miss", the manufacturer of the t-shirts, retailers who sell them and the network which airs the related TV show (paragraph 10 and Figure 4)

(f) Inappropriate analysis and conclusion (paragraph 11)

The replication study conducted on "Clifford the Big Red Dog" a well known brand of similar awareness level to that of Disney Princess, show that even for such a well known brand the biased design of the Helfgott study lead to similar results as those obtained for the Little Miss trademark.  (paragraph 13 and Figures 5, 6, 7 and 8)

-   75% of the respondents mentioned Disney as the source, a comparable result to that of the Helfgott study with 79% of the respondents mentioned Disney.

-   Not one respondent mentioned the actual trademark owner – Norman Bridwell.  A comparable result to that of the Helfgott study with not one mention of THOIP or CHORION, the actual owner of the "Little Miss" trademark.

X _____        Aug. 13 2009

       Yoram (Jerry) Wind                          Date

23