UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

THOIP (A Chorion Limited Company),

        **Plaintiff,**

        - against -

THE WALT DISNEY COMPANY,
DISNEY CONSUMER PRODUCTS,
INC., and DISNEY DESTINATIONS,
LLC,

        **Defendants.**

------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 6823 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/9/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

In stark contrast to the cuteness and humor of the cartoons at the heart

of this trademark dispute, presently before the Court are dueling motions *in limine*

to preclude dueling expert testimony. Each side argues that the other's expert

survey concerning consumer confusion is so methodologically unsound as to

render the survey and accompanying testimony inadmissible. No survey is perfect

and the limits and flaws of a survey generally go to evidentiary weight and do not

warrant exclusion. Exclusion may be justified, however, where a single error or

the cumulative errors are so serious that the survey is unreliable or insufficiently

1

probative. For the reasons stated below, I conclude that THOIP's survey is inadmissible and Disney's survey is admissible.

## II.    BACKGROUND

THOIP claims rights in an unregistered trademark consisting of "LITTLE MISS" with a character trait in big, bold, capital letters plus a character.[1] For example:



According to THOIP, the mark was first used in the United States on a series of children's books — to which THOIP acquired rights in 2004.[2] "From 1981 to the present, over 35 LITTLE MISS characters have been created and featured in at least 75 books, each book with a title character prominently featured on the cover, as well as various television series and videos."[3] In addition to marketing the Little

---

[1]    *See* 10/9/09 Hearing Transcript at 4-5; 7/15/09 Hearing Transcript at 9-11.

[2]    *See* Second Amended Complaint ("SAC") ¶ 16.

[3]    *Id.* ¶ 14.

Miss — and related Mr. Men — books, THOIP has extensively licensed "the images, characters, stories and settings from the books . . . for a wide range of uses worldwide[,]"[4] including for an assortment of merchandise.[5]

In the summer of 2006,[6] a THOIP licensee launched a line of T-shirts featuring the Little Miss "images and names in a format taken from the iconic cover of each book."[7] The shirts are faux-distressed so as to look and feel vintage.[8] They are sold at boutiques such as Kitson; national retail chains such as Bloomingdale's, Gap Kids, Hot Topic, Macy's, Nordstrom, Urban Outfitters, and Walmart; and online.[9] Additionally, beginning in May 2007, THOIP's shirts were

---

[4]     *Id.* ¶ 17.

[5]     *See id.* ¶ 22.

[6]     *See* Deposition of Morgan Ward, Director of Licensing for Junk Food Clothing, Inc. ("Ward Dep.") at 24, Ex. 3 to 10/23/09 Declaration of Melanie Bradley, Defendants' Counsel, in Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("10/23/09 Bradley Decl."); SAC ¶¶ 41, 43.

[7]     SAC ¶ 26.

[8]     *See id.* ¶ 38.

[9]     *See* Ward Dep. at 24, 39; Declaration of Amory Millard, Executive Vice President of Creative Services for Chorion, in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Myron J. Helfgott ("Millard Decl.") ¶ 3; 1/15/10 Supplemental Declaration of Amanda Schaffer, Plaintiff's Counsel, in Further Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Myron J. Helfgott and in Opposition to Defendants' Motion to Exclude the Testimony of Dr. Gary Ford ("1/15/10 Schaffer Decl.") ¶ 5; SAC ¶ 43.

available at Vault 28 — a boutique inside the Downtown Disney shopping complex, which lies outside of the Disneyland theme park in Anaheim, California.[10] THOIP's shirts were also sold at Disney World in Orlando, Florida, specifically at Epcot Center's United Kingdom Pavilion and at the Virgin store in the Downtown Disney complex.[11]

In this suit, THOIP contends under section 43(a) of the Lantham Act and common law that its mark was infringed by two lines of T-shirts of the Walt Disney Company, Disney Consumer Products, Inc., and Disney Destinations, LLC (collectively "Disney").[12] The first line — the so-called "Little Miss Disney" line — was launched in February 2008 and consisted of four different shirts: "Little Miss Bossy" with Daisy Duck, "Little Miss Perfect" with Minnie Mouse, "Little

---

[10]     *See* Deposition of Kelli Coleman, Vice President for Disney Destinations, LLC ("Coleman Dep.") at 30, Ex. 5 to 10/23/09 Bradley Decl.; Declaration of Mary Murray, Director of Retail Merchandise for Disney Destinations, LLC, in Further Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("Murray Decl.") ¶¶ 2, 4; SAC ¶ 44.

[11]     *See* Declaration of Kelli Coleman in Further Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("Coleman Decl.") ¶ 8; Deposition of Patrice Guy, Product Developer for Disney Theme Park Merchandise ("Guy Dep.") at 23-24, 29-30, Ex. 4 to 10/23/09 Bradley Decl., Ex. C to Coleman Decl., and Ex. 5 to Declaration of Martin Schwimmer, Plaintiff's Counsel, in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Myron J. Helfgott ("Schwimmer Decl.").

[12]     *See* SAC ¶¶ 1-3, 45-48, 57, 64.

4

Miss Sassy" with Tinkerbell, and "Little Miss Wicked" with the Queen from the tale of Snow White.[13]



THOIP puts out a "Little Miss Bossy" shirt with its character, but has not used the specific adjectives perfect, sassy, or wicked.[14]

The Little Miss Disney shirts were sold at Disney theme parks, including Disneyland and Disney World, and at the World of Disney store in Manhattan.[15]

THOIP alleges that the Little Miss Disney shirts are infringing

---

[13]    *See* Coleman Dep. at 100-101; Memorandum of Law in Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("Def. Mem. (Ford)") at 3.

[14]    *See* SAC ¶¶ 32, 47.

[15]    *See* Coleman Dep. at 78, 100-101. Sales of both lines of Disney shirts at issue in this suit were halted in August 2008 following the filing of this suit. *See* Def. Mem. (Ford) at 3 n.3; *see also* Coleman Dep. at 148; Deposition of Stephen Teglas, Vice President General Manager of Fashion and Home Business for Disney Consumer Products ("Teglas Dep.") at 144, Ex. 6 to 10/23/09 Bradley Decl.; SAC ¶¶ 50-51.

because both companies' shirts:

> (1) use as their most prominent term the consistent formative LITTLE MISS element; (2) followed by a personality trait, usually self-deprecating; (3) rendered in identical sans-serif block letter typefaces, taken from the MR. MEN and LITTLE MISS book covers; (4) alongside a cartoon character visually portraying the relevant personality trait; (5) the shirts are rendered in faux-distressed style; [and] (6) the shirts are made from a fabric made to appear and feel well-worn and soft.[16]

The second line of allegedly infringing Disney shirts — the "Miss Disney" line — was launched in October 2007 and consisted of four different shirts: "Miss Chatterbox" with Minnie Mouse, "Miss Fabulous" with Minnie Mouse, "Miss Attitude" with Tinkerbell, and "Miss Adorable" with Marie the Cat.[17]

   

---

[16]     SAC ¶ 46.

[17]     *See* Teglas Dep. at 63-64; Def. Mem. (Ford) at 3.

THOIP puts out a "Little Miss Chatterbox" shirt with its character, but has not used the terms fabulous, attitude, or adorable.[18]

The Miss Disney shirts were sold by many of the same national retail chains as the Little Miss THOIP shirts, as well as online.[19] Two Miss Disney shirts — Miss Attitude and Miss Fabulous — were also available at Vault 28 within Downtown Disney in Anaheim.[20]

Though THOIP does not use "Miss" without the modifier "Little",[21] THOIP alleges the Miss Disney shirts nonetheless are an unlawful infringement upon its mark.[22]

### C. The Ford Survey

In support of its claims, THOIP proffers a survey from its retained expert Dr. Gary Ford that purports to examine whether consumers perceive two Little Miss Disney and two Miss Disney shirts to be emanating from, associated

---

[18]    *See* SAC ¶ 32.

[19]    *See* Teglas Dep. at 77; Def. Mem. (Ford) 3; SAC ¶ 32.

[20]    *See* Murray Decl. ¶ 6.

[21]    *See* Deposition of Eric Karp, Executive Vice President of Global Licensing and Merchandising for THOIP, at 44, Ex. 7 to 10/23/09 Bradley Decl. *See generally* SAC.

[22]    *See* SAC ¶ 48.

7

with, or permitted by THOIP.[23]

## 1. Design and Operation

Dr. Ford conducted a two-room "sequential array" survey in which respondents were shown, in room one, a THOIP shirt, and, in room two, an array of five shirts including an allegedly infringing Disney shirt (or control shirt) and four non-infringing "filler" shirts.[24] Each respondent participated in one of eight different cells.[25] Cells One, Three, Five, and Seven were "treatment" cells in which a THOIP shirt was compared to an array that included an accused Disney

---

[23] *See* Amended Expert Report of Dr. Gary T. Ford ("Ford Survey"), Ex. 3 to Declaration of Dale M. Cendali, Defendants' Counsel, in Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("Cendali Decl.").

