**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

**THOIP (A Chorion Limited Company),**

             **Plaintiff,**

        **- against -**

**THE WALT DISNEY COMPANY,**
**DISNEY CONSUMER PRODUCTS,**
**INC., and DISNEY DESTINATIONS,**
**LLC,**

           **Defendants.**

------------------------------------------------- X

**OPINION AND ORDER**

**08 Civ. 6823 (SAS)**



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

THOIP claims rights to a family of unregistered trademarks stemming
from a collection of children's books featuring the "Mr. Men" and "Little Miss"
("MMLM") cartoon characters.  Under the Lanham Act and the common law,
THOIP alleges that its family of marks was infringed by two lines of T-shirts from
The Walt Disney Company, Disney Consumer Products, Inc., and Disney
Destinations, LLC (collectively "Disney").  The Disney shirts are "undeniably

alike" a line of THOIP T-shirts featuring the marks at issue here,[1] except that the

challenged shirts feature iconic Disney characters. The parties have cross moved

for summary judgment, sacrificing a small forest along the way.[2]

---

[1]     *THOIP v. The Walt Disney Co.*, 690 F. Supp. 2d 218, 233 (S.D.N.Y.
2010).

[2]     The parties' submissions on these motions total more than 1,500
pages. There are six briefs: THOIP's Memorandum of Law in Support of Its
Motion for Summary Judgment ("THOIP Mem."), Disney's Memorandum of Law
in Opposition to THOIP's Motion for Summary Judgment ("Disney Opp."),
THOIP's Reply Memorandum of Law in Support of Its Motion for Summary
Judgment ("THOIP Reply"), Disney's Memorandum of Law in Support of Its
Motion for Summary Judgment ("Disney Mem."), THOIP's Memorandum of Law
in Opposition to Disney's Motion for Summary Judgment ("THOIP Opp."), and
Disney's Reply Memorandum of Law in Support of Its Motion for Summary
Judgment ("Disney Reply"). There are two statements of undisputed fact under
Local Rule 56.1 ("THOIP 56.1" and "Disney 56.1") and two responses to those
statements ("Disney 56.1 Response" and "THOIP 56.1 Response"). There are also
fourteen declarations accompanied by fifty-six exhibits. And I note that I denied
THOIP's request to inundate the Court with a substantially larger number of
exhibits. *See* Docket Entry # 94.
        What is more, a number of submissions were made in two different
forms — one public version redacted of purportedly confidential information and
one confidential version filed under seal. Complicating matters further, many
submissions were filed only under seal. Where I discuss information filed under
seal, I conclude that any interest served by confidentiality is outweighed by the
public interest in a transparent judiciary and the danger of impairing the Court's
efficient execution of its Article III functions. *See, e.g., In the Matter of Eastman
Kodak Co.'s Application for an Order Sealing the Files in Civil Actions Against
Ability Enterprise Co. Ltd. and Kyocera Corp.*, 2010 WL 2490982, at *1 (S.D.N.Y.
June 16, 2010) (denying a miscellaneous application to file several complaints
under seal and warning: "The courts and the government depend on transparency,
and a party attempting to undermine this principle is well-advised to change
course.").

Throughout this action, THOIP has pressed a *forward* confusion theory, *i.e.*, that consumers mistakenly believe that THOIP (the prior/senior user of the mark) is the source of, or otherwise sponsored or approved, the allegedly-infringing shirts from Disney (the subsequent/junior user of the mark).[3]  Indeed, the only consumer-confusion surveys commissioned by the parties purported to test forward confusion.[4]  In a prior opinion considering the parties dueling *Daubert* motions, I excluded THOIP's survey because it was fundamentally flawed and, therefore, not a reliable indicator of consumer confusion.[5]  Disney's survey, which I determined was sufficiently reliable to be admitted into evidence, found that virtually no one seeing an allegedly-infringing Disney shirt thought that it was connected to THOIP or the MMLM characters.[6]

In addition to arguing forward confusion, THOIP now asserts a *reverse* confusion theory, as well.[7]  Reverse confusion "is the misimpression that

---

[3]     *See THOIP*, 690 F. Supp. 2d at 233.

[4]     *See id.* at 222-27.

[5]     *See id.* at 234-41.

[6]     *See id.* at 225-27, 241-42.

[7]     Though THOIP has not, until now, in any way focused on reverse confusion — I suspect because THOIP was and is interested in asserting its market strength — I cannot conclude that the argument is waived.  THOIP raised the issue, however minimally, during discovery.  In particular, in its May 1, 2009 response to Disney's contention interrogatories, THOIP stated: "To the extent that a particular

3

the junior user is the source of the senior user's goods."[8] The Second Circuit has explained that "[w]ere reverse confusion not a sufficient basis to obtain Lanham Act protection, a larger company could with impunity infringe the senior mark of a smaller one."[9] Forward and reverse confusion are not mutually exclusive, particularly where the junior user is apt to drown out the moderate success of the senior user. THOIP argues such is the case here:

> The moderate strength of THOIP's family of MMLM marks would likely cause consumers who are already familiar with those marks to believe that THOIP licensed or approved the [allegedly-infringing Disney shirts]. This situation leads to a finding of forward confusion. At the same time, the admittedly much greater strength of Disney's marks would likely cause consumers who do not yet associate the MMLM character marks with THOIP to believe that it is Disney, not THOIP and its predecessors, who are the originators and senior users of those marks, thereby robbing THOIP of any ability to increase the strength of its brand and ultimately destroying the goodwill it has already generated. This latter situation leads to a

---

consumer encounters [Disney's] infringing shirts prior to encountering\ [THOIP's] shirts in the market, such a consumer is likely to mistakenly believe that [THOIP's] shirts are licensed or approved by, or otherwise affiliated with [Disney], or even worse may mistakenly believe that [THOIP] is infringing [Disney's] rights." Declaration of Paul Fakler, THOIP's former counsel, in Support of THOIP's Motion for Summary Judgment ("Fakler Decl.") ¶ 3. Accordingly, Disney was on fair notice of THOIP's reverse confusion theory, even if the Court was not.

[8]      *Banff, Ltd. v. Federated Dep't Stores*, 841 F.2d 486, 490 (2d Cir. 1988).

[9]      *Id.* at 490-91.

finding of reverse confusion.[10]

As explained below, THOIP's family of marks is inherently distinctive and, consequently, entitled to trademark protection without a showing of "acquired meaning". Turning, then, to the likelihood of confusion between THOIP's and Disney's products, I conclude that, with respect to *forward* confusion, no material issues of fact are in dispute and Disney is entitled to summary judgment. As to *reverse* confusion, discovery is ordered reopened so that the parties may conduct further discovery, including expert surveys.

## II.   BACKGROUND

### A.   The MMLM Characters

In 1971, Roger Hargreaves wrote, illustrated, and published *Mr. Tickle* — the first book in Hargreaves's series of children's books featuring the Mr. Men characters.[11] Over fifty different Mr. Men characters, such as Mr. Happy, Mr. Messy, and Mr. Silly, have appeared in at least 130 published books.[12] In 1981, Hargreaves published *Little Miss Bossy* — the first of his books featuring the Little Miss characters.[13] Over thirty-five different Little Miss characters, such as Little

---

[10]   THOIP Opp. at 6-7.

[11]   *See* THOIP 56.1 ¶¶ 8-9; Disney 56.1 Response ¶¶ 8-9.

[12]   *See* THOIP 56.1 ¶¶ 10-11; Disney 56.1 Response ¶¶ 10-11.

[13]   *See* THOIP 56.1 ¶¶ 12, 14; Disney 56.1 Response ¶¶ 12, 14.

Miss Chatterbox, Little Miss Splendid, and Little Miss Sunshine, have appeared in at least seventy-five published books.[14]  Each MMLM book features as its main character a Mr. Men or Little Miss character that is named after a particular personality or character trait.[15]

The cover of nearly all of the MMLM books uses a "Classic Format" with two main features:  *First*, a character name ("MR." or "LITTLE MISS" and a personality or character trait) written in bold, block letters; and *second*, the relevant MMLM character portraying the featured trait.[16]  For example:



Since the MMLM books hit the United States market in 1981,[17] approximately 14.7 million copies have been sold, of which approximately 12.5

---

[14]    *See* THOIP 56.1 ¶¶ 15-16; Disney 56.1 Response ¶¶ 15-16.

[15]    *See* THOIP 56.1 ¶¶ 30-31; Disney 56.1 Response ¶¶ 30-31.

[16]    *See* THOIP 56.1 ¶¶ 30-31, 34, 41; Disney 56.1 Response ¶¶ 30-31, 34, 41.