[24] *See id.* ¶ 15; *see also* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy on Trademarks") § 32:177 at 32-377 to 32-378 (2008) (describing "line-up" survey methods).

[25] *See* Ford Survey ¶ 17. Respondents in the Ford Survey were otherwise-qualified women aged eighteen and over who had purchased within the past three months, or were likely to purchase within the next three months a T-shirt with an image of a cartoon character for themselves or a female child. *See id.* ¶¶ 25, 31-36. Each cell had approximately 150 respondents. *See id.* ¶¶ 26-30. Within each cell, approximately half of the women were between eighteen and thirty-four years old, and approximately half were thirty-five years or older. *See id.* ¶¶ 25-30. Approximately half of the women in each age group within a cell had or were likely to purchase a shirt for themselves, and the other half, for a female child. *See id.* Respondents were intercepted at twenty-eight shopping malls across the United States. *See id.* ¶ 26 & n.4.

shirt.[26] Dr. Ford testified that he paired a specific THOIP shirt with an allegedly infringing Disney shirt based on resemblance.[27]

Cells Two, Four, Six, and Eight were "control" cells — each corresponding to the immediately preceding treatment cell.[28] In the control cells, a THOIP shirt was compared to an array of shirts in which the allegedly infringing Disney shirt from the corresponding treatment cell was replaced with a shirt bearing the same Disney character but omitting the words.[29]

More specifically to survey operation, a respondent was shown in room one a specific THOIP shirt and was told to look at it as if deciding whether to purchase it.[30] When the respondent was finished looking at the shirt, the shirt was removed from view and the interviewer asked some unrelated questions intended to clear short-term memory of the THOIP shirt.[31]

The interviewer then escorted the respondent into a second room in

---

[26]     *See id.* ¶¶ 15-20.

[27]     *See* Deposition of Dr. Gary Ford ("Ford Dep.") at 31, 107-108, Exs. 8 & 9 to 10/23/09 Bradley Decl.

[28]     *See* Ford Survey ¶¶ 15-20.

[29]     *See id.* ¶ 15.

[30]     *See id.* ¶¶ 16, 39.

[31]     *See id.* ¶ 40.

9

which she was shown the five-shirt array.[32] The interviewer instructed the respondent to look at the shirts as if considering whether to purchase any of them.[33] The order of the array remained constant across respondents within a cell; the allegedly infringing Disney shirt (or control shirt) was always in the middle of the display.[34] None of the shirts in the survey contained a neck label or any other indicia of origin.[35]

When the respondent finished looking over the array, the interviewer asked her a series of questions to determine whether she thought one or more of the shirts in the array emanated from, was associated with, or was permitted by THOIP.[36] For instance, a respondent was asked: "Do you think one or more of these products is put out by the same company that put out the shirt I showed you earlier or that none of these products is put out by the same company that put out the shirt I showed you earlier or don't you know?"[37]

---

[32]    *See id.* ¶¶ 16, 41.

[33]    *See id.* ¶ 41.

[34]    *See* Ford Dep. at 92.

[35]    *See id.* at 73.

[36]    *See* Ford Survey ¶¶ 42-44.

[37]    *Id.* ¶ 42 (emphasis omitted).

As an example, Cell One — which tested THOIP's Little Miss Bossy shirt with Disney's Little Miss Bossy shirt — was presented as follows:





As shown above, the array in room two consisted of Minnie Mouse, Lucy from Peanuts with the word "Lucy" above her image, Disney's allegedly infringing Little Miss Bossy with Daisy Duck, Dora the Explorer with the words "Dora the Explorer" above her image, and Hello Kitty.[38]

---

[38] *See id.* ¶ 17.

The array from Cell Two — the control cell corresponding to Cell One — was as follows:



Cell Three tested THOIP's Little Miss Chatterbox shirt with Disney's Miss Chatterbox shirt; Cell Four was the control version of Cell Three.[39] Cell Five tested THOIP's Little Miss Splendid shirt with Disney's Miss Fabulous shirt; Cell Six was the control version of Cell Five.[40] Cell Seven tested THOIP's Little Miss Splendid shirt with Disney's Little Miss Perfect shirt; Cell Eight was the control version of Cell Seven.[41]

### 2. Coding and Results

Dr. Ford classified a respondent as confused as to source, association, or permission if she identified one of the following reasons for selecting the allegedly infringing Disney shirt:

---

[39]     *See id.* ¶ 18.

[40]     *See id.* ¶ 19.

[41]     *See id.* ¶ 20.

> a) [b]ecause the shirt said Little Miss Bossy, Miss Chatterbox or Little Miss Splendid and/or Miss Fabulous and Little Miss Splendid and/or Little Miss Perfect or some variant of those terms; b) [b]ecause the shirt said "Little Miss" or "Miss;" c) [b]ecause the shirt said the same name, or same wording in both, same slogan or a similar phrase; or d) [b]ecause the shirt [sic] the same lettering, the lettering looks the same, or a similar response related to the lettering or writing on the shirt.[42]

Respondents were not classified as confused if they "gave a response such as it is a cartoon character,' 'same fabric' or similar responses or gave responses that may have had multiple meanings, such as 'same logo.'"[43]

     Based on his coding, Dr. Ford found: (1) 27.5 percent of respondents perceived Disney's Little Miss Bossy shirt to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Bossy shirt;[44] (2) no respondents perceived the control shirt in Cell Two to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Bossy shirt;[45] (3) 25.3 percent of respondents perceived Disney's Miss Chatterbox shirt to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss

---

    [42]    *Id.* ¶ 53.

    [43]    *Id.* ¶ 54.

    [44]    *See id.* ¶¶ 55-56; *see also id.* at 24-26 Tab. 1 (verbatim responses).

    [45]    *See id.* ¶¶ 55-56.

13

Chatterbox shirt;[46] (4) no respondents perceived the control shirt in Cell Four to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Chatterbox shirt;[47] (5) 14 percent of respondents perceived Disney's Miss Fabulous shirt to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Splendid shirt;[48] (6) no respondents perceived the control shirt in Cell Six to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Splendid shirt;[49] (7) 14.6 percent of respondents perceived Disney's Little Miss Perfect shirt to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Splendid shirt;[50] and (8) no respondents perceived the control shirt in Cell Eight to be from a source that was the same as, associated with, or permitted by the company that put out THOIP's Little Miss Splendid shirt.[51]

As discussed more fully below in Part IV.B, Disney argues that Dr.

---

[46]  *See id.* ¶¶ 58-59; *see also id.* at 27-29 Tab. 2 (verbatim responses).

[47]  *See id.* ¶¶ 58-59.

[48]  *See id.* ¶¶ 61-62; *see also id.* at 30-31 Tab. 3 (verbatim responses).

[49]  *See id.* ¶¶ 61-62.

[50]  *See id.* ¶¶ 64-65; *see also id.* at 32-34 Tab. 4 (verbatim responses).

[51]  *See id.* ¶¶ 64-65.

Ford's survey did not have an effective control, pointing out that none of the

control respondents were classified as confused. Because Dr. Ford only counted as

confused those respondents who made some reference to words or the style of the

lettering on the shirt, and because none of the control shirts featured any lettering,

"it was . . . impossible under Dr. Ford's methodology for someone to have selected

the control shirt in a way that Dr. Ford would have counted as confused."[52]

In response to this criticism, but without conceding that his original

coding choices were incorrect, Dr. Ford "broadened [his] standards and recoded

respondents as confused based on three additional criteria: e) [b]ecause of design;

f) [b]ecause the shirts looked the same or similar; and g) [b]ecause it's the same

type of pose or similar."[53] Under Dr. Ford's more "liberal" standards, confusion

increased in Cell One from 27.5 percent to 35.6 percent and in Cell Two from 0.0

percent to 8.6 percent with a net confusion (treatment cell minus control cell) of 27

percent for Disney's Little Miss Bossy shirt; confusion increased in Cell Three

from 25.3 percent to 32 percent and in Cell Four from 0.0 percent to 7.2 percent

with a net confusion of 24.8 percent for Disney's Miss Chatterbox shirt; confusion

increased in Cell Five from 14 percent to 17.3 percent and in Cell Six from 0.0

percent to 5.9 percent with a net confusion of 11.4 percent for Disney's Miss

---

[52]     Def. Mem. (Ford) at 24.

[53]     Ford Decl. ¶ 10.

Fabulous shirt; and confusion increased in Cell Seven from 14.6 to 17.9 percent and in Cell Eight from 0.0 percent to 6.6 percent with a net confusion of 11.3 percent for Disney's Little Miss Perfect shirt.[54]

Comparing Dr. Ford's original results to the recoded results, the net confusion for Disney's (1) Little Miss Bossy shirt decreased from 27.5 percent to 27 percent; (2) Miss Chatterbox shirt decreased from 25.3 percent to 24.8 percent; (3) Miss Fabulous shirt decreased from 14 percent to 11.4 percent; and (4) Little Miss Perfect shirt decreased from 14.6 percent to 11.3 percent.