[17]    *See* THOIP 56.1 ¶ 17; Disney 56.1 Response ¶ 17.

million copies were sold before October 2007 (when the first line of allegedly-

infringing Disney shirts went on sale).[18]  The MMLM books were (and are) often

packaged in groups or sets, and the evidence indicates that bookstores stock and

display the books together.[19]  Further uniting the MMLM characters, the back of

the Mr. Men books contain a grid of other Mr. Men characters, and the back of the

Little Miss books contain a grid of other Little Miss characters.[20]

      The MMLM characters and names were (and are) extensively licensed

---

[18]    *See* THOIP 56.1 ¶¶ 18-19.  In support of these numbers, THOIP cites
to the declaration of Robert Crossley, the Director of Legal and Business Affairs
for Chorion.  Disney objects to the Crossley declaration on the ground that it is
self-serving and conclusory.  Disney also notes that THOIP has offered different
estimates of U.S. sales of the MMLM books over the course of the litigation.
Disney's objection is overruled.  Crossley's declaration is based on personal
knowledge, his review of THOIP's internal documents, and discussions with other
THOIP employees.  *See* Declaration of Robert Crossley in Support of Plaintiff's
Motion for Summary Judgment ("Crossley Decl.") ¶ 2.

      THOIP's records of U.S. sales of the MMLM books are incomplete in
that data are missing for certain periods of time.  Attempting to fill these gaps with
sales averages taken before and/or after the missing periods, THOIP argues that the
actual number of U.S. sales of the MMLM books are actually in the nineteen to
twenty-one million range.  *See* THOIP 56.1 ¶¶ 21-24.  Disney agrees there are
missing data but argues that there is no basis to increase the sales figures because
no evidence shows that the MMLM books were sold during the periods for which
data are missing.  *See* Disney 56.1 Response ¶¶ 21-24.  While Disney may be
technically correct, there is also no basis to believe that the MMLM books abruptly
stopped selling during the periods in question.  Without resolving this dispute, it is
clear that millions of MMLM books have been sold in the United States.

[19]    *See* THOIP 56.1 ¶¶ 37, 48; Disney 56.1 Response ¶¶ 37, 48.

[20]    *See* THOIP 56.1 ¶¶ 39-40; Disney 56.1 Response ¶¶ 39-40.

for a variety of products sold in the United States, such as television shows, home videos, toys, greeting cards, and apparel.[21]  Every licensee licensed all of the MMLM characters.[22]  For such products, a variety of formats and fonts are used,

---

[21]     *See, e.g.*, THOIP 56.1 ¶¶ 4, 52, 71-72, 119; Disney 56.1 Response ¶¶ 4, 52, 71-72, 119. To establish that the MMLM characters were extensively licensed since their inception, THOIP cites to, among other things, the declaration of Richard Culley. According to Culley's declaration, he "personally developed [along with Hargreaves] an extensive and highly successful international licensing program for [the Mr. Men and Little Miss books, characters, and other properties]." Declaration of Richard Culley in Support of Plaintiff's Motion for Summary Judgment ("Culley Decl.") ¶ 3. Disney objects to the Culley declaration on the grounds that (1) he was not identified in THOIP's initial disclosures as a witness upon whom THOIP intended to rely, (2) he was not designated by THOIP as a Rule 30(b)(6) witness, and (3) his declaration consists almost entirely of self-serving, conclusory, contradictory, and hearsay. *See* Disney 56.1 Response at 2-3. Disney's objection is overruled. *First*, Disney was on notice during discovery that Culley was someone "most knowledgeable" about the licensing, use, and promotion of the MMLM characters. *See* Plaintiff's Supplemental Responses and Objections to Defendant The Walt Disney Company's First Set of Interrogatories, Ex. 3 to the Declaration of Courtney Schneider, Disney's counsel, in Opposition to THOIP's Motion for Summary Judgment. *Second*, because Culley is not a THOIP employee, THOIP was under no obligation to identify Culley as a 30(b)(6) witness. *See In re Ski Train Fire of Nov. 11, 2000 Kaprun Aus.*, No. MDL 1428, 2006 WL 1328259, at * 9 (S.D.N.Y. May 16, 2006) ("There is simply no authority for the proposition that a corporate party must produce for deposition fact witnesses who are not employed by, and do not speak for, that party."). *Third*, Culley's declaration is based on personal knowledge, his review of business documents, and his discussion with associates. *See* Culley Decl. ¶ 1. *Fourth*, as to the issue of hearsay, Culley does not report statements made by third parties and the list of licenses annexed to the Culley Declaration is admissible as a business record. *See* Fed. R. Evid. 803(6).

[22]     *See* THOIP 56.1 ¶ 66. To establish that licensees did not license the MMLM characters separately or individually, THOIP cites to the Culley Declaration. For the reasons stated *supra* n.21, Disney's objection to the Culley declaration is overruled.

including but not limited to the Classic Format.[23]

## B.    The Little Miss THOIP Shirts

In 2004, THOIP acquired global intellectual property rights to the MMLM characters, for which Chorion Limited (THOIP's parent) paid approximately thirty million pounds.[24]  THOIP intentionally refrained from licensing the characters from 2004 through the beginning of 2006 to allow time for the old products and licensees to clear out of the market before re-launching the brand.[25]

In June 2006, Chorion issued a press release announcing that it had signed a licensing agreement with Junk Food, Inc., a manufacturer and designer of T-shirts, to develop a range of T-shirts featuring MMLM characters for sale in the United States, among other countries.[26]  I generally refer to the shirts featuring the Little Miss characters as the "Little Miss THOIP shirts".  The press release also announced to the industry that Junk Food would be launching the shirts at the

---

[23]     *See, e.g.*, Disney 56.1 ¶ 26; THOIP 56.1 Response ¶ 26.

[24]     *See* THOIP 56.1 ¶¶ 2-3; Disney 56.1 Response ¶¶ 2-3.  THOIP is a wholly-owned subsidiary of Chorion, a company incorporated under the laws of England and Wales. *See* THOIP 56.1 ¶ 1; Disney 56.1 Response ¶ 1.

[25]     *See* THOIP 56.1 ¶ 131; Disney 56.1 Response ¶ 131.

[26]     *See* THOIP 56.1 ¶ 181; Disney 56.1 Response ¶ 181.

Summer 2006 MAGIC Licensing Tradeshow.[27]  Several manufacturers competed

to get the license that ultimately went to Junk Food, including Mighty Fine, Inc., a

company well known for its licensed Disney T-shirts.[28]

Junk Food has released the MMLM shirts in hundreds of different

styles.[29]  One such style is the Classic Format with its bold, block lettering; but

there are other fonts and formats used, such as cursive lettering.  Many of the shirts

are faux-distressed so as to look and feel vintage.[30]

According to Eric Karp, the former Executive Vice President of

Global Licensing and Merchandising for THOIP, "[i]mmediately upon entering the

market in mid-2006, THOIP's Little Miss T-shirts became wildly popular[, which]

increased when several young celebrities (including Britney Spears and Paris

Hilton) appeared in the media wearing the T-shirts."[31]  Also according to Karp,

---

[27]    *See* THOIP 56.1 ¶ 182; Disney 56.1 Response ¶ 182.

[28]    *See* THOIP 56.1 ¶ 183; Disney 56.1 Response ¶ 183.

[29]    *See* THOIP 56.1 ¶ 184; Disney 56.1 Response ¶ 184.

[30]    *See* THOIP 56.1 ¶ 185; Disney 56.1 Response ¶ 185.

[31]    Declaration of Eric Karp in Support of THOIP's Motion for Summary
Judgment ("Karp Decl.") ¶ 16.  Disney argues that THOIP has not submitted
evidence to support Karp's statements. *See, e.g.*, Disney 56.1 Response ¶¶ 186-
188.  Disney's objection is overruled.  Karp's declaration is based on personal
knowledge, his review of internal THOIP documents, and discussions with other
THOIP employees. *See* Karp Decl. ¶ 2.

10

"[t]housands of retailers in Junk Food's distribution network . . . promote to consumers through advertising and in-store displays."[32]  The Little Miss THOIP shirts were also featured in publications and on television shows and websites.[33] Fashion magazines described the Little Miss THOIP shirts as "must have" items.[34] To promote the shirts, Junk Food gave them away to celebrities.[35]

The Little Miss THOIP shirts are sold in over five thousand boutiques; in large chain department stores such as Bloomingdale's, Gap Kids, Hot Topic, Macy's, Nordstrom, Urban Outfitters; and online.[36]  In May 2007, Disney began purchasing Little Miss THOIP shirts for its own Vault 28 store in the Disneyland theme park in Anaheim, California.[37]  The Little Miss THOIP shirts have also been sold at Disney World, specifically at Epcot Center's United Kingdom Pavillion and the Virgin store in Downtown Disney.[38]

Through the first quarter of 2009, Junk Food's U.S. sales of *all*

---

[32]   Karp Decl. ¶ 16.

[33]   *See* THOIP 56.1 ¶¶ 189-191; Disney 56.1 Response ¶¶ 189-191.

[34]   *See* THOIP 56.1 ¶ 190; Disney 56.1 Response ¶ 190.

[35]   *See* THOIP 56.1 ¶ 192; Disney 56.1 Response ¶ 192.

[36]   *See* THOIP 56.1 ¶ 195; Disney 56.1 Response ¶ 195.

[37]   *See* THOIP 56.1 ¶ 205; Disney 56.1 Response ¶ 205.

[38]   *See* THOIP 56.1 ¶ 206; Disney 56.1 Response ¶ 206.