## 3. Rebuttal to Ford Survey

Disney proffers a report and a declaration from its retained expert, Dr. Itamar Simonson, to rebut the Ford Survey, including Dr. Ford's recoding efforts.[55] Dr. Simonson's report and declaration are addressed in Part IV.

## D. The Helfgott Survey

Disney proffers a survey from Dr. Myron Helfgott that, like Dr. Ford, purports to study "whether or not [four of the accused shirts] are likely to cause consumers to think they are put out by, in association with, or with the permission

---

[54]   *See id.* ¶¶ 12-15 & Tab.1.

[55]   *See* Rebuttal Expert Report of Dr. Itamar Simonson ("Simonson Report"), Ex. 2 to Cendali Decl.; Declaration of Dr. Itamar Simonson In Support of Defendants' Motion *In Limine* to Exclude Testimony of Dr. Gary Ford ("Simonson Decl.").

16

of [THOIP]."[56]

## 1. Design and Operation

Dr. Helfgott conducted a so-called *"Eveready"* or "monadic" survey.[57]

Respondents were shown either an allegedly infringing Disney shirt or a control

shirt, and then were queried about source, association, and permission.[58] The four

allegedly infringing shirts were the same as those tested by Dr. Ford: Little Miss

Bossy with Daisy Duck, Miss Chatterbox with Minnie Mouse, Miss Fabulous with

Minnie Mouse, and Little Miss Perfect with Minnie Mouse.[59] The four control

---

[56]     Expert Report of Dr. Myron J. Helfgott ("Helfgott Survey") at 5, Ex. 1
to Schwimmer Decl.

[57]     *See* 6 McCarthy on Trademarks § 32:174 at 32-367 to 32-369
(describing the *Eveready* format and its namesake *Union Carbide Corp. v. Ever-
Ready, Inc.*, 531 F.3d 366 (7th Cir. 1976)).

[58]     Like Dr. Ford, Dr. Helfgott interviewed females eighteen or older who
had purchased a T-shirt bearing an image of a cartoon character for themselves or a
female child in the past, or were likely to do so in the future. *See* Helfgott Survey
at 8, A3. And like Dr. Ford, Dr. Helfgott split the age variable in the survey into
equal categories (eighteen to thirty-four and over thirty-five) and further divided
the quota for each age group into approximately half of the respondents purchasing
for themselves and the other half purchasing for a female child. *See id.* at 6. The
only difference between Dr. Ford's and Dr. Helfgott's survey universes was the
timeframe in which the respondents had purchased or were likely to purchase a
character T-shirt. Dr. Ford utilized a three-month timeframe and Dr. Helfgott
utilized a twelve-month timeframe. *See id.* at 8, A4. Dr. Helfgott conducted his
survey in malls in fifteen metropolitan areas across the United States, including
twelve of the locations utilized by Dr. Ford. *See id.* at 6. Each test and control
shirt was seen by 150 respondents. *See id.* at 7.

[59]     *See id.* at 7, 9.

shirts featured the same Disney character as the corresponding accused shirt, but the words "Little Miss" or "Miss" were omitted and the character trait was replaced with a different (though definitionally similar) term — pushy, motormouth, marvelous, and flawless.[60]



Thus, unlike Dr. Ford's control shirts which contained no verbiage, Dr. Helgfott's control shirts included a single descriptive term.

Respondents were told to look over the allegedly infringing or control shirt as if considering whether to buy the shirt.[61] The interviewer then asked the following questions: (1) "What company do you think puts out this T-shirt, or don't you know?"[62] (2) "Do you think the company that puts out this T-shirt puts it out themselves, or in association with some other company, or don't you

---

[60] *See id.* at 7.

[61] *See id.* at 9, A6.

[62] *Id.* at A6.

know?"[63] And (3) "Do you think the company that puts out this T-shirt got permission from some other company, did not get permission from some other company, or don't you know?"[64] If the respondent answered any of the above questions with a company name, a follow-up question was asked: "What in particular about this T-shirt makes you think [that]?"[65] Where the respondent mentioned at least one company, she was asked about the products of each company mentioned.[66]

## 2. Coding and Results

Respondents were coded as confused if they identified any of the following in response to questions (1), (2), and (3) above: "THOIP", "Chorion", "Miss Books", "Little Miss Books", "Books", or "Children's Books".[67] A respondent answering "Miss" or "Little Miss" was not coded as confused unless further inquiry indicated the respondent had THOIP or its products in mind.[68]

Based on his coding, Dr. Helfgott concluded that "the great majority

---

[63] *Id.* at A7.

[64] *Id.*

[65] *Id.* at 9 (alteration in original). *Accord id.* A6-A7.

[66] *See id.* at A8.

[67] *See id.* at 10.

[68] *See id.*

of respondents correctly identify the exhibits shown as Disney products."[69] Specifically, 71 percent of respondents identified Disney's Little Miss Bossy shirt as a Disney shirt; 85 percent of respondents identified Disney's Miss Chatterbox shirt as a Disney shirt; 75 percent of respondents identified Disney's Miss Fabulous shirt as a Disney shirt; and 85 percent of respondents identified Disney's Little Miss Perfect shirt as a Disney shirt.[70] Across the four test cells, 79 percent of respondents were not confused.[71] Across the four control cells, 82 percent of respondents were not confused.[72] Thus, across the total sample, 80 percent of respondents were not confused.[73] Only one respondent out of 1,200 identified the allegedly infringing Disney shirt as being associated with THOIP — an incidence rate of .0008 percent. Accordingly, Helfgott concluded that "there was virtually no evidence of confusion."[74]

### 3. Rebuttal to Helfgott Survey

THOIP proffers a report from its retained expert, Dr. Yoram (Jerry)

---

[69] *Id.* at 11 (emphasis omitted).

[70] *See id.* at 14.

[71] *See id.* at 11, 14.

[72] *See id.*

[73] *See id.*

[74] *Id.* at 11 (emphasis omitted).

Wind, to rebut the Helfgott Survey.[75]  Dr. Wind's report is addressed in Part IV.

## III.  APPLICABLE LAW

### A.  Trademark Infringement Under the Lanham Act

Claims for infringement of an unregistered trademark arise under

section 43(a) of the Lanham Act ("the Act").[76]  Specifically, section 43(a) prohibits

the use in commerce of:

> any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin,
> false or misleading description of fact, or false or
> misleading representation of fact, which . . . is likely to
> cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval
> of his or her goods, services, or commercial activities by
> another person.[77]

This section also acts as "a broad federal unfair competition provision."[78]

"A claim of trademark infringement, whether brought under [section

---

[75]   *See* Rebuttal Report of Yoram (Jerry) Wind Evaluating Dr. Myron J.
Helfgott's July 2009 Likelihood of Confusion Survey Concerning Disney T-shirts
("Wind Report"), Ex. 1 to Declaration of Yoram (Jerry) Wind in Support of
Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Myron J.
Helfgott.

[76]   *See EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos
Inc.*, 228 F.3d 56, 61 (2d Cir. 2000); *Louis Vuitton Malletier v. Dooney & Bourke,
Inc.* ("*Vuitton V*"), 561 F. Supp. 2d 368, 378 (S.D.N.Y. 2008).

[77]   15 U.S.C. § 1125(a)(1)(A).

[78]   *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002).

21

$32(1)^{79}$ or section 43(a) of the Act], is analyzed under [a] familiar two-prong

test . . . ."[80] "The test looks first to whether the plaintiff's mark is entitled to

protection, and second to whether defendant's use of the mark is likely to cause

consumers confusion as to the origin or sponsorship of the defendant's goods."[81]

"The likelihood-of-confusion inquiry turns on whether 'numerous ordinary prudent

purchasers are likely to be misled or confused as to the source of the product in

question because of the entrance in the marketplace of defendant's mark.'"[82] "To

---

[79]     Section 32(1) of the Lanham Act governs claims for infringement of a
registered trademark, prohibiting the use in commerce of "any reproduction,
counterfeit, copy, or colorable imitation of a registered mark in connection with the
sale, offering for sale, distribution, or advertising of any goods or services on or in
connection with which such use is likely to cause confusion, or to cause mistake, or
to deceive." 15 U.S.C. § 1114(1).

[80]     *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing
*Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993)).
*Accord Starbucks Corp. v. Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009);
*Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton II*"), 454 F.3d 108, 115
(2d Cir. 2006).

[81]     *Virgin Enters.*, 335 F.3d at 146. *Accord Starbucks Corp.*, 588 F.3d at
114 ("To prevail on a trademark infringement and unfair competition claim under
[section 32(1) or section 43(a) of the Act], in addition to demonstrating that the
plaintiff's mark is protected, the plaintiff must prove that the defendant's use of the
allegedly infringing mark would likely cause confusion as to the origin or
sponsorship of the defendant's goods with plaintiff's goods."); *Vuitton II*, 454 F.3d
at 115.