MMLM shirts totaled approximately $17.6 million at wholesale, with
approximately $1.6 million in 2006, $9 million in 2007, $5 million in 2008, and $2
million for the first quarter of 2009.[39] The portion of these sales related to shirts in
the Classic Format is unclear. Through 2008, U.S. sales for the Little Miss shirts
totaled approximately $10.4 million at wholesale, with approximately $1.4 million
in 2006, $6 million in 2007, and $3 million in 2008.[40] For the period beginning
July 2006 and ending October 2007 (when Disney first entered the market with its
allegedly-infringing shirts), Junk Food had shipped for sale approximately 850,000
shirts bearing a Little Miss character.[41] Again, it is unclear what portion of the
sales and shipments of the Little Miss shirts were in the Classic Format.

### C.   Disney's Allegedly-Infringing Shirts

There are two lines of allegedly-infringing Disney T-shirts at issue
here — the "Miss Disney" shirts and the "Little Miss Disney" shirts.

### 1.   The Miss Disney Shirts

In late 2007, Mighty Fine approached Disney Consumer Products

---

[39]   *See* THOIP 56.1 ¶¶ 197-198, 200, 202, 204; Disney 56.1 Response
¶¶ 197-198, 200, 202, 204.

[40]   *See* THOIP 56.1 ¶¶ 199, 201, 203; Disney 56.1 Response ¶¶ 199, 201,
203.

[41]   *See* Disney 56.1 ¶ 46; THOIP 56.1 Response ¶ 46.

("DCP") with designs for the Miss Disney shirts.[42]  Before approaching DCP,

Mighty Fine, as noted above, competed in 2006 for the THOIP license to make the

MMLM shirts that ultimately was awarded to Junk Food.[43]

      The original Mighty Fine designs for DCP utilized the phrase

"LITTLE MISS".  After DCP employees independently questioned whether there

was a legal problem with that phrase because it had become a brand,[44] Mighty Fine

dropped the word "LITTLE" and used only "MISS" in order "to alleviate any

concern or confusion with the brand that is already out on the market."[45]  There is

no evidence that DCP sought legal advice from any Disney attorneys to address

this concern.[46]  Mighty Fine, like all DCP licensees, was contractually obligated to

clear the designs submitted to DCP.[47]  DCP ultimately approved Mighty Fine's

designs.[48]

---

[42]    *See* THOIP 56.1 ¶ 272; Disney 56.1 Response ¶ 272.  DCP handles, among other things, the licensing of Disney intellectual property to third parties for use on a variety of goods and services sold to third-party retailers.  *See* Disney 56.1 ¶ 80; THOIP 56.1 Response ¶ 80.

[43]    *See* THOIP 56.1 ¶¶ 183, 270; Disney 56.1 Response ¶¶ 183, 270.

[44]    *See* THOIP 56.1 ¶ 291; Disney 56.1 Response ¶ 291.

[45]    THOIP 56.1 ¶ 294; Disney 56.1 Response ¶ 294.

[46]    *See* THOIP 56.1 ¶ 292; Disney 56.1 Response ¶ 292.

[47]    *See* Disney 56.1 Response ¶ 284.

[48]    *See* THOIP 56.1 ¶ 273; Disney 56.1 Response ¶ 273.

Disney concedes — and other evidence demonstrates — that DCP was aware of the MMLM characters and products prior to the first sale of the Miss Disney shirts.[49] Further, DCP attended the Summer 2006 MAGIC tradeshow, where Junk Food launched the Little Miss THOIP shirts.[50]

The Miss Disney line went on sale in October 2007.[51] The shirts are faux-distressed and bear the phrase "MISS" and "CHATTERBOX", "ATTITUDE", "FABULOUS", or "ADORABLE", written in bold, block letters.[52] The shirts bear a Disney character portraying the relevant trait.[53]

   

THOIP sells a shirt with the phrase "LITTLE MISS CHATTERBOX" and its character, but has not used the words "FABULOUS", "ATTITUDE", or

---

49   *See, e.g.*, THOIP 56.1 ¶ 237; Disney 56.1 Response ¶ 237.

50   *See* THOIP 56.1 ¶¶ 238-239; Disney 56.1 Response ¶¶ 238-239.

51   *See* THOIP 56.1 ¶ 279; Disney 56.1 Response ¶ 279.

52   *See* THOIP 56.1 ¶¶ 274-275; Disney 56.1 Response ¶¶ 274-275.

53   *See* THOIP 56.1 ¶ 276; Disney 56.1 Response ¶ 276.

"ADORABLE" in connection with a Little Miss character.[54] THOIP does not use the word "MISS" alone.[55]

The Miss Disney shirts were sold in department stores, specialty retailers, and online.[56] They were also sold at Disney's Vault 28 store at the same time that the Little Miss THOIP shirts were being sold there.[57] The Miss Disney shirts were withdrawn from the market around August 2008, following the filing of this suit.

### 2.   The Little Miss Disney Shirts

In March 2007, Tiltworks, a T-shirt vendor, approached Disney Destinations ("DD") with designs for the second line of T-shirts at issue here — the Little Miss Disney shirts.[58] Tiltworks based its designs for the Little Miss Disney shirts on a "Little Miss trend."[59] At her deposition, Marlou Hollens, DD's Product Developer, was asked "whether Tiltworks based their design on any other

---

[54]     *See* Disney 56.1 ¶ 109; THOIP 56.1 Response ¶ 109.

[55]     *See* Disney 56.1 ¶ 110; THOIP 56.1 Response ¶ 110.

[56]     *See* THOIP 56.1 ¶ 280; Disney 56.1 Response ¶ 280.

[57]     *See* THOIP 56.1 ¶ 281; Disney 56.1 Response ¶ 281.

[58]     *See* THOIP 56.1 ¶ 242; Disney 56.1 Response ¶ 242.  DD handles, among other things, the development of merchandise for the Disney theme parks, resorts, and World of Disney stores. *See* Disney 56.1 ¶ 81; THOIP 56.1 Response ¶ 81.

[59]     *See* THOIP 56.1 ¶ 243; Disney 56.1 Response ¶ 243.

design that was out in the market."[60]  Hollens replied, "[n]ot that I'm aware of[,]"[61]

indicating that Tiltworks based its design on the Little Miss THOIP shirts.

After modifying the design by substituting more standard depictions

of Disney characters than those proposed,[62] Disney approved the project.[63]

Disney's internal process for approving the sale of the Little Miss Disney shirts

required DD to submit clearance forms to its parent company, The Walt Disney

Company ("TWDC").[64]  These forms, submitted in January 2008, expressly state

that the design for the shirts was "inspired" by the Little Miss THOIP shirts.[65]  On

the forms are pictures of a number of Little Miss THOIP products, including six

Little Miss THOIP shirts in the Classic Format, next to which are pictures of the

proposed Little Miss Disney shirts.[66]  DD's employees searched the Internet to find

online retailers that were already selling the MMLM shirts, copied images of those

---

[60]     Deposition of Marlou Hollens at 45, Ex. 1 to Fakler Decl.

[61]     *Id.*

[62]     *See* THOIP 56.1 ¶ 245; Disney 56.1 Response ¶ 245.

[63]     *See* THOIP 56.1 ¶ 257; Disney 56.1 Response ¶ 257.

[64]     *See* THOIP 56.1 ¶ 252; Disney 56.1 Response ¶ 252.

[65]     *See* THOIP 56.1 ¶ 253; Disney 56.1 Response ¶ 253.

[66]     *See* THOIP 56.1 ¶ 254; Disney 56.1 Response ¶ 254.

shirts, and attached the images to the clearance forms.[67] Disney concedes — and other evidence demonstrates — that DD was aware of the MMLM characters and products before launching the Little Miss Disney shirts.[68]

Hollens testified, however, that she was not aware of the MMLM brand at the time DD was approached by Tiltworks or at the time DD (as opposed to TWDC) approved the proposed line.[69] Hollens further testified that she only became aware of the THOIP shirts in August 2007 when she saw them at the MAGIC licensing show, which was after the Little Miss Disney shirts had been approved by DD (but not TWDC).[70] Hollens and another DD employee testified that they believed they were using the words "Little Miss" with a character trait and a Disney character in a descriptive sense rather than in a trademark sense.[71] Additionally, they considered the Little Miss Disney shirts to be an extension of DD's use, in 2002, of the phrase "Little Miss Attitude" in connection with the character Tinkerbell on various merchandise.[72]

---

[67]     See THOIP 56.1 ¶ 255; Disney 56.1 Response ¶ 255.

[68]     See, e.g., THOIP 56.1 ¶ 211; Disney 56.1 Response ¶ 211.

[69]     See Disney 56.1 ¶ 126; THOIP 56.1 Response ¶ 126.

[70]     See Disney 56.1 ¶ 142; THOIP 56.1 Response ¶ 142.

[71]     See Disney 56.1 ¶ 134; THOIP 56.1 Response ¶ 134.

[72]     See Disney 56.1 ¶ 86; THOIP 56.1 Response ¶ 86. The font used by DD for its Little Miss Attitude with Tinkerbell items is more stylized than the bold,

DD also appears to have conducted trademark searches in 2007,[73] which did not turn up any relevant applications or registrations.[74]  Finally, Tiltworks was contractually obligated to clear any trademark issues involving its designs.