[82]     *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d
Cir. 2004) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477-78
(2d Cir. 1996)). *Accord Chambers*, 282 F.3d at 155 ("Where there is a claim of
consumer confusion [as] to the association of a product or service with another

support a finding of infringement, there must be a 'probability of confusion, not a mere possibility.'"[83] "The central consideration in assessing a mark's protectability, namely its degree of distinctiveness, is also a factor in determining likelihood of confusion."[84]

In determining whether there is a likelihood of confusion, courts within the Second Circuit apply the eight-factor balancing test introduced in *Polaroid Corporation v. Polarad Electronics Corporation.*[85] The *Polaroid* factors are: (1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that plaintiff will "bridge the gap"; (5) actual confusion between products; (6) defendant's good or bad faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.[86] "The application of the

---

person's trademark, the central inquiry is whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled as to the source or sponsorship of the product or service in question." (quoting *EMI Catalogue P'ship*, 228 F.3d at 61-62)).

[83]     *Playtex Prods.*, 390 F.3d at 161 (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001)).

[84]     *Vuitton II*, 454 F.3d at 115 (citing *Playtex Prods.*, 390 F.3d at 161).

[85]     *See* 287 F.2d 492, 495 (2d Cir. 1961); *see also Starbucks Corp.*, 588 F.3d at 115.

[86]     *See Polaroid*, 287 F.2d at 495.

23

*Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'"[87] "No single factor is dispositive, nor is a court limited to consideration of only these factors."[88] "Further, 'each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product.'"[89]

## B. Admission of Expert Testimony

The proponent of expert evidence bears the initial burden of establishing admissibility by a "preponderance of proof."[90] Rule 702 of the Federal Rules of Evidence states the following requirements for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

---

[87] *Starbucks Corp.*, 588 F.3d at 115 (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd*, 412 F.3d 373, 384 (2d Cir. 2005)).

[88] *Brennan's, Inc. v. Brennan's Restaurant, LLC.*, 360 F.3d 125, 130 (2d Cir. 2004) (citing *Polaroid*, 287 F.2d at 495).

[89] *Id.* (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986)).

[90] *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (discussing Rule 104(a) of the Federal Rules of Evidence). *Accord Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily*, 483 U.S. at 175-76, and explaining that the proponent of expert testimony must prove admissibility by a preponderance of proof).

> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the district

court must determine whether the proposed expert testimony "both rests on a

reliable foundation and is relevant to the task at hand."[91] The district court must

act as "'a gatekeeper to exclude invalid and unreliable expert testimony.'"[92] In

doing so, the court's focus must be on the principles and methodologies underlying

the expert's conclusions, rather than on the conclusions themselves.[93] "[T]he

---

[91] 509 U.S. at 597. *Accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

[92] *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999)). *Accord Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton IV*"), 525 F. Supp. 2d 558, 561-65 (S.D.N.Y. 2007) (discussing district court's "special obligation" to gatekeep with respect to expert evidence).

Additionally, expert testimony may not usurp the role of the court in determining the applicable law. *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). Although an expert "may opine on an issue of fact," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Expert testimony is also inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

[93] *See Daubert*, 509 U.S. at 595.

Federal Rules of Evidence favor the admissibility of expert testimony, and [courts'] role as gatekeeper is not intended to serve as a replacement for the adversary system."[94]

In addition, Rule 403 of the Federal Rules of Evidence states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."[95]

## C. Survey Evidence

Factor Five of the *Polaroid* inquiry concerns "actual confusion" between products and "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion."[96] However, it is well-established that a plaintiff seeking to prevail under the Lanham Act need not prove the existence of actual confusion, "since actual confusion is very difficult to prove

---

[94]     *Vuitton IV*, 525 F. Supp. 2d at 562 (citation and quotation marks omitted).

[95]     *Id.* (quotation marks omitted).

[96]     *Virgin Enters.*, 335 F.3d at 151.

and the Act requires only a likelihood of confusion as to source."[97]

Parties to trademark infringement actions frequently use consumer surveys to demonstrate or refute a likelihood of consumer confusion.[98] Obviously, "[s]urveys do not measure the degree of actual confusion by real consumers making mistaken purchases. Rather surveys create an experimental environment from which we can get useful data from which to make informed inferences about the likelihood that actual confusion will take place."[99]

Reliance on expert studies is not unqualified and without hazards. Indeed, "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions . . . . It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another."[100] Practically speaking, there is "no such thing as a 'perfect' survey. The nature of the beast is

---

[97]     *Lois Sportswear, U.S.A.*, 799 F.2d at 875.

[98]     *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225-28 (2d Cir. 1999).

[99]     6 McCarthy on Trademarks § 32:184 at 32-392.  As McCarthy explains, "[d]irect evidence of actual confusion can come only from such sources as misdirected phone calls or letters or even from that rarest of evidence, the testimony of someone willing to testify that they were once a confused customer." *Id.*  Although survey evidence is not direct evidence of actual confusion, it is nonetheless routinely categorized "under the heading of 'actual confusion.'" *Id.* at 32-393.

[100]    *Id.* § 32:178 at 32-380.

27

that it is a sample, albeit a scientifically constructed one."[101]

        To assess the validity and reliability of a survey, a court should

consider a number of criteria, including whether:

> (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.[102]

"[T]he closer the survey methods mirror the situation in which the ordinary person

would encounter the trademark, the greater the evidentiary weight of the survey

results."[103] The failure of a survey to approximate actual marketplace conditions

can provide grounds for inadmissibility.[104]

---

[101]    *Id.* at 32-380 to 32-381.

[102]    *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("*Vuitton I*"), 340 F. Supp. 2d 415, 433 (S.D.N.Y. 2004) (citation and alterations omitted), *vacated on other grounds by Vuitton II*, 454 F.3d at 117. *See also* Manual For Complex Litigation § 11.493 at 103 (Federal Judicial Center 4th ed. 2004) (setting out seven criteria); Shari Seidman Diamond, Reference Guide on Survey Research, *in* Reference Manual On Scientific Evidence ("Diamond on Survey Research") at 229, 236-72 (Federal Judicial Center 2d ed. 2000) (discussing criteria to be considered to determine the admissibility of and weight to be accorded to survey evidence).

[103]    6 McCarthy on Trademarks § 32:163 at 32-333.

[104]    *See Troublé v. Wet Seal*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) ("Although no survey can construct a perfect replica of 'real world' buying

28

While errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely to be insufficiently probative, unfairly prejudicial, misleading, confusing, or a waste of time.[105] Where, as here, a trademark action contemplates a jury trial rather than a bench trial, the court should scrutinize survey evidence with particular care.[106]

## IV. DISCUSSION

Disney argues that the Ford Survey suffers from a number of flaws that individually and collectively require its exclusion under Rules 702 and 403. THOIP argues the same as to the Helfgott Survey.

---

patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions."); *see also American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (holding district court decision to exclude survey "for failure to conduct it under actual marketing conditions" not clearly erroneous).

[105]    *See Schering*, 189 F.3d at 228; *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 296-98 (2d Cir. 1999) (affirming district court's exclusion of survey where any probative value was outweighed by prejudicial effect); *Vuitton IV*, 525 F. Supp. 2d at 568 (adopting Special Masters' recommendation to exclude flawed survey under Rules 702 and 403); 6 McCarthy of Trademarks § 32:170 at 32-351 to 32-352 ("In an extreme case, an improperly conducted survey with slanted questions or serious methodological defects may be excludable as 'irrelevant' of the true state of mind of potential purchasers. . . . [However, t]he majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.").

[106]    *See Vuitton IV*, 525 F. Supp. 2d at 562; *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 n.3. (S.D. Ind. 2000).

## A. Marketplace Conditions and Survey Format

Survey results are contingent on the method used, and different methods for assessing likelihood of confusion often produce drastically different results.[107] Case in point: the Ford and Helfgott surveys. THOIP and Disney vigorously dispute the proper survey format for examining consumer confusion in the context of this case. Unsurprisingly, each side contends that its expert's survey design is the only appropriate format for the facts presented: THOIP urges the sequential array format used by Dr. Ford while Disney urges the single-exposure *Eveready* format used by Dr. Helfgott. In support of their respective positions, both sides deploy experts of formidable position and experience.[108]

---

[107] *See, e.g., Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 289-91 (S.D.N.Y. 1997) (discussing the "markedly" divergent results between a sequential survey and an *Eveready* survey, and assigning reduced evidentiary weight to both for flaws in each).