The Little Miss Disney line was launched in February 2008.[75]  The shirts are faux-distressed and bear the phrase "LITTLE MISS" and "BOSSY", "PERFECT", "SASSY", or "WICKED", written in bold, block letters.[76]  The shirts bear a Disney character portraying the relevant trait.[77]

---

block lettering used in THOIP's Classic Format or on the Little Miss Disney shirts.

[73]     See Disney 56.1 ¶¶ 137-138, 143, 145, 147-148.  THOIP argues that Disney has not cited to admissible evidence of its trademark searches as Disney has maintained its attorney-client privilege over all legal advice given by its legal department and, therefore, has waived reliance on an "advice of counsel" defense. See THOIP 56.1 Response ¶¶ 137-138, 143, 145, 147-148.  THOIP's objection is overruled.  Trademark searches are factual in nature and Disney has cited deposition testimony evidencing their existence.  Moreover, not only did Disney produce the search reports during discovery, see Disney Reply at 8, THOIP's counsel inquired about the searches during the deposition cited by Disney.

[74]     THOIP did not begin to file applications in the United States for any of its Little Miss character names or designs until September 14, 2007. See Disney 56.1 ¶¶ 139, 144, 146, 149; THOIP 56.1 Response ¶¶ 139, 144, 146, 149.

[75]     See THOIP 56.1 ¶ 262; Disney 56.1 Response ¶ 262.

[76]     See THOIP 56.1 ¶¶ 246-247; Disney 56.1 Response ¶¶ 246-247.

[77]     See THOIP 56.1 ¶ 247; Disney 56.1 Response ¶ 247.



THOIP sells a shirt with the phrase "LITTLE MISS BOSSY" with its character, but has not used "PERFECT", "SASSY", or "WICKED" in connection with a Little Miss character.[78]

The Little Miss Disney shirts were sold inside the Disney theme parks and at the World of Disney store in Manhattan.[79] The Little Miss Disney shirts were withdrawn from the market around August 2008, following the filing of this suit.

## III.   APPLICABLE LAW

### A.   Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[78]   *See* Disney 56.1 ¶ 154; THOIP 56.1 Response ¶ 154.

[79]   *See* THOIP 56.1 ¶ 250; Disney 56.1 Response ¶ 250.

19

law."[80]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[81]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[82]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[83]  The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[84] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[85]  However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[86]

---

[80]     Fed. R. Civ. P. 56(c).

[81]     *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[82]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[83]     *See id.*

[84]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[85]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[86]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

20

In determining whether a genuine issue of material fact exists, the

court must "constru[e] the evidence in the light most favorable to the non-moving

party and draw all reasonable inferences" in that party's favor.[87]  However, "'only

admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment.'"[88]  "'Credibility assessments, choices between conflicting

versions of the events, and the weighing of evidence are matters for the jury, not

for the court on a motion for summary judgment.'"[89]  Summary judgment is

therefore "appropriate only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law."[90]

## B.    Trademark Infringement Under the Lanham Act

Claims for infringement of an unregistered trademark arise under

section 43(a) of the Lanham Act.[91]  Specifically, section 43(a) prohibits the use in

---

(1986)).

[87]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[88]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[89]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[90]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[91]    *See EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000); *Louis Vuitton Malletier v. Dooney & Bourke*,

commerce of:

> any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin,
> false or misleading description of fact, or false or
> misleading representation of fact, which . . . is likely to
> cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval
> of his or her goods, services, or commercial activities by
> another person.[92]

This section also acts as "a broad federal unfair competition provision."[93]

"A claim of trademark infringement, whether brought under [section

32(1)[94] or section 43(a) of the Act], is analyzed under [a] familiar two-prong

test . . . ."[95] "The test looks first to whether the plaintiff's mark is entitled to

protection, and second to whether defendant's use of the mark is likely to cause

_____

*Inc.* ("*Vuitton*"), 561 F. Supp. 2d 368, 378 (S.D.N.Y. 2008).

[92]    15 U.S.C. § 1125(a)(1)(A).

[93]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002).

[94]    Section 32(1) of the Lanham Act governs claims for infringement of a registered trademark, prohibiting the use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1).

[95]    *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). *Accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009).

consumers confusion as to the origin or sponsorship of the defendant's goods."[96]

"The first of these questions relates closely to the second, because a trademark's distinctiveness — the key consideration in assessing its protectability — is also a factor in determining the likelihood of confusion."[97]

### 1.    Protectability of the Mark

The level of protection provided to a trademark is "categorized by the degree of the mark's distinctiveness in the following ascending order: generic, descriptive, suggestive, and arbitrary or fanciful."[98]  Generic marks, which are not entitled to trademark protection, are those "consisting of words that identify the type or species of goods or services to which they apply, [and that] are totally lacking in distinctive quality."[99]  "Aspirin," "automobile," and "shredded wheat," for instance, are generic marks that are not protectable.[100]  Generic marks tend to be

---

[96]     *Virgin Enters.*, 335 F.3d at 146.  *Accord Starbucks*, 588 F.3d at 114.

[97]     *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004).

[98]     *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993).

[99]     *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001).

[100]    *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 117-18 (1938); *Paddington Corp. v. Attiki Import & Distrib., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993); *Gruner + Jahr USA Publ'g*, 991 F.2d at 1075; *Banff*, 841 F.2d at 489; *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

nouns that refer to an entire class of products.[101]

A descriptive mark is one that "describes a product or its 'qualities, ingredients or characteristics,'"[102] such as "Tasty" bread.[103]  Descriptive marks tend to be adjectives "identifying the special characteristics of an article."[104]  "The free-market policy considerations compelling the rule that generic marks are unprotectable under trademark law also disfavor protection for descriptive marks."[105]  "Descriptive marks are nonetheless protectable when they acquire 'secondary meaning.'"[106]  Secondary meaning — or "acquired meaning"[107] —

---

[101]    *See Merritt Forbes & Co. Inc. v. Newman Inv. Sec., Inc.*, 604 F. Supp. 943, 954 (S.D.N.Y. 1985).

[102]    *Playtex Prods.*, 390 F.3d at 163 (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997)).

[103]    *Wal-mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 213 (2000).

[104]    *Merritt Forbes & Co.*, 604 F. Supp. at 954.

[105]    *Playtex Prods.*, 390 F.3d at 163.

[106]    *Id.*

[107]    *See Wal-mart Stores*, 529 U.S. at 211 at n* ("The phrase 'secondary meaning' originally arose in the context of word marks, where it served to distinguish the source-identifying meaning from the ordinary, or 'primary,' meaning of the word. 'Secondary meaning' has since come to refer to the acquired, source-identifying meaning of a nonword mark as well. It is often a misnomer in that context, since nonword marks ordinarily have no 'primary' meaning. Clarity might well be served by using the term 'acquired meaning' in both the word-mark and the nonword-mark contexts . . . .").

24

"occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"[108]  "When there is widespread recognition of a mark among consumers, there is an increased likelihood that 'consumers will assume it identifies the previously familiar user,' and therefore an 'increas[ed] . . . likelihood of consumer confusion if the new user is in fact not related to the first.'"[109]

"'Suggestive marks' are those marks that 'do not directly describe goods or services or their attributes, but rather are suggestive of them . . . .'"[110]  A term is suggestive "if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods."[111]  The following are examples of suggestive marks:  "Wet Ones" moistened towelettes,[112] "Wite-Out" correction

---

[108]    *Id.* (quoting *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 851 n.11 (1982)) (alteration in original).  *Accord Playtex Prods.*, 390 F.3d at 163; *Brennan's, Inc. v. Brennan's Restaurant, LLC.*, 360 F.3d 125, 131 (2d Cir. 2004).

[109]    *Playtex Prods.*, 390 F.3d at 163 (quoting *Virgin*, 335 F.3d at 148) (alteration in original).

[110]    *Playtex Prods.*, 390 F.3d at 163 (quoting *TCPIP Holding Co.*, 244 F.3d at 94).  *Accord Estee Lauder*, 108 F.3d at 1509.

[111]    *Abercrombie & Fitch*, 537 F.2d at 11 (quoting *Stix Prods., Inc. v. United Merch. & Mfr.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968)).

[112]    *See Playtex Prods.*, 390 F.3d at 164.

fluid,[113] "Tide" laundry detergent,[114] and "Orange Crush" soda.[115] All of these marks "could plausibly describe a wide variety of products."[116] Because suggestive marks have a distinctive quality, they are entitled to trademark protection without a showing of acquired meaning.[117]

"The most distinctive marks — those receiving the most protection — are marks that are 'arbitrary or fanciful in relation to the products (or services) on which they are used.'"[118] "Such may always claim trademark protection, is never a common name for a product, and bears little or no relationship to the kind of product represented."[119] "An arbitrary term is one that has a dictionary meaning — though not describing the product[,]"[120] such as "Ivory" soap and "Camel"

---

113 *See BIC Corps. v. Far Eastern Source Corp.*, No. 99 Civ. 11385, 2000 WL 1855116, at *3 (S.D.N.Y. Dec. 19, 2000).

114 *See Wal-mart Stores*, 529 U.S. at 210-12.

115 *See Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.

116 *Playtex Prods.*, 390 F.3d at 164.

117 *See Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.

118 *Playtex Prods.*, 390 F.3d at 163 (quoting *Virgin Enters.*, 335 F.3d at 147). *Accord Paddington Corp.* 996 F.2d at 583.