[108] THOIP's experts include Dr. Ford, who is Emeritus Professor of Marketing at the Kogod School of Business at American University, *see* Ford Survey ¶¶ 1-6 (qualifications) & Appx. A (curriculum vitae); and Dr. Wind, The Lauder Professor and Professor of Marketing at the Wharton School at the University of Pennsylvania, *see* Wind Report at Appx. A (curriculum vitae). Disney's experts include Dr. Helfgott, who has worked as a consultant to attorneys in the area of survey research since 1982, *see* Helfgott Survey at 2-3; Dr. Pham, the Kravis Professor of Business in the Marketing Division at the Graduate School of Business of Columbia University, *see* Expert Report of Dr. (Michel) Tuan Pham ("Pham Report") ¶¶ 2-10 (qualifications) & Ex. A (curriculum vitae), Ex. 1 to Cendali Decl.; and Dr. Simonson, the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business at Stanford University, *see* Simonson Report ¶¶ 1-9 (qualifications) & Ex. A (curriculum vitae).

In untangling this knot, tied tight by numerous opposing expert

opinions, the principal question is whether either survey, if not both, sufficiently

simulated the actual marketplace conditions in which consumers encountered the

parties' products so as to be a reliable indicator of consumer confusion.[109]  In

answering this fact-intensive question, the type of confusion alleged is of

paramount importance.[110]  THOIP alleges "forward confusion" such that a

consumer who encounters an allegedly infringing Disney shirt erroneously believes

that shirt originates from or is affiliated in some manner with THOIP (the

---

[109]   *See, e.g.*, *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.* (*"Burlington Coat Factory"*), 426 F.3d 532, 534 (2d Cir. 2005) ("[W]hile simultaneous comparison may be a useful heuristic means of identifying the similarities and differences between two products, the ultimate conclusion as to whether a substantial number of consumers are likely to be confused by the similarities must be reached with a focus on actual market conditions and the type of confusion alleged.  Where products in the relevant market are not typically displayed in the same locations, centering on whether they are likely to be distinguished when viewed simultaneously is incorrect, and will result in a faulty likelihood-of-confusion analysis."); *id.* at 538 ("[T]he Lanham Act requires a court to analyze the similarity of the products in light of the way in which the marks are actually displayed in their purchasing context."); *id.* at 539 ("[C]ourts must evaluate the likely effect on consumers of the marks' similar and dissimilar features *with a focus on market conditions*, even if the products appear to be adequately different in a non-marketplace setting." (emphasis in original)); *WE Media v. General Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) ("Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions." (citing *Trouble*, 179 F. Supp. 2d at 308)).

[110]   *See Burlington Coat Factory*, 426 F.3d at 534.

prior/senior user of the mark).[111]  THOIP has not articulated a "reverse confusion"

theory that consumers perceive THOIP's shirts as having been produced by Disney

(the subsequent/junior user of the mark).[112]  Dr. Simonson, Disney's rebuttal

expert, frames the inquiry thus:

> The likelihood of confusion (and the proper methodology
> for estimating the likelihood of confusion) depend largely
> on (a) the relevant consumers' awareness (or lack thereof)
> of THOIP's shirts (including the "Little Miss" phrase), and
> (b) the typical manner in which consumers encounter the
> THOIP shirts, and in particular, whether or not there is a
> high likelihood that they would encounter *side-by-side* the
> specific allegedly infringed THOIP shirt (e.g., "Little Miss
> Chatterbox") and the corresponding allegedly infringing
> Disney shirt (e.g., "Miss Chatterbox").[113]

THOIP tends to agree with Dr. Simonson's framing of the inquiry,[114]

---

[111]    *See Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 293 (S.D.N.Y. 2003) ("Forward confusion is the traditional form of confusion in which the junior user uses the mark to sell goods or services based on the misperception that they originate with the senior user.").

[112]    *See id.* ("'Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user.'") (quoting *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991)).

[113]    Simonson Report ¶ 23 (emphasis added).

[114]    *See, e.g.*, Plaintiff's Opposition to Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("Pl. Mem (Ford)") at 3 (relying on Dr. Simonson's deposition testimony for the proposition that "[t]he key determinant of whether the *Eveready* design or the sequential line-up design (also know as an array format) is appropriate is whether consumers are likely to encounter both parties' products in the marketplace").

except that, as discussed more fully below, THOIP contests the notion that a sequential array survey is only justified where the products are encountered side-by-side in the marketplace.

Before addressing each side's contentions about why the other's expert survey failed to sufficiently reflect marketplace conditions, it is important to describe those conditions and, in particular, the manner in which consumers encountered THOIP's and Disney's products in the marketplace, including whether they are competitors.

Obviously, the Little Miss THOIP, Little Miss Disney, and Miss Disney lines are within the same narrow category of goods directed at the same set of consumers.[115] The products are undeniably alike: All are T-shirts bearing a cartoon and a similar phrase of a certain witticism or cheekiness, are fabricated in a common faux-distressed style, and are marketed to and for women and girls. While it is unclear whether the parties' shirts retailed for the exact same price, they

---

[115] In this regard, the various cases upon which Disney relies that address products that were *not* rivals are of diminished persuasive value. *See, e.g.*, *Kargo Global, Inc. v. Advance Magazine Publishers*, No. 06 Civ. 550, 2007 WL 2258688, at *7 (S.D.N.Y Aug. 6, 2007) (excluding sequential survey where Kargo's wireless services "were not competing" with Advance's men's shopping magazine); *National Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 482-84 (S.D.N.Y. 2002) (accepting *Eveready* survey and excluding sequential array survey where the parties' products were not only in different categories (high-end vodka and inexpensive vodka coolers) but also were sold in different types of locations).

33

were without a doubt within the same price-point.[116]

THOIP's shirts hit the market in the summer of 2006 and apparently continue to be offered for sale nationwide. The Little Miss Disney and Miss Disney lines were launched in February 2008 and October 2007, respectively, and were pulled from the shelves by August 2008. Therefore, THOIP's shirts overlapped with the Little Miss Disney line for approximately six months, and with the Miss Disney line for approximately ten months.

Because the two lines of accused Disney shirts were available in different locations, I analyze each line separately. The parties agree that the THOIP and Little Miss Disney shirts were not sold in the same stores but rather were sold in different stores within various distances of each other.[117] In particular, the Little Miss Disney shirts were sold at the World of Disney Store in Manhattan, which is located at Fifth Avenue and Fifty-Fifth Street. A number of other stores within a few city blocks carried the Little Miss THOIP shirts, such as Gap Kids at Fifth Avenue and Fifty-Fourth Street, and Saks Fifth Avenue at Fifth Avenue and

---

[116]    *See* Coleman Decl. at Ex. B (filed under seal).

[117]    *See* 1/12/10 Conference Transcript ("1/12/10 Tr.") at 3-4; 1/15/10 Supplemental Declaration of Melanie Bradley in Further Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("1/15/10 Bradley Decl.") ¶ 2.

Fiftieth Street.[118]  Similarly, where the Little Miss Disney shirts were sold *inside*

Disneyland and possibly at the World of Disney Store in the Downtown Disney

complex *outside* of Disneyland, THOIP's shirts were sold at Vault 28 in this

Downtown Disney complex.  The Little Miss THOIP and Little Miss Disney shirts

may also have been available in nearby stores at Disney World in Florida —

specifically, while THOIP's shirts were sold at the Virgin Store, the World of

Disney Store in the Downtown Disney complex may have sold Little Miss Disney

shirts.[119]

     As for the Miss Disney line, the parties agree that their shirts were

sold by the same chains.[120]  The parties dispute whether their products were

---

[118]    *See* Wind Report at 7 fig. 3.1; Millard Decl. ¶ 8; Schwimmer Decl.
¶ 10 & Ex. 6 (map of mid-town Manhattan).

[119]    *Compare* Pl. Mem (Ford) at 10 ("The Little Miss Disney Shirts . . .
were *likely* sold at the World of Disney Store in Downtown Disney in Disney
World." (emphasis added)); Schwimmer Decl. ¶¶ 8-9 (same), *with* Coleman Dep.
at 87 ("I do not know for sure [whether the Little Miss Disney shirts were sold at
all three World of Disney Stores in Anaheim, Orlando, and New York City].  They
are our top volume location [sic], so I would think so.  But I'm not sure if all
locations.").
    THOIP's shirts were not sold at Epcot center until November 2008 —
three months *after* the end of the selling period for the Little Miss Disney shirts at
Epcot's Mouse Gear.  *See* Coleman Decl. ¶¶ 7-9 & Ex. B (filed under seal); Guy
Dep. at 48; 1/15/10 Bradley Decl. ¶ 3.  Accordingly, I find that it is highly unlikely
that consumers would have encountered the parties' shirts together at Epcot Center.