119 *Gruner + Jahr USA Publ'g*, 991 F.2d at 1075.

120 *Id.* at 1075-76.

cigarettes.[121]  "A fanciful mark is a name that is made-up to identify the trademark

owner's product[,]" such as "Kodak" photography products, "Exxon" oil, and

"Clorox" bleach.[122]

    These categories are rough approximations intended to guide the

assessment of a mark's distinctiveness.  A mark is to be examined as a "composite"

— rather than "as isolated components" — when ascertaining protectability.[123]

Nonetheless, a mark may combine elements falling in different categories.  For

example, the Second Circuit has determined that the mark "Bee Wear" — the name

of a clothing line — combined "both an arbitrary and a generic term, resulting in a

suggestive or arbitrary mark entitled to copyright protection."[124]

## 2.    Likelihood of Confusion

    The second prong of the test for trademark infringement — the

likelihood-of-confusion inquiry — "turns on whether 'numerous ordinary prudent

purchasers are likely to be misled or confused as to the source of the product in

---

[121]    *See Wal-mart Stores*, 529 U.S. at 210; *Gruner + Jahr USA Publ'g*, 991 F.2d at 1075-76.

[122]    *See Wal-mart Stores*, 529 U.S. at 210; *Gruner + Jahr USA Publ'g*, 991 F.2d at 1076.

[123]    *Banff*, 841 F.2d at 489.

[124]    *Id.*

question because of the entrance in the marketplace of defendant's mark.'"[125]  "To support a finding of infringement, there must be a 'probability of confusion, not a mere possibility.'"[126]  "The central consideration in assessing a mark's protectability, namely its degree of distinctiveness, is also a factor in determining likelihood of confusion."[127]

In determining whether there is a likelihood of confusion, courts within the Second Circuit apply the eight-factor balancing test set forth in *Polaroid Corporation v. Polarad Electronics Corporation*.[128]  The *Polaroid* factors are: (1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that plaintiff will "bridge the gap"; (5) actual confusion between products; (6) defendant's good or

---

[125]     *Id.* (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir. 1996)). *Accord Chambers*, 282 F.3d at 155 ("Where there is a claim of consumer confusion [as] to the association of a product or service with another person's trademark, the central inquiry is whether it is likely that 'an appreciable number of ordinarily prudent purchasers' will be misled as to the source or sponsorship of the product or service in question." (quoting *EMI Catalogue P'ship*, 228 F.3d at 61-62)).

[126]     *Playtex Prods.*, 390 F.3d at 161 (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001)).

[127]     *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006).

[128]     *See* 287 F.2d 492, 495 (2d Cir. 1961); *see also Starbucks*, 588 F.3d at 115.

28

bad faith in adopting the mark; (7) the quality of defendant's product; and (8) the

sophistication of the buyers.[129]

Of these factors, the strength of the plaintiff's mark, the similarity of

plaintiff's and defendant's marks, actual confusion, and defendant's bad faith are

more probative of likelihood of confusion than the other factors.[130]  Nevertheless,

"application of the *Polaroid* test is 'not mechanical, but rather, focuses on the

ultimate question of whether, looking at the products in their totality, consumers

are likely to be confused.'"[131]  "No single factor is dispositive, nor is a court

limited to consideration of only these factors."[132]  "Further, 'each factor must be

evaluated in the context of how it bears on the ultimate question of likelihood of

confusion as to the source of the product.'"[133]

"'If a factual inference must be drawn to arrive at a particular finding

on a *Polaroid* factor, and if a reasonable trier of fact could reach a different

---

[129]    *See Polaroid*, 287 F.2d at 495; *see also Starbucks*, 588 F.3d at 115.

[130]    *See Playtex Prods.*, 390 F.3d at 167 n.5 (discussing *Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955 (2d Cir. 1996)).

[131]    *Starbucks*, 588 F.3d at 115 (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd*, 412 F.3d 373, 384 (2d Cir. 2005)).

[132]    *Brennan's, Inc.*, 360 F.3d at 130.

[133]    *Id.* (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986)).

conclusion, the district court may not properly resolve that issue on summary

judgment.'"[134]  As such, summary judgment should only be granted "where the

undisputed evidence would lead only to one conclusion as to whether confusion is

likely."[135]  "Where the predicate facts are beyond dispute, the proper balancing of

these factors is considered a question of law."[136]

## C.    Trademark Infringement and Unfair Competition Under Common Law

"The elements necessary to prevail on common law causes of action

for trademark infringement mirror the Lanham Act claims.  A claim of unfair

competition under New York law also requires evidence of defendant's bad

faith."[137]

## IV.    DISCUSSION

### A.    Protectability of the Mark

#### 1.    Defining THOIP's Mark

Before ascertaining whether THOIP's purported mark is entitled to

protection, I must define that mark.  In the *Daubert* opinion, I described the mark

---

[134]    *Cadbury Beverages*, 73 F.3d at 478.  *Accord Patsy's Brand, Inc. v. I.O.B. Realty Inc.*, 317 F.3d 209, 215-16 (2d Cir. 2003).

[135]    *Cadbury Beverages*, 73 F.3d at 478.

[136]    *Playtex Prods.*, 390 F.3d at 162.

[137]    *Vuitton*, 561 F. Supp. 2d at 381.

as "consisting of 'LITTLE MISS' with a character trait in big, bold, capital letters plus a character."[138]  This description was based on representations to the Court by THOIP's counsel, including the explicit statement that "Mr." was not at issue in this suit.[139]  In any event, my prior description was not meant to be a final definition of the mark because I was not determining THOIP's rights.

THOIP now seeks to broaden the mark in two different respects:  to include (1) any font in any style, and (2) the Mr. Men characters.  THOIP has made no showing that it is entitled to a trademark encompassing any font or style other than that used in the Classic Format.  Throughout this action, THOIP stated time and again that its claimed mark is limited to bold, block lettering.  Indeed, the bold, block typeface — as explained below — helps to tie THOIP's individual marks together into a family of marks.  Moreover, according to two of THOIP's declarants, "the Classic Format was the most popular style due to its association with the classic book series."[140]  I decline to define the mark to reach any font or style beyond that shown in the illustrations above.

---

[138]    *THOIP*, 690 F. Supp. 2d at 219.

[139]    At the July 15, 2009 conference, when asked by the Court whether THOIP was objecting to Disney's use of the single word "Mr.", THOIP's counsel replied: "That's not in this case.  None of the T-shirts in this case were Mr. shirts." 7/15/09 Hearing Tr. at 3-4.

[140]    THOIP Mem. at 4 (citing the declarations of Culley and Crossley).

Nonetheless, I agree with THOIP that its mark should not be limited to the Little Miss characters.[141] While it is true that the Mr. Men characters are not at issue here in the sense that the allegedly-infringing Disney shirts only bear the words "LITTLE MISS" or "MISS", THOIP's Mr. Men and Little Miss characters and names constitute a family of individual marks. Just as it would be incorrect to view the Little Miss characters in insolation from each other, it would be incorrect to view the Little Miss characters in isolation from the Mr. Men characters.

A group of marks forms a family when the individual marks have "a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner."[142] "The key to a finding that a family of marks exists is a recognition among the purchasing public that . . . the element common to all the marks . . . is indicative of a common origin

---

[141]    In this connection, I reject Disney's repeated contention that the Mr. Men characters, names, products, marks, etc. are irrelevant to this suit. *See, e.g.*, Disney 56.1 Response at 4 (general objection # 2). I do, however, agree with Disney that formats other than the Classic Format are irrelevant for the reasons stated above.

[142]    *J&J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991); *Victoria Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804, 2009 WL 959775, at *4 (S.D.N.Y. Apr. 8, 2009); *McDonald's Corp. v. McBagel's Inc.*, 649 F. Supp. 1268, 1272 (S.D.N.Y. 1986).

of the goods."[143]  "This recognition is a question of fact, to be determined by
considering (1) whether, prior to the junior user's entry, the marks in the alleged
family were used and promoted in such a way as to create public perception of the
[common element] as an indication of source; and (2) whether the [the common
element] is distinctive."[144]

Since 1981, THOIP, its predecessor in interest, and their licensees
have consistently used and promoted the various individual MMLM marks as a
group of related marks from a common source.  Nearly all of the book covers
utilize the Classic Format, which ties the books and characters together.  Millions
of these books have been sold in the United States.  Other aspects of the individual
MMLM marks unite them, such as similarities in the general look of the MMLM
characters themselves, including their bubble shape and dot eyes.  The characters
are named in the same convention ("Mr." or "Little Miss" with a trait).  Many of
the books feature more than one character within the story.  The books have been
marketed and packaged together.  The back of the books include a grid of many of

---

[143]    *Victoria Secret Stores Brand Mgmt.*, 2009 WL 959775, at *4
("Perhaps the most famous example of a family of marks is the McDonald's
Corporation's 'Mc' family, members of which include: MCDONALD'S, EGG
McMUFFIN, and CHICKEN McNUGGETS. . . . McDonald's Corporation was
able to block the registration of McPRETZEL, McDENTAL and MC CLAIM,
even though McDonald's was not itself using those marks." (citations omitted)).