[120]    *See* 1/12/10 Tr. at 8.

available simultaneously in specific stores,[121] and, if they were, whether they were on sale near to each other within those stores. According to Disney's expert, Dr. Michel Pham, department stores, such as JC Penney, Kmart, Kohl's, and Target, "generally sold [Miss Disney] t-shirts in a specific section grouped with other Disney merchandise in order to take advantage of the Disney brand."[122] THOIP counters with photographs showing THOIP and Disney shirts (though not the THOIP and Disney shirts at issue here) on display next to each other in a Walmart in Middle Island, New York, and other photographs depicting Disney shirts and apparently non-Disney shirts on display together in several chain stores in Manhattan.[123] Disney responds that because the pictures do not show the actual T-shirts at issue in this suit, they prove nothing.[124] THOIP's declarant, Amory

---

[121]     *See* 1/15/10 Bradley Decl. ¶¶ 9-11.

[122]     Pham Report ¶ 73.

[123]     *See* Schwimmer Decl. ¶ 12 & Ex. 8; Declaration of Matthew P. Moore, Plaintiff's Counsel, in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Myron J. Helfgott ¶¶ 3-10 & Exs. 2, 3.

[124]     Disney also argues that these photographs should be excluded because they were not produced by THOIP in discovery or as part of an expert report. *See* Disney Mem. (Helfgott) at 9. I am denying this request because these photographs, which were taken in late August and October 2009, are highly relevant and Disney has suffered no prejudice by their admission. Additionally, Disney produced documents and photographs after the close of discovery. *See* 11/20/09 Declaration of Amanda Schaffer in Support of Plaintiff's Motion to Exclude the Proposed Expert Testimony of Dr. Myron J. Helfgott ¶¶ 6-7.

Millard, responds that based on her years of experience: "[I]f Disney had not taken the Miss Disney Shirts off the market (or if Disney were to resume selling the Miss Disney Shirts) it is highly likely that the Miss Disney Shirts would be sold alongside other Disney T-shirts at Walmart, Target, and other stores . . . ."[125]

Additionally, the parties agree that the THOIP shirts and two infant Miss Disney shirts were available at the same time at Vault 28.[126]  Disney again asserts that its shirts were not sold next to THOIP's because the Miss Disney shirts were displayed in an armoire containing infant and children's clothes that was approximately thirty-six feet from where the THOIP shirts were displayed.[127] THOIP responds that Vault 28 is a relatively small boutique of only 1,185 square feet.[128]

---

[125]     Millard Decl. ¶ 4.  Further according to Millard, "[d]epartment stores and retailers . . . rarely merchandise T-shirts by brand, unless they are running a special promotion.  Usually, multiple brands are all displayed together on tables and/or walls and Disney and THOIP T-shirts are often displayed side-by-side or in the same section."  *Id.* ¶ 5.

[126]     *See* Murray Decl. ¶¶ 4, 6; 1/15/10 Bradley Decl. ¶ 5.

[127]     *See* Murray Decl. ¶¶ 6-7.

[128]     *See* 1/15/10 Schaffer Decl. ¶ 3 & Ex. 1.

## B.   The Ford Survey

### 1.   The Ford Survey Failed to Sufficiently Replicate Actual Marketplace Conditions

Disney first argues that the Ford Survey did not reflect marketplace conditions because "THOIP has failed to demonstrate beyond mere speculation that there was an appreciable likelihood of *seriatim* viewing of the THOIP and Disney T-shirts at issue in the real world."[129]  According to Dr. Simonson, "a sequential presentation of the two marks at issue (or array) is appropriate only if it reflects a significant number of real world situations in which both marks at issue are likely to be evaluated sequentially or side-by-side."[130]  For example, a sequential survey is proper, according to Dr. Simonson, to estimate confusion with respect to two skincare lines sold in many of the same outlets,[131] Monster Milk and Monster Energy drinks,[132] Bounty and Brawny paper towels,[133] or Heinz and Hunts

---

[129]   Def. Reply (Ford) at 1.

[130]   Simonson Decl. ¶ 2.

[131]   *See id.* (discussing sequential survey prepared by Dr. Simonson in *Gross v. Bare Escentuals Beauty, Inc.*, No. 03 Civ. 3089 (S.D.N.Y.)); Fakler Decl. at Ex. 8 (report).

[132]   *See id.* ¶ 3 (discussing sequential survey prepared by Dr. Simonson in *Hansen Beverage Co. v. Cytosport, Inc.*, No. 09 Civ. 31 (C.D. Cal.)); Declaration of Dr. Itamar Simonson in Support of Hansen Beverage Company's *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction, *Hansen Beverage Co.*, Ex. 4 to Declaration of Paul Fakler, Plaintiff's Counsel, in Support of Plaintiff's Opposition to Defendants' Motion *In*

ketchup.[134] In his deposition, Dr. Simonson testified that an *Eveready* study would probably not be appropriate in such a scenario.[135] Dr. Simonson further testified that an *Eveready* study is the appropriate design — and a sequential survey is inappropriate — where the products are in the same category of goods but are sold in *different* stores *within* the same shopping center.[136] Based on these views, Dr. Simonson opined that the Ford Survey format was not justified because "there is no evidence of any marketplace situation in which the Disney and THOIP shirts at issue appeared together."[137]

---

*Limine* to Exclude Expert Testimony of Dr. Gary Ford ("Fakler Decl."); Declaration of Dr. Itamar Simonson in Support of Hansen Beverage Company's Motion for Preliminary Injunction, *Hansen Beverage Co.*, Ex. 6 to Fakler Decl.; Fakler Decl. at Ex. 7 (questionnaire).

[133]    *See* Deposition of Itamar Simonson ("Simonson Dep.") at 86, Ex. 2 to 11/20/09 Supplemental Declaration of Melanie Bradley in Further Support of Defendants' Motion *In Limine* to Exclude Expert Testimony of Dr. Gary Ford ("11/20/09 Bradley Decl.").

[134]    *See id.* ("[Y]ou have two soft drinks sold in the same store, doesn't have to be in every store but there are enough stores where that happens. [Or where y]ou have two paper towels, Bounty and Brawny. There are many stores were [sic] these two products are sold together. Perhaps not in every store, but in many stores. That means that sequential presentation would be fully justified and, in fact, probably Eveready would not be justified. So in other words, if you want to estimate the likelihood of confusion between Heinz ketchup and Hunts ketchup, Eveready would be inappropriate in my opinion.").

[135]    *See id.*

[136]    *See id.* at 86-87.

[137]    Simonson Decl. ¶ 4. *Accord* Simonson Report.

THOIP responds that Dr. Ford's "sequential array format is the only appropriate format for a case such as this, where both parties sell identical products, which are sold in the same stores and in the stores within close shopping proximity to one another are therefore reasonably likely to be encountered by the same consumers."[138] Dr. Ford argued in his deposition why a sequential array format better replicates marketplace conditions in this case than an *Eveready* design:

> [I]f people are out shopping and encounter, as they move from department to department within a store or move from store to store and encounter the brand, even on different days, the array study does a better job of replicating that experience than does the — an *Eveready* study. [The *Eveready* design does] not in any way reflect the shopping experience that people might have.[139]

Similarly, Dr. Wind opined:

> [T]he Ford study which utilized the array design is the more appropriate design for the context of this case and any similar co[-]branded situation in which the parties have (I) different trademark assets — in this case Disney who own [sic] the cartoon characters, and "Little Miss" [sic] who own the unique combination of "Little Miss + personality/character traits + a cartoon character" presented as a variable family of designs[;] (ii) when one of the brands is much better known than the other and especially in an unaided awareness context[; and] (iii) both products are available in close shopping proximity in a number of

---

138    Pl. Mem (Ford) at 1. *Accord id.* 2-6, 8-11.

139    Ford Dep. at 66.

real world shopping environments.[140]

THOIP and its experts define "close shopping proximity" to include the scenarios where the senior and junior products are available within the same stores, though not necessarily in the same section, as well as in different stores within a close distance.[141]

Based on all of the expert testimony and reports and my review of the academic literature and case law, I conclude that the Ford Survey did not sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace. When ascertaining whether a survey methodology sufficiently simulates marketplace conditions, the focal point must be the specific products tested by the survey. THOIP has not shown a reasonable likelihood that consumers would have proximately encountered the specific pairs of shirts tested by Dr. Ford. Those were: THOIP's Little Miss Bossy with Disney's Little Miss Bossy; THOIP's Little Miss Splendid with Disney's Little Miss Perfect; THOIP's Little Miss Chatterbox with Disney's Miss Chatterbox; and THOIP's Little Miss Splendid with Disney's Miss Fabulous. Of crucial importance, Dr. Ford coupled THOIP and Disney shirts based on resemblance rather than on whether they were

---

[140]    Wind Report ¶ 7(e).

[141]    *See* Pl. Mem. (Ford) at 8-11; Wind Report ¶ 7.

41

found together in the marketplace.[142] While comparing the most similar THOIP

and Disney shirts may be a useful heuristic device, a legally-probative estimation

of consumer confusion must be tethered to marketplace conditions.