[144]    *Id.*

the other characters, in a format akin to the Classic Format, in order to introduce purchasers of one book to the other characters. Additionally, every licensee licensed the entire family of MMLM marks. And, as explained below, the common element — the Classic Format — is distinctive.

THOIP's overarching mark, encompassing the individual MMLM marks, can thus be defined as follows: "MR." or "LITTLE MISS" with a character trait in bold, block lettering, plus a MMLM character portraying the relevant trait.[145] Having defined the mark, I now turn to its protectability.

## 2 . THOIP's Mark is Entitled to Protection

The owner of a family of marks need not prove rights in the common element of the marks alone; rather, the relevant inquiry is into the distinctiveness of the marks as a whole.[146] *First*, the MMLM characters are fanciful and, as such, are inherently distinctive.[147] *Second*, the format — *e.g.*, the selection of bold, block

---

[145]     THOIP also attempts to define its mark in terms of *any* character, not just its MMLM characters. THOIP is only entitled to a trademark featuring its own characters. Of course, this mark *may* nonetheless be infringed by products bearing other characters, as this case exemplifies.

[146]     *See J&J Snack Foods*, 932 F.2d at 1463.

[147]     *See, e.g.*, *Brown v. It's Entm't, Inc.*, 34 F. Supp. 2d 854, 859 (E.D.N.Y. 1999) (holding cartoon character "Arthur" is inherently distinctive as a "whimsical and arbitrary creature: a stylized aardvark dressed like school boy"); *D.C. Comics v. Reel Fantasy, Inc.*, 539 F. Supp. 141, 144 (S.D.N.Y. 1982) (holding Batman comic-book character inherently distinctive).

lettering — is also arbitrary.[148]  Junk Food's release of hundreds of different shirt

designs utilizing a variety of different fonts and formats, demonstrates that the

design details of the Classic Format are arbitrary.  *Third*, the entire phrase, such as

Little Miss Bossy, while not descriptive of the products themselves (*e.g.*, books or

shirts), are descriptive of the characters, who portray the relevant trait.  Disney

seizes upon the descriptive nature of the phrase to argue that THOIP's mark is

merely descriptive.  But Disney fails to acknowledge not only the fanciful nature of

the characters and the arbitrary design elements, but also that distinctiveness is

assessed in terms of the mark as a whole.  Viewed through that lens, THOIP's

mark is inherently distinctive and, consequently, is protectable without a showing

of acquired meaning.[149]

---

[148]    *See, e.g., Patsy's Brand*, 317 F.3d at 217-18 ("[A] personal name
[which in and of itself is a descriptive mark] rendered in a distinctive lettering style
may be considered strong without a showing of secondary meaning.  Here, the
protected mark is a distinctive rendition of a name in script lettering accompanied
by initials and a date as well as arbitrary design elements.  As such, the strength of
the mark favors the Plaintiff.").

[149]    In ascertaining acquired meaning, a court considers evidence such as:
(1) advertising; (2) consumer studies linking the name to the source; (3) the senior
user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5)
length and exclusivity of the mark's use; and (6) unsolicited media coverage of the
products at issue.  *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d
1217, 1222 (2d Cir. 1987); *Medici Classic Prods. LLC v. Medici Group LLC*, No.
07 Civ. 9938, 2010 WL 437444, at *5 (S.D.N.Y. Feb. 9, 2010).
         *If* THOIP's mark were purely descriptive and thus only protectable on
a showing of acquired meaning, I would hold that disputed issues of material fact
would render summary judgment to either party inappropriate.  For example, it is

## B.    Likelihood of Confusion

When assessing likelihood of confusion, the type of confusion

alleged is of paramount importance.[150]  As described above, THOIP argues both

forward and reverse confusion.  It is also important to describe the marketplace

conditions in which consumers encountered the THOIP and Disney shirts, because

those conditions are relevant to most of the *Polaroid* factors.  I previously

explained those conditions in detail:

> Obviously, the Little Miss THOIP, Little Miss
> Disney, and Miss Disney lines are within the same narrow
> category of goods directed at the same set of consumers.
> The products are undeniably alike: All are T-shirts bearing
> a cartoon and a similar phrase of a certain witticism or
> cheekiness, are fabricated in a common faux-distressed
> style, and are marketed to and for women and girls.  While
> it is unclear whether the parties' shirts retailed for the exact
> same price, they were without a doubt within the same
> price-point.
>
> THOIP's shirts hit the market in the summer of 2006
> and apparently continue to be offered for sale nationwide.
> The Little Miss Disney and Miss Disney lines were
> launched in February 2008 and October 2007, respectively,

unclear how many of the MMLM shirts sold in the United States bore the mark at
issue here.  As stated above, the sales figures provided by THOIP include shirts in
the Classic Format, which are relevant here, as well as alternatively-styled shirts,
which are not relevant here.

[150]    *See also THOIP*, 690 F. Supp. 2d at 232 ("[In assessing whether an
expert survey] sufficiently simulated the actual marketplace conditions in which
consumers encountered the parties' products so as to be a reliable indicator of
consumer confusion . . . the type of confusion alleged is of paramount
importance.").

and were pulled from the shelves by August 2008. Therefore, THOIP's shirts overlapped with the Little Miss Disney line for approximately six months, and with the Miss Disney line for approximately ten months.

Because the two lines of accused Disney shirts were available in different locations, I analyze each line separately. The parties agree that the THOIP and Little Miss Disney shirts were not sold in the same stores but rather were sold in different stores within various distances of each other. In particular, the Little Miss Disney shirts were sold at the World of Disney Store in Manhattan, which is located at Fifth Avenue and Fifty-Fifth Street. A number of other stores within a few city blocks carried the Little Miss THOIP shirts, such as Gap Kids at Fifth Avenue and Fifty-Fourth Street, and Saks Fifth Avenue at Fifth Avenue and Fiftieth Street. Similarly, where the Little Miss Disney shirts were sold inside Disneyland and possibly at the World of Disney Store in the Downtown Disney complex outside of Disneyland, THOIP's shirts were sold at Vault 28 in this Downtown Disney complex. The Little Miss THOIP and Little Miss Disney shirts may also have been available in nearby stores at Disney World in Florida — specifically, while THOIP's shirts were sold at the Virgin Store, the World of Disney Store in the Downtown Disney complex may have sold Little Miss Disney shirts.

As for the Miss Disney line, the parties agree that their shirts were sold by the same chains. The parties dispute whether their products were available simultaneously in specific stores, and, if they were, whether they were on sale near to each other within those stores. According to Disney's expert, Dr. Michel Pham, department stores, such as JC Penney, Kmart, Kohl's, and Target, "generally sold [Miss Disney] t-shirts in a specific section grouped with other Disney merchandise in order to take advantage of the Disney brand." THOIP counters with photographs showing THOIP and Disney shirts (though not the THOIP and Disney shirts at issue here) on display next to each other in a Walmart in Middle Island, New York,

37

and other photographs depicting Disney shirts and
apparently non-Disney shirts on display together in several
chain stores in Manhattan. Disney responds that because
the pictures do not show the actual T-shirts at issue in this
suit, they prove nothing. THOIP's declarant, Amory
Millard, responds that based on her years of experience:
"[I]f Disney had not taken the Miss Disney Shirts off the
market (or if Disney were to resume selling the Miss
Disney Shirts) it is highly likely that the Miss Disney Shirts
would be sold alongside other Disney T-shirts at Walmart,
Target, and other stores . . . ."

Additionally, the parties agree that the THOIP shirts
and two infant Miss Disney shirts were available at the
same time at Vault 28. Disney again asserts that its shirts
were not sold next to THOIP's because the Miss Disney
shirts were displayed in an armoire containing infant and
children's clothes that was approximately thirty-six feet
from where the THOIP shirts were displayed. THOIP
responds that Vault 28 is a relatively small boutique of only
1,185 square feet.[151]

## 1.    Strength of Plaintiff's Mark

I turn now to the first *Polaroid* factor — the strength of THOIP's

mark. "To determine the strength of a mark, a court examines the mark's tendency

to identify the goods sold under the mark as emanating from a particular, although

possibly anonymous, source."[152]  Like the protectability inquiry, this factor

---

[151]    *THOIP*, 690 F. Supp. 2d at 233-35 (footnotes omitted).  The Little
Miss Disney and Miss Disney shirts are to analyzed separately, not only because
they were available in different sets of stores, but also because they involve
different designs and different defendants.

[152]    *Patsy's Brand*, 317 F.3d at 217.

38

revolves around inherent distinctiveness and acquired distinctiveness.[153]  As I have

already discussed, THOIP's mark is inherently distinctive because it combines a

fanciful character, an arbitrary format, and a descriptive phrase.  Therefore, this

factor weighs in THOIP's favor on both forward and reverse confusion theories.

### 2.    Similarity of the Parties' Marks

In considering the similarity of the marks, "courts must assess

whether the 'overall impression' created by the marks at issue in relation to the

'context in which they are found' is likely to confuse prospective customers."[154]

As explained above, the parties' shirts are not only within the same narrow

category of goods directed at the same set of consumers, they are strikingly similar

in design: they utilize similar (sometimes identical) phrases, more or less identical

formats and typeface, and cartoon characters portraying the relevant trait.  While

there are subtle differences in format,[155] these differences do not individually or

---

[153]    *See Playtex Prods.*, 390 F.3d at 163; *Virgin*, 335 F.3d at 147.