By contrast to THOIP's failure to establish that the specific pairs

tested in the Ford Survey were to be found in close proximity in the marketplace,

Disney has demonstrated that Dr. Ford's choices did not reflect the realities of the

marketplace. As to the Miss Disney line specifically, the January 15, 2010

declaration of Melanie Bradley states:

> A review of the Junk Food [the THOIP licensee] and
> Disney royalty reports indicates that the specific pairs of
> shirts that Dr. Ford tested were never sold in the same retail
> locations, with one exception. The Nordstrom's [sic] retail
> chain apparently carried a "Little Miss Chatterbox" THOIP
> T-shirt and also at some point carried a "Miss Chatterbox"
> Disney T-shirt. However, we have no way of knowing
> which Nordstrom's [sic] locations carried the T-shirts or if
> *any* Nordstrom's [sic] locations carried *both* T-shirts. We
> also do not know whether the T-shirts were carried by the
> Nordstrom's [sic] chain during the same time period.[143]

---

[142]   *See* Ford Dep. at 31, 107-108.

[143]   1/15/10 Bradley Decl. ¶ 9 (emphasis added). *See also id.* ¶ 10
("Given the small number of 'buys' of THOIP T-shirts and 'Miss Disney' T-shirts
it is not clear whether a given chain purchased for all of the stores in the chain or a
subset thereof. For example, the March 2008 royalty report produced by Junk
Food indicates that Nordstrom's [sic] purchased approximately 234 'Little Miss
Chatterbox' THOIP T-shirts. Given that Nordstrom's [sic] operates approximately
100 Nordstrom's [sic] stores nationwide and that stores generally carry at least one
of each size T-shirt (S, M, L, XL), it would appear that at most 58 of the 110
Nordstrom's [sic] stores carried that particular THOIP shirt.").

Bradley continues:

> [W]hile . . . other retailers such as Macy's and Urban
> Outfitters may have carried at one time or another one or
> more "Miss Disney" T-shirts and one or more THOIP
> T-shirts, again, the documents do not show which locations
> carried each T-shirt or the time period during which these
> T-shirts were sold. As such, there is nothing to indicate
> that the "Miss Disney" T-shirts and the THOIP T-shirts at
> issue here ever appeared in the same stores at the same
> time.[144]

THOIP has offered no proof to rebut Bradley's assertions. Thus, notwithstanding

that many of the same retailers sold THOIP and Miss Disney shirts, and despite the

evidence that Disney shirts are at times sold side-by-side non-Disney shirts, such

*general* information does not justify Dr. Ford's *specific* choices.

In addition, with respect to the Little Miss Disney line, even assuming

*arguendo* the soundness of THOIP's position that a sequential array survey is

justified where the products are found in different stores within short distances of

each other,[145] THOIP has not shown a reasonable likelihood that consumers would

---

[144]    *Id.* ¶ 11.

[145]    There seems to be some legal support for THOIP's position. *See, e.g.*,
*Burlington Coat Factory*, 426 F.3d at 539 ("The parties concede that, in the actual
marketplace, these products [high-end and discount handbags] are *not sold
side-by-side*, and are instead *sold in different stores and on different websites*.
Under the circumstances, a focus on the likely effect of simultaneous viewing on
consumers was legally erroneous. . . . On remand, the [district] court should give
particular weight to any evidence submitted by the parties addressing the overall
impression that consumers are likely to have of the handbags when they are viewed
*sequentially*, and in different settings, rather than simultaneously." (emphasis

have proximately encountered its shirts and the Little Miss Disney shirts in a critical number of real world situations. Though THOIP's shirts were available in thousands of stores nationwide,[146] the Little Miss THOIP and Little Miss Disney shirts were on sale in a small number of nearby stores in at most *three* geographic locations (New York City, Anaheim, and Orlando).[147] In these circumstances, there is not a reasonable likelihood that consumers would have encountered in close proximity Little Miss THOIP and Little Miss Disney shirts, let alone those

---

added)); *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 218 (2d Cir. 2003) (concluding under *Polaroid* Factor Three — closeness in proximity of the products — that "[c]onsumers who visit a Patsy's Pizzeria are reasonably likely to visit nearby retail stores where Patsy's Brand sauces are sold, creating the opportunity for confusion"); *Vuitton IV*, 525 F. Supp. at 574 & n.120 (excluding survey for, *inter alia*, failing to employ a "methodology involving sequential presentation or 'line-up' of stimuli which better approximates marketplace conditions" where the parties' handbags were sold in different locations). *But see Kargo*, 2007 WL 2258688, at *7 (criticizing sequential survey for failing to reflect marketplace conditions where, among other things, the plaintiff "offered no data or other evidence to support the proposition that prospective consumers were likely to encounter Kargo's trademark *a short time* after seeing *Cargo* magazine . . . the Court doubts that a non-negligible number of prospective consumers of Kargo's products would see *Cargo* magazine, followed *a minute or less later*, by the KARGO logo" (emphasis added)).

[146] *See* SAC ¶ 26.

[147] *Cf. Simon Prop. Group*, 104 F. Supp. 2d at 1044-45 (excluding proposed survey where respondents were to be presented with the parties' two home pages together because such sites would rarely if ever appear together).

pairs specifically tested by Dr. Ford.[148]

Another aspect of Dr. Ford's methodology caused his survey to further depart from actual marketplace conditions. The shirts used in the survey did not bear the neck labels and hang tags that would have been attached to the shirts in the marketplace.[149] Dr. Ford asserts it is unlikely that including such indicia of origin would have had a substantial impact on his findings because "if respondents paid attention to the neck label and/or hang tags and realized that the source of the t-shirts was Disney, they still may have perceived that Disney produced the shirts in association with THOIP or got permission from THOIP."[150]

---

[148]    This is not of course to say that trademark infringement cannot occur in such a scenario. Indeed, any infringement, however limited, is actionable. Rather, the question here is whether the sequential array survey conducted by Dr. Ford sufficiently reflects the broad marketplace conditions surrounding the THOIP and Disney shirts, such that the survey is *reliable* and *probative*.

[149]    *See* Pham Report ¶¶ 44, 50, 75 (explaining that Disney's shirts were sold with neck labels and hang tags identifying their source as Disney and bearing the Disney trademark, and that THOIP's shirts are sold bearing neck labels identifying the licensee). While the Miss Disney shirts produced by Disney to THOIP did not have hang tags, *see* Fakler Decl. ¶ 12, there is no dispute that all of the shirts featured neck tags in the marketplace.

[150]    Ford Decl. ¶ 35. Additionally, THOIP contends that Dr. Ford could not have used shirts with neck labels or hang tags because THOIP could not acquire such shirts in sufficient quantities, namely because Disney refused to produce more than one sample of each of its allegedly infringing shirts in discovery. *See* Pl. Mem. (Ford) at 23-24 (citing Fakler Decl. ¶¶ 11-12). However, according to Disney, THOIP rejected an offer under which Disney would have provided five of each accused shirt in exchange for five of each purportedly infringed THOIP shirt. *See* 11/20/09 Bradley Decl. ¶ 14.

45

Additionally, Dr. Ford contends that "[neck tags] are visible but relatively unobtrusive . . . ."[151]

While it may be true that a respondent informed about the source of a Disney shirt might have still thought that shirt was associated with or permitted by THOIP, it is very likely that source information would have diminished confusion not only as to source but also as to association and permission. Labels are not unnoticed by consumers; rather, they serve as important sources of information, including brand identification.[152] Dr. Ford's failure to use hang tags and neck labels clearly is a deviation from actual marketplace conditions.[153]

Finally, Disney argues that the Ford Survey failed to approximate

---

[151] Ford Decl. ¶ 35.

[152] *See* Simonson Dep. at 204-206.

[153] *Cf. Beverage Marketing USA, Inc. v. South Beach Beverage Corp.*, No. 97 Civ. 4137, 2000 WL 1708214 (S.D.N.Y. Nov. 15, 2000) ("Comparing the bottles, with the labels properly on them, unlike plaintiffs' survey comparison of the bottles with that very significant element of their trade dress removed, the Court holds that a reasonable jury properly considering the aforementioned factors, could not find a likelihood of confusion."), *aff'd*, 36 Fed. Appx. 12, 14-15 (2d Cir. 2002) (unpublished); *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203, 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) ("[T]the survey did not replicate the marketplace conditions in which consumers encounter Lancôme's products. Lancôme's cosmetics are sold at Lancôme counters or department store sections, or over websites, with prominent signage identifying Lancôme as the seller, and the products as Lancôme products. Lancôme products are also packaged in both boxes and a product container that identify them as Lancôme products.").

marketplace conditions because it improperly created artificial awareness of THOIP's claimed mark among survey respondents,[154] and, relatedly, "tested 'conditional probability,' i.e., only the *potential* rate of confusion amongst the limited subset of people who were *already* aware of THOIP's claimed mark, not the *actual* likelihood of confusion among the far broader universe of potential consumers who are not."[155] Of course, these alleged flaws are inherent in an otherwise-justified sequential survey testing forward confusion. Here, though public awareness of THOIP's name and that of its parent company is low,[156] there is an appreciable awareness of the Little Miss — and related Mr. Men — characters.[157] Therefore, that Dr. Ford showed respondents a THOIP shirt before

---

[154]   *See* Def. Mem. (Ford) at 10-12.