[154]    *Vuitton*, 561 F. Supp. 2d at 384 (quoting *Gruner + Jahr*, 991 F.2d 1079).

[155]    With respect to the Little Miss Disney T-shirts, the words appear to the side of the Disney character, while the words on THOIP's shirts appear above the image of the Little Miss characters.  Also, the character trait on the Little Miss Disney shirts is presented in a larger font than the words "LITTLE MISS".  With respect to the Miss Disney shirts, while they omit the word "LITTLE", the words appear, like THOIP's, above the character, and the character trait is in the same font size as the rest of the phrase.

39

collectively diminish the potential for confusion by consumers encountering the
parties' shirts in the market conditions described above. Likewise, that Disney
mostly used different traits than THOIP does not decrease the likelihood of
confusion given that (1) Disney's traits are similar to those used by THOIP; and
(2) THOIP has used a wide variety and large number of traits (approximately
eighty-five) across its characters.

   The biggest difference between the parties' shirts is that THOIP's
shirts bear its characters and Disney's shirts feature its characters. Hangtags and
neck labels further bore Disney's name.[156] The Second Circuit has "repeatedly
found that the presence of a distinct brand name may weigh against a finding of
confusing similarity[,]" yet "has also held that, in some circumstances, 'the
addition of a trade name does not necessarily alleviate the problem of confusion of
marks, and indeed, can aggravate it, as 'a purchaser could well think plaintiff had

---

[156] *See* Disney 56.1 ¶¶ 99, 120. As evidence that Disney's shirts bore
hangtags and neck labels, Disney cites to the expert report of Dr. Pham. THOIP
argues that Dr. Pham is not competent to give fact testimony, and that he did not
conduct any consumer research to determine whether consumers viewed the
hangtags or neck labels as indicating Disney as a source of its shirts. *See* THOIP
56.1 Response ¶¶ 99, 120. THOIP's objection is overruled. *See THOIP*, 690 F.
Supp. 2d at 239 n.149 (citing Dr. Pham's report and stating "there is no dispute
that all of the [Disney] shirts featured necktags in the marketplace"); *id.* at 239
("Labels are not unnoticed by consumers; rather, they serve as important sources of
information, including brand identification.").

licensed defendant as a second user.'"[157]  The Second Circuit "addressed the

tension between these two lines of cases and decided that, at least where the junior

and senior marks are not identical, the presence of a trade name will tend to

militate against a finding of confusion."[158]  Thus, in *Playtex Products, Inc. v.

Georgia-Pacific Corp.*, the court concluded that the presence of the brand "Quilted

Northern" on the defendants' product ("Moist-Ones" towelettes) served to decrease

confusion with the plaintiff's product ("Wet Ones" towelettes).[159]  Similarly, in

*Arrow Fastener Co. v. Stanley Works*, the Second Circuit concluded that the

presence of defendants' brand ("Stanley-Bostitch") diminished confusion where

the marks at issue were not identical.[160]

Whether the Disney characters serve to increase or dispel confusion is

a somewhat complex question because the characters are *not*, as in *Playtex

Products* or *Arrow Fastener*, an additional feature *apart from* the elements of

Disney's shirts that THOIP challenges.  Rather, Disney's characters are *part of* the

alleged infringement, just as THOIP's characters are *part of* its mark.  In any event,

---

[157]    *Playtex Prods.*, 390 F.3d at 164-65 (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 395 (2d Cir. 1995)).

[158]    *Id.*

[159]    *See id.*

[160]    *See Arrow Fastener*, 59 F.3d at 395-96.

41

it is clear that, despite the strong similarities identified above, the parties' shirts are not identical given that each uses its own characters. Therefore, the images of Disney's famous characters, along with the presence of Disney's name on the tags and labels, dispel forward confusion. Indeed, as addressed below, only one out of 1,200 respondents in Disney's confusion survey thought that the allegedly-infringing Disney shirts were in any way connected to THOIP or its characters. Therefore, this factor favors Disney as to forward confusion.

The undisputed strength of Disney's characters and the Disney name, however, works against Disney on THOIP's reverse confusion theory. Because the face of the parties' shirts are very similar in all respects except the characters, the fame of Disney's characters and its name increases the likelihood that consumers will mistakenly believe that Disney is the source of or approved the Little Miss THOIP shirts. Therefore, this factor favors THOIP as to reverse confusion.

### 3.    Competitive Proximity

In analyzing the competitive proximity of the products, a court examines the extent to which the products compete with each other and how such competition leads to consumer confusion.[161] "Included in the court's consideration of this factor are: (1) market proximity and (2) geographic proximity. These

---

[161]    *See Sly Magazine, LLC v. Weider Publ'ns LLC*, 529 F. Supp. 2d 425, 439 (S.D.N.Y. 2007).

elements are considered to determine whether the two products have an

overlapping client base."[162]

       Here, there is sufficient market and geographic proximity to view this

factor in THOIP's favor.[163]  For reasons already stated, the parties' shirts were

direct competitors, even if they were not sold in the same stores at the same time.[164]

---

      [162]    *Rush Indust., Inc. v. Garneir LLC*, 496 F. Supp. 2d 220 (E.D.N.Y. 2007).

      [163]    Disney's reliance on the *Daubert* opinion for the proposition that I already decided that the parties' products were not in competitive proximity is misplaced.  I did not determine the competitive proximity of the shirts *as a general matter*, but rather was focused on *the specific shirts tested by THOIP's expert*.  *See THOIP*, 690 F. Supp. 2d at 236-37 ("When ascertaining whether a survey methodology sufficiently simulates marketplace conditions, the focal point must be the specific products tested by the survey.  THOIP has not shown a reasonable likelihood that consumers would have proximately encountered the specific pairs of shirts tested by [THOIP's expert]. . . .  While comparing the most similar THOIP and Disney shirts may be a useful heuristic device, a legally-probative estimation of consumer confusion must be tethered to marketplace conditions.").  As to the point that "THOIP ha[d] not shown a reasonable likelihood that consumers would have proximately encountered its shirts and the Little Miss Disney shirts in a critical number of real world situations[, because] [t]hough THOIP's shirts were available in thousands of stores nationwide, the Little Miss THOIP and Little Miss Disney shirts were on sale in a small number of nearby stores in at most three geographic locations," *id.* at 238, I agree with THOIP that because the THOIP shirts were sold in each location as the Little Miss Disney shirts, there is "100% geographical overlap" as a *general* matter.  THOIP Opp. at 24.  This does not, however, justify THOIP's expert specific pairings or other problems with THOIP's survey requiring its exclusion.

      [164]    *See Patsy's Brand*, 317 F.3d at 218 (holding two companies' pasta sauces to be in competitive proximity despite the fact that they were never sold in the same stores, where "[t]he products appeal[ed] to the same consumers, and sale locations [we]re geographically close," and consumers who visited stores selling

Accordingly, this factor favors THOIP.

### 4. Likelihood that THOIP Will "Bridge the Gap" Between the Products

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."[165]  Because THOIP and Disney's T-shirts are in direct competition, the "bridging the gap" factor is irrelevant.[166]

### 5. Actual Consumer Confusion

This factor examines whether the parties' products have actually confused consumers in the marketplace.[167]  While "actual confusion need not be shown to prevail,"[168] evidence of actual confusion is "highly probative" of the likelihood of confusion.[169]  Proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion.

---

the one product "[we]re reasonably likely to visit nearby retail stores where [the other was] sold, creating the opportunity for confusion")

[165]    *Star Indust.*, 412 F.3d at 387.

[166]    *See id.*; *Starbucks*, 588 F.3d at 115 ("[T]he 'bridging the gap' factor is irrelevant . . . where, as here, the two products are in direct competition with each other.").

[167]    *See Centaur Commc'ns*, 830 F.2d at 1227.

[168]    *Lois Sportswear, U.S.A.*, 799 F.2d at 875.

[169]    *Sunenblick v. Harrell*, 895 F. Supp. 616, 630 (S.D.N.Y. 1995).

Though THOIP's shirts were available on the market with the Little

Miss Disney and Miss Disney shirts for eight months and ten months respectively,

THOIP has not presented evidence of actual confusion.[170]  In contrast, Disney has

proffered an expert survey — in which respondents were shown only allegedly-

infringing Disney shirts — finding that "[o]nly one respondent out of 1,200

identified the . . . Disney shirts as being associated with THOIP — an incidence

rate of .0008 percent."[171]  Such a low rate of confusion is strong evidence that there

is no actual confusion on a forward confusion theory.[172]  While neither party

submitted a survey on a reverse confusion theory, the burden in this case lies with

THOIP.  Accordingly, the actual-confusion factor weighs toward Disney,

especially as to forward confusion.

### 6.    Disney's Intent in Adopting Its Mark

This factor focuses on whether the defendant "'acted in bad faith in

---

[170]    I excluded THOIP's likelihood-of-confusion survey because it was
fundamentally flawed.  *See THOIP*, 690 F. Supp. 2d at 235-41.

[171]    *Id.* at 227; *see also id.* at 225-27 (describing the methodology of
Disney's confusion survey).