[155]   *Id.* at 12 (emphasis in original).

[156]   *See* Pl. Mem. (Ford) at 7; Ford Decl. ¶ 32; Wind Report ¶ 9.

[157]   *See* Pl. Mem. (Ford) at 16 ("In fact a THOIP internal study from 2007 empirically demonstrates that unaided awareness of the THOIP Mr. Men/Little Miss family of characters on printed tops in early 2007 was 69% . . . ." (citing Deposition of Dr. Yoram Wind at 158, Ex. 2 to Fakler Decl.)). While THOIP "has not conducted a secondary meaning survey to measure the actual awareness level of THOIP products," Def. Mem. (Ford) at 13, it appears likely that a critical portion of relevant consumers are aware of the Little Miss characters. The Little Miss characters have been seen widely in books, TV shows, videos, and merchandise. With respect to the Little Miss and Mr. Men shirts themselves, "[s]ales . . . for 2007 at wholesale were almost $10 million and this year to date have been over $4 million. The MR. MEN and LITTLE MISS T-shirts are distributed in over 5000 boutique locations in the U.S., as well as large chain department stores . . . ."). SAC ¶ 26. THOIP concedes that awareness of its brand

47

displaying the array cannot be considered a flaw of any significance.[158]

Nonetheless, based on all of the foregoing discussion, I conclude that the Ford Survey failed to sufficiently replicate the manner in which consumers encountered the parties' products in the marketplace, which severely diminishes the reliability and probative force of this survey.

## 2. The Ford Survey Did Not Use an Adequate Control

Not only did the Ford Survey fail to approximate marketplace conditions, it also suffers from another major flaw — it did not have an effective control. A survey designed to estimate likelihood of confusion must include a proper control.[159] A control is designed to estimate the degree of background "noise" or "error" in the survey. Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology.[160] To fulfill its function, a control should

---

is "low relative to the undisputed fame of the Disney characters . . . ." Pl. Mem. (Ford) at 7.

[158] *Cf. National Distillers*, 198 F. Supp. 2d at 484 (excluding sequential survey where "[t]he second major flaw we discern in the Rappeport Survey is that every respondent was exposed to the Teton Glacier product in the first room, thus acquainting them with a product that they would almost certainly have been unfamiliar with otherwise, due to Teton Glacier's very limited distribution network and weak sales").

[159] *See* Diamond on Survey Research at 257.

[160] *See* 6 McCarthy on Trademarks § 32:187 at 32-397 to 32-400.

"share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[161] To obtain an estimate of the net likelihood of confusion, the researcher subtracts the measured confusion level in the control from the measured confusion level in the treatment version.

Dr. Ford's control was a shirt depicting the same Disney character image as an allegedly infringing shirt but without any words. Disney argues that these control shirts, because they contained no words, were too dissimilar to the test shirts such that they were not an effective control. Even assuming the control was adequate, Disney contends, "Dr. Ford's methodology ensured that in practice his 'control' would not account for any 'background' noise."[162] As noted previously, under Dr. Ford's original confusion standards, no respondent selecting the control shirt was coded as confused.

In response, Dr. Ford expanded his confusion criteria and recoded the data. However, according to Disney, Dr. Ford's efforts to recode do not repair the problem with the control itself.[163] I agree. Even after recoding, the control

---

[161]   Diamond on Survey Research at 258. *Accord Government Employees Ins. Co. v. Google, Inc.* ("*GEICO*"), 77 U.S.P.Q.2d 1841, 1846-47 (E.D. Va. 2005); *Simon Prop. Group*, 104 F. Supp. 2d at 1045.

[162]   Def. Mem. (Ford) at 23.

[163]   *See* Def. Reply (Ford) at 7.

49

underestimates the "noise" in the survey as it only contained a cartoon character and lacked other key unprotectable elements of the test shirts, such as a descriptive term. Thus, respondents were less likely to pick the control shirt or give a response that Dr. Ford would code as confusion.

Because the Ford Survey failed to replicate actual marketplace conditions in which consumers encountered the products at issue here and failed to use an adequate control, it is not a reliable indicator of consumer confusion. Accordingly, the Ford Survey is inadmissible.

### C.    The Helfgott Survey

#### 1.    The Helfgott Survey Sufficiently Replicates Marketplace Conditions

Mirroring its arguments in support of the Ford Survey, THOIP argues that Dr. Helfgott's *Eveready* study failed to sufficiently replicate actual marketplace conditions because "[s]urvey participants never saw samples or even images of THOIP's shirts, despite the fact that both parties' shirts are sold in the same and/or proximate locations."[164]  In this regard, THOIP argues the *Eveready* format severely underestimates consumer confusion, especially where, as here, there is low public awareness of THOIP and Chorion.

As I have already explained, because of the low likelihood that

---

[164]    Pl. Mem. (Helfgott) at 9 (citing Wind Report ¶ 7).

consumers would have encountered, in close proximity, the specific pairs of shirts

tested by Dr. Ford, his survey does not approximate the actual marketplace

conditions surrounding the products at issue here. By contrast, Dr. Helfgott's

*Eveready* study, in which respondents were exposed to a single shirt, does

approximate those conditions.[165]

## 2. Other Challenges to the Helfgott Survey

THOIP claims a host of other problems with the Helfgott Survey.

Most significantly, THOIP contends that Dr. Helfgott conducted an "unusual"

variation of the *Eveready* study by only asking respondents the name of the

company that put out or authorized the shirt. THOIP argues this was inappropriate

because consumers do not know the name of THOIP or its parent as THOIP's

"marketing strategy has been to focus on and promote the Mr. Men and Little Miss

family of characters as a brand, and not to identify its licensed goods with a

corporate name as the source of origin."[166]

Dr. Helfgott's use of the word "company" in his survey questions was

---

[165]     To be clear, it is *not* my holding that any given set of marketplace
conditions can support only one survey design. More than one survey format may
sufficiently reflect marketplace conditions so as to meet the standard for
admissibility.

[166]     Pl. Mem. (Helfgott) at 11.

not unusual.[167]  Indeed, Dr. Ford used the term "company" in his survey questions

and testified that the use of the term was appropriate and would not mislead

respondents.[168]  This is not a problem because when the confusion results were

tabulated in the Helfgott Survey, the respondents did not need to know or state the

exact legal name of the entity that puts out the product at issue to be counted as

confused.  Under Dr. Helfgott's confusion criteria, respondents who stated "Miss

Books", "Little Miss Books", "Books", or "Children's Books" qualified as

confused.[169]

THOIP asserts a number of other flaws in the Helfgott survey,

including that the questions were biased and leading, the universe was incorrect,

there was no reference to interviewer briefings or practice interviews, and that Dr.

Helfgott relied on a subcontractor to review the verbatim responses.[170]  I have

carefully reviewed these concerns and conclude that they go to weight and not

exclusion.

Finally, THOIP argues that the Helfgott Survey and testimony should

be excluded because Dr. Helfgott "destroyed and failed to produce [his notes and

---

[167]  *See* 6 McCarthy on Trademarks § 32:175 at 32-370.

[168]  Ford Dep. at 83-83.

[169]  *See* Helfgott Survey at 10.

[170]  *See* Pl. Mem. (Helfgott) at 15-16.

work papers] relied upon in forming his opinions."[171]  However, Dr. Helfgott

testified that he only destroyed his notes after incorporating the information

contained in them in his report.[172]  As such, THOIP has shown no prejudice and its

request to exclude the survey on this ground is denied.

## V.     CONCLUSION

For the reasons set forth above, the Ford Survey is inadmissible and

the Helfgott Survey is admissible.  Accordingly, Disney's motion is granted and

THOIP's motion is denied.  The Clerk of the Court is directed to close these

motions (document numbers 66 and 70).  A conference is scheduled for February,

16, 2010 at 4 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           February 9, 2010

---

[171]     Pl. Mem. (Helfgott) at 18 (citing Fed. R. Civ. P. 26(a)(2)(B)(ii)).

[172]     *See* Deposition of Myron Helfgott, at 138, Ex. 3 to Declaration of
Courtney Schneider, Defendants' Counsel, in Support of Defendants' Motion In
Opposition to Plaintiff's Motion *In Limine* to Exclude Expert Testimony of Dr.
Myron Helfgott.

- Appearances -

**For Plaintiff:**

Paul M. Fakler, Esq.
Martin Schwimmer, Esq.
Kandis Koustenis, Esq.
Amanda J. Schaffer, Esq.
Moses & Singer LLP
405 Lexington Avenue
New York, New York 10174
(212) 554-7800

**For Defendants:**

Dale M. Cendali, Esq.
Melanie Bradley, Esq.
Courtney Schneider, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800