[172]    *See, e.g.*, *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d
305, 322-24 (S.D.N.Y. 2000) ("[T]he levels of confusion are negligibly low (below
5%) and virtually indistinguishable from levels of confusion in the control
group."), *aff'd* 234 F.3d 1262 (2d Cir.); 4 J. Thomas McCarthy, *McCarthy on
Trademarks and Unfair Competition* ("McCarthy on Trademarks") § 32.189
("When the percentage results of a confusion survey dip below 10%, they can
become evidence which will indicate that confusion is not likely.")

any sense relevant to the Lanham Act, that is, by deceiving consumers into believing that its products . . . were related to' the plaintiff."[173]  Thus, "the 'only relevant intent is intent to confuse.  There is a considerable difference between an intent to copy and an intent to deceive.'"[174]  "Prior knowledge of a senior user's mark does not, without more, create an inference of bad faith."[175]  In other words, "[a]lthough deliberate copying may indicate that the defendant acted in bad faith, the District Court is not required to draw that inference where there is evidence to the contrary."[176]

To show intent to deceive, THOIP emphasizes that Disney was well aware of the MMLM characters and names — Disney had, after all, sold Little Miss THOIP shirts, among other MMLM products.  More importantly, THOIP

---

[173]    *Vuitton*, 561 F. Supp. 2d at 387 (quoting *New York Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 556 n.1 (2d Cir. 2002)).

[174]    *Starbucks*, 588 F.3d 117 (quoting 4 McCarthy on Trademarks § 23.113).

[175]    *Playtex Prods.*, 390 F.3d at 166 (citing *Arrow Fastener Co.*, 59 F.3d at 397).  *Accord Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product."); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir. 1992) ("Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a free ride is permitted." (citation and quotation marks omitted)).

[176]    *Starbucks*, 588 F.3d 117 (citation omitted).

highlights that the approval forms submitted by DD to TWDC explicitly state that the Little Miss Disney shirts were based on THOIP's shirts. With respect to the Miss Disney shirts, Disney was aware of a potential legal conflict with the phrase "Little Miss" but never sought legal advice clearing the conflict.

Disney admits "that in developing the Little Miss Disney and Miss Disney shirts, defendants believed that they were following a trend that they perceived in the marketplace and that they were inspired by THOIP's use of that trend."[177] Disney nonetheless argues that THOIP cannot show that Disney intended to foster confusion between the parties' products. With respect to the Miss Disney shirts, Disney emphasizes: (1) Mighty Fine was contractually obligated to ensure that its designs were not infringing; and (2) in response to Disney's inquiry about whether use of the phrase "Little Miss" created a legal issue, Mighty Fine eliminated the word "Little" to alleviate confusion. With respect to the Little Miss Disney shirts, Disney highlights: (1) Tiltworks was contractually obligated to ensure that its designs were not infringing; (2) Tiltworks stated its design was based on a trend; (3) DD previously used "Little Miss Attitude" with Tinkerbell; (4) trademark searches did not turn up any relevant marks or applications; and (5) the shirts were sold in Disney-branded

---

[177]    Disney Mem. at 17.

47

environments, such as Disney theme parks.  Finally, Disney argues that its lack of intent to deceive is evidenced by the fact that Disney characters and names appear on both lines of shirts.

Keeping in mind the Second Circuit's dual warnings that "[s]ubjective issues such as good faith are singularly inappropriate for determination on summary judgment,"[178] and that '[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion,'"[179] I conclude that a trier of fact could not view the evidence as demonstrating that Disney intended to "exploit the goodwill and reputation" of THOIP by creating shirts "with the intent to sow confusion between two companies' products."[180]  While Disney almost undoubtedly intended to copy THOIP's shirts, other evidence indicates that Disney did not have the requisite intent to deceive.  Thus, no inference to the contrary can be drawn.

### 7.    Quality of Disney's Products

This factor is primarily concerned with whether "the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product

---

[178]    *Nora Beverages*, 269 F.3d at 125 (quotation marks omitted).

[179]    *Id.*

[180]    *Star Indus.*, 412 F.3d at 388.

is of inferior quality."[181] "[A] very markedly difference in quality between the two products would militate against finding a likelihood of confusion as consumers 'will be less likely to assume that the senior user whose product is high-quality will have produced lesser-quality products of the junior user.'"[182] By contrast, where products are of similar if not the same quality, consumer confusion is likely to rise.

THOIP and Disney agree that their products are of similar quality. Therefore, this factor weighs in THOIP's favor, but only to a limited extent because where the quality of the products is similar, the risk of harm to plaintiff is lower.[183]

### 8. Sophistication of Relevant Consumer Group

"[T]he likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers."[184] In general, "[t]he more sophisticated the consumer, the less likely they are to be misled by similarity in marks."[185] "[A]nalysis of consumer sophistication 'consider[s] the general

---

[181]   *Sports Auth.*, 89 F.3d at 965.

[182]   *Star Indust.*, 412 F.3d at 389 (quoting *Savin Corp. v. Savin Group*, 391 F.3d 439, 461 (2d Cir. 2004)).

[183]   *See id.* ("But if there is no reduction in quality in [defendant's] product, then [plaintiff] is less likely to have suffered harm . . . .").

[184]   *Cadbury Beverages*, 73 F.3d at 480 (quotations omitted.)

[185]   *TCPIP Holding Co.*, 244 F.3d at 102.

impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'"[186] While direct evidence, such as expert opinions or surveys, may be used to prove consumer sophistication, "in some cases a court is entitled to reach a conclusion about consumer sophistication based soley on the nature of the products or its price."[187]

When purchasing a shirt, whether to keep for oneself, to give as a gift, or for some other purpose, an ordinary consumer can be expected to examine the shirt, consider alternatives, and even try it on. Furthermore, ordinary purchasers are sophisticated enough to recognize Disney's famous characters and name. Nonetheless, the relatively inexpensive T-shirts here do not call for any degree of sophistication that would warrant viewing this factor in Disney's favor.[188] Thus,

---

[186] *Star Indust.*, 412 F.3d at 390 (quoting *Sports Auth.*, 89 F.3d at 965).

[187] *Id.*

[188] *See Paul Frank Indus., Inc. v. Sunich*, 502 F. Supp. 3d 1094, 1101 (C.D. Cal. 2007) ("T-shirts are not the type of product that would warrant any particular degree of care on the part of the purchaser."); *see also Playtex Prods.*, 390 F.3d at 162 (stating "consumers cannot be expected to invest much time or effort in distinguishing among inexpensive bath tissues"); *Patsy's Brand*, 317 F.3d at 219 (noting that consumer sophistication is generally low in dealing with cheaper products or products sold in cluttered supermarkets). *But see Star Indust.*, 412 F.3d at 390 (distinguishing *Patsy's Brand* and concluding: "In comparison with items available at [cluttered and frantic] supermarkets . . . unhurried consumers in the relaxed environment of the liquor store, making decisions abut $12 and $24 [vodka] purchases, may be expected to exhibit sufficient

this factor is neutral.

### C.   Balancing the Factors

Notwithstanding the inherent distinctiveness of THOIP's family of marks and the competitive proximity and similar quality of the shirts at issue, Disney's expert survey shows that there is virtually no chance that a consumer seeing a Disney shirt will think it came from, was affiliated with, or was approved by THOIP. This, coupled with Disney's lack of bad faith and the presence of Disney's famous characters and the Disney name on the shirts, lead me to conclude that no reasonable juror could find forward confusion.

As to reverse confusion, the strength of THOIP's mark, the similarity of the allegedly-infringing elements of Disney's shirts to THOIP's mark, the equal quality of the parties' shirts, and their competitive proximity all weigh in THOIP's favor. Nonetheless, THOIP has submitted no evidence of actual reverse confusion. While the Court is poised to decide this issue — and Disney's defenses if necessary — on the record as it now stands, it is appropriate to reopen discovery so that the parties may, if they choose, conduct expert surveys on reverse confusion. The Court does not extend this invitation lightly; extensive discovery has already taken place. Nonetheless, given the parties' lack of focus on reverse confusion,

---

sophistication to distinguished between Star's and Bacardi's products, which are differently labeled.").

51

fairness demands that the parties have the opportunity to fully develop this issue.

## V.   CONCLUSION

For the reasons stated above, Disney's motion for summary judgment is granted in part and denied in part. THOIP's motion for summary judgment is denied. The Clerk of the Court is directed to close these motions (document numbers 95 and 101).

The parties shall inform the Court within thirty days of this Opinion and Order whether they intend to conduct further discovery. If either side chooses to conduct further discovery, the parties shall also submit a proposed scheduling order. If neither party chooses to conduct further discovery, the Court will decide the question of reverse confusion on the briefing and record currently *sub judice*.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    August 13, 2010
          New York, New York

## - Appearances -

**For Plaintiff:**

Abraham Y. Skoff, Esq.
Martin Schwimmer, Esq.
David Mark Rabinowitz, Esq.
Jordan Daniel Greenberger, Esq.
Moses & Singer LLP
405 Lexington Avenue
New York, New York 10174
(212) 554-7897

**For Defendants:**

Dale M. Cendali, Esq.
Melanie Bradley, Esq.
Courtney Schneider, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800