**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------- X

THOIP (A Chorion Limited Company),

               **Plaintiff,**

          **- against -**

THE WALT DISNEY COMPANY,
DISNEY CONSUMER PRODUCTS,
INC., and DISNEY DESTINATIONS,
LLC,

             **Defendants.**

--------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/10/11

**OPINION AND ORDER**

**08 Civ. 6823 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

This action arises out of THOIP's claim to rights to a family of unregistered trademarks stemming from a collection of children's books featuring the "Mr. Men" and "Little Miss" ("MMLM") cartoon characters.  Under the Lanham Act and the common law, THOIP alleges that its family of marks was infringed by two lines of T-shirts from The Walt Disney Company, Disney Consumer Products, Inc., and Disney Destinations, LLC (collectively "Disney").

In an opinion dated August 13, 2010, I granted Disney's motion for summary judgment on the issue of "forward confusion," holding that there was

1

virtually no chance that a consumer seeing an allegedly infringing "Miss Disney shirt"[1] or "Little Miss Disney shirt"[2] would think it came from, was affiliated with, or was approved by THOIP.[3]  As to "reverse confusion," I found that four of the eight "*Polaroid* factors" weighed in THOIP's favor, but reopened discovery, allowing the parties the opportunity, if they wished, to conduct expert surveys on reverse confusion.[4]  Both parties accepted the invitation.  Disney now moves to exclude THOIP's survey, and both parties move for summary judgment on the issue of reverse confusion.  Disney's motions are granted, and THOIP's is denied.

## II.   BACKGROUND

### A.   The Ostberg Survey

---

[1]     *See THOIP v. The Walt Disney Co.*, 736 F. Supp. 2d 689, 698-99 (S.D.N.Y. 2010) ("*THOIP II*").

[2]     *See id.* at 699-701.

[3]     *See id.* at 715.  In an earlier opinion considering the parties' dueling *Daubert* motions, I excluded THOIP's survey (the "Ford Survey") because it was fundamentally flawed and, therefore, not a reliable indicator of consumer confusion.  *See THOIP v. The Walt Disney Co.*, 690 F. Supp. 2d 218, 234-41 (S.D.N.Y. 2010) ("*THOIP I*").  Disney's survey, which I determined was sufficiently reliable to be admitted into evidence, found that virtually no one seeing an allegedly-infringing Disney shirt thought that it was connected to THOIP or the MMLM characters.  *See id.* at 225-27, 241-42.  This opinion assumes familiarity with the facts, applicable legal standards, and analysis as set forth in *THOIP I* and *THOIP II*.

[4]     *See THOIP II*, 736 F. Supp. 2d at 715.

In support of its motion, THOIP proffers a survey from its retained expert Dr. Henry Ostberg that purports to examine whether consumers perceive the "Little Miss THOIP shirts"[5] at issue in this litigation to be "produced by or with the permission or approval of [Disney]."[6]

### 1.    Design and Operation

Dr. Ostberg conducted two surveys based on the "array or Squirt research model"[7] – one for the Miss Disney shirts ("Miss Disney survey") and another for the Little Miss Disney shirts ("Little Miss Disney survey").  In brief, respondents for each survey were asked a series of questions after being exposed to two portfolios of products: one containing either Miss Disney or Little Miss Disney shirts, and one containing Little Miss THOIP shirts.

The surveys were conducted in eighteen shopping malls throughout

---

[5]    *See id.* at 696-98.

[6]    *See* Expert Report of Dr. Henry Ostberg ("Ostberg Survey"), Ex. 1 to Declaration of Martin Schwimmer, Counsel for THOIP, in Support of THOIP's Motion for Partial Summary Judgment ("Schwimmer Decl."), at 6.

[7]    *See id.* at 7.  *See also* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition ("McCarthy on Trademarks") § 32:173.50 at 32-370 to 32-373 (describing the *Squirt* format and its namesake *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)); *id.* § 32:177 at 32-377 to 32-378 (2008) (describing "line-up" survey methods, "[a] more subtle form of '*Squirt*' survey").  *Id.* § 32:173.50 at 32-372.

the United States in the fall of 2010.[8]  Screening interviews located women who indicated that they intended to purchase a T-shirt with an image of a cartoon character, either for themselves or for a female child, during the next six months.[9] The participants in each survey were divided (roughly evenly) into a "test group" and a "control group"[10] and were interviewed in research offices located in the shopping malls.[11]

For the Miss Disney survey, test group respondents were first shown five photographic arrays of three products each, displayed in an eleven- by seventeen-inch portfolio:[12]

• Three Bella Sara jigsaw puzzles (Master Pieces Puzzles)

• Three "I Can Read!/Fancy Nancy" booklets (Harper-Trophy)

• Three pajama pants with cartoon characters (Paul Frank Industries)

• Three Dora cartoon T-shirts (Nickelodeon)

---

[8]     *See* Ostberg Survey at 15.

[9]     *See id.* at 7, 17.  Roughly half of the 351 participants in the Miss Disney survey, and roughly half of the 338 participants in the Little Miss Disney suvey, were 18 to 34 years old; the other half were 35 years of age or older.  *See id.*

[10]     *See id.*

[11]     *See id.* at 17.

[12]     *See id.* at 8, 9.

- Three Miss Disney shirts

The Miss Disney shirts included in the portfolio were "Miss Chatterbox," "Miss Fabulous," and "Miss Attitude"[13] (see following page):

_____

[13]     *See id.* at 9.  I discuss Dr. Ostberg's basis for selecting the products included in the arrays in Part IV.A.1.

# Portfolio with Miss Disney Shirts

  

  

  

  

  

The Little Miss Disney test group participants were shown the same photographic arrays, but with three Little Miss Disney shirts instead of the Miss Disney shirts.  The Little Miss Disney shirts were "Little Miss Perfect," "Little Miss Wicked," and "Little Miss Sassy":[14]



The order in which the three sets of products were included in the portfolio was rotated among the different respondents.[15]  Each photographed product purportedly displayed "the appropriate neck label or company indicia."[16]

Respondents were then asked a series of questions about their television viewing to provide a time interval and "a 'distracter' between what

---

[14]     *See id.* at 17.

[15]     *See id.* at 10.

[16]     *Id.* at 12.

respondents saw in the first and second portfolios, simulating the extraneous conditions which may exist during a typical shopping visit."[17]

Next, interviewers showed respondents a second portfolio, also including five groups of three products each:

- Three pajama pants with cartoon characters (Paul Frank Industries)

- Three "I Can Read!/Fancy Nancy" booklets (Harper-Trophy)

- Three 750-piece Jigsaw Puzzles (CEACO)

- Three cartoon sweatshirts (Joe Boxer)

- Three Little Miss THOIP shirts

The THOIP shirts in the second portfolio were "Little Miss Sunshine," "Little Miss Chatterbox," and "Little Miss Trouble"[18] (see following page):

---

[17]     *Id.* at 11.

[18]     *See id.* at 12.  Dr. Ostberg claims that "[b]y having two sets of products which were the same and two sets of products which were different in the second portfolio than in the first portfolio, there was no suggestion as to whether the THOIP t-shirts in the second portfolio were the same or different than [*sic*] the [Miss or Little Miss] Disney shirts in the first portfolio."  *Id.* at 11.

8

# Test Portfolio



  

  

  

  

Control group participants in each survey were first shown the same first portfolio.[19]  In the second portfolio, however, photographs of the three Little Miss THOIP shirts were replaced with three "control" T-shirts that "provide[d] an appropriate and real-life control for determining the extent to which respondents associate any product which has a cartoon character and wording including a name and/or character trait with the Walt Disney Company."[20]  As "controls," Dr. Ostberg selected three Crown Creative Co., Ltd. ("Crown Creative") T-shirts containing "an illustration of a 'cute French bulldog' together with wording that included the bulldog's name and/or character trait, either 'Rebecca Bonbon,' 'I'm Way Way Too Cool,' or simply 'Love:'"[21]

---

[19]    *See id.* at 13.

[20]    *Id.* at 14.

[21]    *Id.* at 13-14.



After respondents had viewed the second portfolio, the interviewer then pointed to the THOIP (or Creative Crown) T-shirts and asked (twice), "Do you think that these shirts – the ones on this page – are put out by the same company as any of the products which you saw in the first portfolio?"[22]  If the respondent gave an affirmative reply, she was then asked, "Which product or products in the first portfolio do you think are put out by the same company as the shirts you are looking at now?"[23]  If a respondent mentioned a company or product,

---

[22]     *Id.* at 12.

[23]     *Id.*

the interviewer asked why she thought that product was made by the same company as the THOIP (or Creative Crown) shirts.[24]

To determine "whether or not respondents believed that there was some other relationship between the THOIP [or Creative Crown] and Disney t-shirts," the interviewer again pointed to the photographs of the THOIP (or Creative Crown) shirts and asked, "Do you think that the company that puts out these shirts obtained – or needed to obtain – permission or approval from any other company to market these shirts?"[25]  If the respondent gave an affirmative reply, she was asked, "Who do you think gave – or needed to give – its permission or approval for these shirts to be marketed?"[26]  Again, if a respondent mentioned a company or product, the interviewer asked why she thought such permission or approval was given or needed.[27]

Dr. Ostberg then subtracted "the percentage of respondents who mentioned the Disney Company as being the source of the Crown Creative t-shirts

---

[24]     *See id.* at 13.  I discuss the manner in which Dr. Ostberg coded the respondents' responses in Part IV.A.3, *infra*.

[25]     *Id.*

[26]     *Id.*

[27]     *See id.*

from the percentage who mentioned the Disney Company in their response to the questions about THOIP t-shirts."[28]

## 2.    Results

Based on his coding, Dr. Ostberg found that 16 percent of respondents in the Miss Disney test group believed the THOIP and Miss Disney shirts "were 'put out' by the *same company* or that the THOIP shirts needed permission or approval from the Disney Company."[29]  Meanwhile, 8 percent of respondents in the control group believed the THOIP and Crown Creative "control" shirts were "put out" by the same company, or that the Crown Creative shirts required permission or approval from Disney,[30] creating a net **likelihood of reverse confusion between the Little Miss THOIP and Miss Disney shirts of 8 percent**.[31]

---

[28]    *Id.* at 14.

[29]    *Id.* at 19 (emphasis added).  In particular, 15 percent believed the shirts were produced by the *same company*, primarily because of the "similarity of the words or lettering" (9 percent), "the characters on the shirts" (5 percent), and the "overall design or layout" (2 percent).  *Id.*  One percent believed the company producing the THOIP shirts obtained or needed to obtain permission or approval from "the Disney Company."  *Id.*

[30]    *See id.* at 20-21.  In particular, 5 percent believed the Crown Creative shirts were produced by the same company *and mentioned the Disney Company*, while 3 percent thought the Crown Creative shirts needed Disney's permission or approval.  *See id.* at 21.

[31]    *See id.* at 21.

As for the Little Miss Disney test group, 24 percent believed the THOIP and Little Miss Disney shirts were "put out" by the *same company* or that the company producing the THOIP shirts needed permission or approval from the Disney Company.[32] Five percent of respondents in the control group expressed similar views about the THOIP and Crown Creative "control" shirts,[33] resulting in a net **likelihood of reverse confusion between the Little Miss THOIP and Little Miss Disney shirts of 19 percent**.[34]

### 3. Rebuttal to Ostberg Survey

Disney proffers a report and declaration from its retained expert, Dr. Itamar Simonson, to rebut the Ostberg Survey.[35] Dr. Simonson's report is addressed below in Part IV.A.

### B. The Helfgott Survey

---

[32] *See id.* at 22.  Twenty percent believed the former (primarily because of "similarity of the words or lettering" (15 percent), "the characters on the shirts" (3 percent), and "the overall look" (3 percent)). *Id.* Four percent believed that "permission or approval from the Disney Company was needed." *Id.* at 23.

[33] *See id.* at 23.  All 5 percent believed the Crown Creative and Little Miss Disney shirts were produced by the same company. *See id.* at 23-24.

[34] *See id.* at 24.

[35] *See* Expert Report of Dr. Itmar Simonson ("Simonson Report"), Ex. 1 to Declaration of Dr. Itamar Simonson in Support of Defendants' Motion *in Limine* and for Summary Judgment ("Simonson Decl.").

Disney proffers a survey from Dr. Myron J. Helfgott that, like Dr. Ostberg's, purports to "determine whether or not T-shirts put out by THOIP are likely to cause consumers to think they are put out by, in association with, or with the permission of Disney."[36]

### 1.    Design and Operation

Dr. Helfgott conducted a so-called "*Eveready*" or "monadic" survey.[37] Respondents were shown either a Little Miss THOIP shirt or a control shirt, and then were queried about source, association, and permission.  The two THOIP shirts were (1) "Little Miss Bossy" and (2) "Little Miss Chatterbox":[38]

---

[36]    Expert Report of Dr. Myron J. Helfgott ("Helfgott Survey"), Ex. 2 to Simonson Decl., at 5.

[37]    *See* McCarthy on Trademarks § 32:174 at 32-367 to 32-369 (describing the *Eveready* format and its namesake *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.3d 366 (7th Cir. 1976)).  The six hundred respondents who participated in the survey were screened and divided by age similarly to those who participated in the Ostberg surveys.  *See* Helfgott Survey at 6, 9.

[38]    *See* Helfgott Survey at 7.  Both THOIP shirts bore the name "THOIP" in very small print at the side or bottom of the cartoon illustration on the shirts, as part of the trademark statement.  *See id.*  However, since all THOIP T-shirts carry a neck label bearing the name "Junk Food" (the manufacturer of the THOIP T-shirts), Dr. Helfgott "decided that maximum benefit would be accrued by showing the Junk Food label in half of each exhibit group" in order to measure precisely "the degree to which a likelihood of reverse confusion score is affected by the presence (or absence) of the neck label."  *Id.* at 8.  He found that it had no effect on reverse confusion scores.  *See id.* at 12.



The two control T-shirts were a (1) "Got Green" and (2) "Berry Sweet" T-shirt

bearing those names and a cartoon illustration.[39]



       During their interviews, each respondent was shown one of the four

t-shirts and asked to look it over "as you would in a store and were considering

---

[39]    *See id.* at 7.  According to Dr. Helfgott, "[n]either of the control cartoons [is] reminiscent of either the Little Miss THOIP cartoon characters or the Disney cartoon characters."  *Id.*

buying it."[40]  The interviewer then asked respondents the following three likelihood of confusion questions:

- "What company do you think puts out this T-shirt, or don't you know?"

- "Do you think the company that puts out this T-shirt puts it out themselves, or in association with some other company, or don't you know?"

- "Do you think the company that puts out this T-shirt got permission from some other company, did not get permission from some other company, or don't you know?"[41]

If the respondent answered any of the above questions with a response other than "don't know," a follow-up "reasons" question was asked: "What in particular about this T-shirt makes you think (that)?"[42]  For each interview in which at least one name was mentioned in response to the previous questioning, a final question was added for each company name: "Please tell me all of the products and brands you know of which this company puts out."  Probe "any others?"[43]  In order to avoid omitting any possible indication of Disney reverse confusion, Dr. Helfgott

---

[40]     *Id.* at 10.

[41]     *Id.*

[42]     *Id.*

[43]     *Id.*

"decided to accept any reference to Disney as a likelihood of reverse confusion response."[44]

## 2.   Results

Six respondents out of 400 associated a THOIP test shirt with Disney (1.5 percent of the sample).[45]  Three control cell respondents out of 200 identified the control exhibits as Disney's (1.5 percent).[46]  "The fact that the test cell measurement of reverse confusion has the same incidence of Disney mentions as the control cell measurement of noise, and not higher, **indicates that there is no residual evidence of reverse confusion.**"[47]

## III.   APPLICABLE LAW

### A.   Reverse Confusion

Reverse confusion "is the misimpression that the junior user is the source of the senior user's goods."[48]  "A 'reverse confusion' situation exists where

---

[44]    *Id.* at 11.  Thus, an interview was counted as indicating a likelihood of reverse confusion if answers to any of the three confusion questions included any reference to Disney.

[45]    *See id.* at 12.

[46]    *See id.*

[47]    *Id.* (emphasis added).

[48]    *Banff, Ltd. v. Federated Dep't Stores*, 841 F.2d 486, 490 (2d Cir. 1988) ("*Banff II*").  *Accord Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 218 (2d Cir. 2003) (upholding district court's "weighing the actual confusion

the junior user is able to amass such trademark strength in its imitative mark that the senior user's products become associated with the junior user in the minds of consumers."[49]  In determining whether there is a likelihood of reverse confusion, courts within the Second Circuit apply the eight-factor balancing test set forth in *Polaroid Corporation v. Polarad Electronics Corporation*,[50] just as they do to

---

factor in favor of [the senior user's] [b]rand" where "[a]lthough no customer bought a jar of the Defendants' sauce thinking it was made by the Plaintiff (normal confusion), in a few instances, a customer of the Defendants' restaurant bought, or at least saw, a jar of the Plaintiff's sauce, thinking it came from the Defendants (reverse confusion)"); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 742 (2d Cir. 1994) ("This case primarily involves reverse confusion, where consumers mistake Sterling's products as originating with Bayer AG."); *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 571 (2d Cir. 1993), *narrowed on other grounds by Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 46 & n.10 (2d Cir. 1994) ("Reverse confusion  has been thought to injure the reputation of the prior user of the mark by causing potential customers to consider it a trademark infringer.") (citing *Banff II*, 841 F.2d at 490); *id.* at 574 ("In this case, where reverse confusion is alleged, the allegation is that a subsequent user's selection of a trademark "is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user.") (citing *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991)); *Lang*, 949 F.2d at 583 (citing *Banff II*, 841 F.2d at 490); *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990 (2d Cir. 1987) (reverse confusion is "an instance in which a person acquainted with the junior user's name becomes confused when confronted with the senior user's name"). *But see Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.,* No. 06-3508-cv, 2007 WL 2914452, at *4 (2d Cir. Oct. 5, 2007) (quoting *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005), for the proposition that "[t]he offender in a reverse confusion case will typically exploit confusion to push the senior user out of the market.").

[49]     *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 388 n.3 (2d Cir. 2005).

[50]     287 F.2d 492, 495 (2d Cir. 1961).

19

assess claims for forward confusion.[51]  The *Polaroid* factors are:  (1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that plaintiff will "bridge the gap"; (5) actual confusion between products; (6) defendant's good or bad faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.[52]

## IV.   DISCUSSION

### A.   Motion *in Limine* to Exclude the Ostberg Survey

Disney argues that the Ostberg Survey suffers from a number of flaws that individually and collectively require its exclusion under Federal Rules of Evidence 702 and 403.  I agree.

### 1.   The Ostberg Survey Failed to Replicate Actual Marketplace Conditions

*First*, the Ostberg Survey failed to replicate actual marketplace conditions.[53]  In *THOIP I*, this Court found the Ford Survey inadmissible in part

---

[51]     *See, e.g.*, *Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 n.6 (2d Cir. 1983).

[52]     *See Polaroid*, 287 F.2d at 495.  *See also THOIP II*, 736 F. Supp. 2d at 705-06 (elaborating on the likelihood of confusion analysis).

[53]     *See THOIP I*, 690 F. Supp. 2d at 230-40 (discussing the criteria to consider in assessing the validity and reliability of a survey, and discussing the Ford Survey's failure to replicate actual marketplace conditions).

because Dr. Ford tested the THOIP and Disney products using a sequential array methodology – despite the absence of evidence that such products would be encountered in close proximity in the actual marketplace.[54]  Yet, in testing for reverse confusion, Dr. Ostberg designed a similar sequential array survey in which (1) respondents were exposed to specific sets of three Miss Disney/Little Miss Disney shirts and then three THOIP shirts and (2) the THOIP and Disney shirts were presented amongst an array of extraneous products.  Moreover, Dr. Ostberg selected the Disney and THOIP shirts used in his survey because they "were believed to be the top sellers for each of the two companies"[55] – not because he had any evidence of how the shirts were actually sold.  "Unlike books, however,

---

[54]        *See id.* at 239-40.  I also criticized the Ford Survey for failure to use hang tags and neck labels clearly.  *See id.* at 239.  Disney now argues that the photographs used in Dr. Ostberg's arrays "oftentimes partially obscured the neck labels on the shirts and, in any case, made them smaller and less prominent than they were in real life, making it difficult for respondents to notice or read the neck labels on the shirts."  Disney's Memorandum of Law in Support of Motion *in Limine* and for Summary Judgment ("Disney Mem.") at 10.  However, after reviewing all thirty photographs used in the Ostberg Survey, I conclude that the photographic arrays adequately displayed the shirts' neck labels.  Indeed, some of the respondents cited "Junk Food," the THOIP shirt licensee, as the source of some of the T-shirts.  *See* Statistical Tables, App. A to Ostberg Report, Tables 102 and 105.  In any event, Dr. Helfgott found that the presence (or absence) of the Junk Food neck label, in his survey, had no effect on reverse confusion scores.  *See* Helfgott Survey at 12.

[55]        Ostberg Survey at 10.  *Accord id.* at 4 nn.1-2.  By comparison, Dr. Ford coupled THOIP and Disney shirts based on resemblance.  *See THOIP I*, 690 F. Supp. 2d at 237.

where the best-sellers are often sold together on the same 'best-seller' rack at a

bookstore, the fact that a particular T-shirt in a line of shirts is a top seller does not

mean that it will be sold in close proximity with other best-selling shirts."[56]

Instead, THOIP argues that "[t]he evidence . . . shows not only that the t-shirts

flowed through the same trade channels, but also that Disney and THOIP shipped

to the same distributors," and that "[b]y selecting the best-selling designs, Dr.

Ostberg reasonably approximated the most likely proximate encounters."[57]  It calls

Disney's "assertion" that it will never market its various products side-by-side with

THOIP's "implausible," directing the Court to photographs of (1) "Disney

trademarked merchandise ['Hannah Montana' children's underwear] displayed

side-by-side with THOIP's products ['Little Miss Sunshine' children's

underwear]"[58] and (2) a sale rack at Walmart displaying THOIP and Disney T-

---

[56]     Disney's Memorandum in Opposition to THOIP's Motion for Partial
Summary Judgment ("Disney Opp. Mem.") at 7-8.  THOIP has not submitted to
the Court any documents showing the actual sales *figures* of the THOIP or Disney
shirts.  According to Disney, this is also a "telling omission as the actual sales
show that the three 'best-selling' Miss Disney shirts, in a line of four shirts,
represented a relatively small number of sales, making it all the more unlikely that
even the most popular Miss Disney T-shirts would be encountered with the THOIP
T-shirts."  *Id.* at 8.

[57]     THOIP's Memorandum of Law in Opposition to Disney's Motion *in
Limine* and for Summary Judgment ("THOIP Opp. Mem.") at 5.

[58]     *Id.* at 6 (citing Photograph, Ex. 13 to Schwimmer Decl.) (originally an
exhibit to the Declaration of Dale M. Cendali, counsel for Disney, in Support of
Motion *in Limine* to Exclude Expert Testimony of Dr. Gary Ford [Docket No. 68]).

shirts – though not the T-shirts at issue in this case – sold side-by-side.[59]  Finally, it directs the Court to Junk Food's website, where both Disney and Little Miss THOIP T-shirts are sold "one click away from each other."[60]

I reject THOIP's argument.  Evidence of three instances (one virtual[61]) in which Disney *products* were sold alongside Little Miss THOIP products says nothing about the likelihood of consumers encountering the *Little Miss Disney or Miss Disney shirts* together with the *Little Miss THOIP shirts* (or Little Miss THOIP *products*, for that matter) in the marketplace.  It does not overcome the lack of evidence that such products were sold side-by-side in the past[62] and it does not prove that Disney will sell the products side-by-side in the future.

> Thus, notwithstanding that many of the same retailers sold THOIP and Miss Disney shirts, and despite the evidence that Disney shirts are at times sold side-by-side non-Disney shirts, such general information does not justify [Dr. Ostberg's] specific choices. . . .  In addition, with respect to the Little Miss Disney line, even assuming arguendo the soundness of THOIP's position that a sequential array survey is justified where the products are found

---

[59]   *Id.* at 7 (citing Photograph, Ex. 15 to Schwimmer Decl.).

[60]   *Id.* (directing the Court to http://www.junkfoodclothing.com/#).

[61]   Indeed, "the Internet is a big place [where] millions of T-shirts are available for sale . . . across a countless number of websites.  Moreover, if particular products truly are sold in proximity over the Internet, a proper survey would approximate that online purchasing environment by having respondents actually navigate the Internet."  Disney Opp. Mem. at 7.

[62]   *See THOIP I*, 690 F. Supp. 2d at 237.

in different stores within short distances of each other, THOIP has not shown a reasonable likelihood that consumers would have proximately encountered its shirts and the Little Miss Disney shirts in a critical number of real world situations.  Though THOIP's shirts were available in thousands of stores nationwide, the Little Miss THOIP and Little Miss Disney shirts were on sale in a small number of nearby stores in at most three geographic locations (New York City, Anaheim, and Orlando).  In these circumstances, there is not a reasonable likelihood that consumers would have encountered in close proximity Little Miss THOIP and Little Miss Disney shirts, let alone those pairs specifically tested by Dr. [Ostberg].[63]

What is more, products other than the Miss Disney shirts "were selected, not because they were necessarily sold next to the Disney shirts, but to permit respondents to identify/describe the products in the first portfolio (if any) they thought were made by or were related to the company which puts out the THOIP shirts."[64]  Indeed, Dr. Ostberg admitted in his deposition that he had no basis to believe that any of these products used in his portfolio – including puzzles, books, and pajama pants – were ever sold alongside any of the shirts at issue.[65]  "[A]

---

[63]     *Id.* at 237-38 (footnotes omitted).

[64]     Ostberg Survey at 10.

[65]     *See* Deposition of Dr. Henry Ostberg ("Ostberg Dep."), Ex. 3 to Simonson Decl., at 191:5-23 ("[T]he only purpose of showing other products that might be somewhat similar in some stores is to create a context so as to avoid undue focus on one product.  And it really doesn't matter what the other products are that I included in the portfolio.").

legally-probative estimation of consumer confusion must be tethered to marketplace conditions,"[66] but Dr. Ostberg's was not.

In this vein, while I rejected Disney's argument in *THOIP I* that the Ford Survey

> failed to approximate marketplace conditions because it improperly created artificial awareness of THOIP's claimed mark among survey respondents, and, relatedly, "tested 'conditional probability,' i.e., only the potential rate of confusion amongst the limited subset of people who were already aware of THOIP's claimed mark, not the actual likelihood of confusion among the far broader universe of potential consumers who are not[,]"[67]

Disney's argument carries more weight in the context of a survey testing for reverse confusion – especially where THOIP has proffered no evidence showing that Disney advertised or promoted the *Miss and Little Miss Disney lines* in the past, or has plans to do so in the future.[68]  I agree with Disney that "THOIP cannot

---

[66]    *THOIP I*, 690 F. Supp. 2d at 237.

[67]    *Id.* at 239 (citations omitted).

[68]    *See* discussion *infra* pp. 43-46.  *See also* McCarthy on Trademarks § 23:10 at 23-73:
> a survey cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case.

*Cf. THOIP I*, 690 F. Supp. 2d at 240 (justifying the Ford Survey's creation of artificial awareness of the THOIP shirts because "though public awareness of THOIP's name and that of its parent company is low, there is an appreciable awareness of the Little Miss – and related Mr. Men – characters").

point to the 'Disney' name or the Disney characters to argue reverse confusion. Rather, THOIP must demonstrate that the allegedly infringing shirts – not just Disney in general – have swamped or are likely to swamp THOIP's brand based on the admissible[] record."[69]  Otherwise, "[i]f such a survey were enough to support a finding of reverse confusion . . . Disney could be held liable for 'reverse confusion' even if it put out only a single shirt with no promotion."[70]

## 2. The Ostberg Survey Lacked a Proper Control

"To fulfill its function, a control should 'share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'"[71]  THOIP argues that the French bulldog shirts were proper controls because they "share all but the infringing characteristics" with the Disney shirts – namely, they "have a cartoon character (but not one of the parties' characters)" and "wording,"[72] but not (1) the words "LITTLE MISS," (2) not words describing a characteristic of the character,

---

[69]    Disney Opp. Mem. at 2 n.1.

[70]    *Id.* at 5.

[71]    *THOIP I*, 690 F. Supp. 2d at 240 (quoting Shari Seidman Diamond, Reference Guide on Survey Research, *in* Reference Manual On Scientific Evidence at 258 (Federal Judicial Center 2d ed. 2000)).

[72]    This Court faulted the Ford Survey for failing to use words in control products.  *See id.*

and (3) not words in block letters.[73]  I disagree.  Dr. Ostberg's control  – "t-shirts bearing an image of a French bulldog and no descriptive term with hearts, splattered paint, or stars"[74] – shared very few similarities with the THOIP or Disney shirts:

> Not only did the font, typeface, layout and size of the character in relation to the wording on the control shirts differ, but the control shirts were cluttered, giving them a very different overall look and feel from the THOIP or Disney shirts.[75]

Indeed, the "overall look and feel" of Dr. Ostberg's "control" T-shirts was much more comparable to that of the "Dora" T-shirts – notably the only other T-shirts besides the Disney shirts contained in the first portfolio.[76]  *Dr. Helfgott*'s "Got Green" and "Berry Sweet" control shirts, by contrast, "were as similar as possible to the test shirts without the protectible elements."[77]  For these reasons, even controlling for confusion based on protectible elements, "fewer respondents were likely to 'match' the control shirts with the Disney shirts [than were likely to

---

[73]     THOIP Opp. Mem. at 10.  *Accord* Ostberg Report at 14.

[74]     Disney Mem. at 12.

[75]     *Id.*

[76]     *Compare supra* page 11 (Crown Creative shirts) *with supra* page 6 (Dora shirts) (fourth set of photographs).

[77]     THOIP Opp. Mem. at 10 (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 568, 595 (S.D.N.Y. 2007)) (purporting to describe the Crown Creative shirts).

'match' the Little Miss THOIP shirts with the Disney shirts], improperly inflating the results."[78]

### 3.    Dr. Ostberg's Improper Coding Inflated "Confusion" Rates

Dr. Ostberg also inflated his "confusion" rates by counting respondents as confused even if their responses were not necessarily indicative of reverse confusion.  For example, Dr. Ostberg counted as confused respondents who said that the two shirts (shown about a minute apart) displaying the word "Miss" or "Little Miss" were put out by the "same company," even though these respondents did not mention Disney.[79]

> But if respondents did not identify "Disney" or at the very least one of Disney's famous characters by name in identifying the source of the T-shirts (instead saying "Little Miss" or "Miss" something), this shows mere matching and not whether any of the respondents believed that both sets of shirts were put out by Disney.[80]

Moreover, Dr. Ostberg also counted as confused those respondents who responded that the THOIP shirts were put out by the same company as a "Little Miss

---

[78]    *Id.*

[79]    *See* Simonson Decl. ¶ 10.

[80]    *Id.  See also Franklin Res. Inc. v. Franklin Credit Mgmt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) ("Surveys which do nothing more than demonstrate the respondents' ability to read are not always probative on the issue of likelihood of confusion.").

Sunshine" T-shirt.[81]  But Disney did not put out a "Little Miss Sunshine" shirt –

THOIP did – and thus there was no Disney "Little Miss Sunshine" shirt in the first

array.[82]  Although respondents may have been confusing THOIP's Little Miss

Sunshine T-shirt with the 2006 movie by that name, "such irrelevant confusion

should not have been counted towards Dr. Ostberg's results."[83]

       Finally, Dr. Ostberg also counted as confused those respondents who

picked the Disney shirts for reasons such as: "same character/character

resemblance," "the characters are theirs," "targeted to the same age group," and

"bright colors."[84]  But such answers are not indicative of reverse confusion because

they are not based on the purportedly protectable elements of THOIP's mark;

references to cartoon characters or colors are not references to the mark.[85]  THOIP

---

[81]     *See* Simonson Decl. ¶ 10.

[82]     *See* Disney Mem. at 13 (citing Simonson Decl. ¶ 10).

[83]     *Id.*  According to Dr. Simonson, recalculating the results just to exclude mentions of "Little Miss Sunshine," the confusion rate would be 6.3 percent for the Miss Disney shirts and 16 percent for the Little Miss Disney shirts. *See* Simonson Decl. ¶ 10.  Recalculating the results to exclude all responses merely mentioning the words on the shirts (including the Little Miss Sunshine mentions), the confusion rate is further reduced to 1.2 percent for the Miss Disney shirts and 6.8 percent for the Little Miss Disney shirts.  *See id.*

[84]     *See* Simonson Decl. ¶ 11.

[85]     *See id.*  According to Dr. Simonson, recalculating the results to exclude such responses, and netting out the control answers *not* based on these same characteristics, the confusion rates decrease for the Miss Disney shirts to 6.8

argues that because Dr. Ostberg coded the control responses the same way, any bias in the results is eliminated.[86]  However, because the Ostberg survey lacked a proper control – one that differed markedly from the THOIP and Disney shirts – I cannot agree.

### 4.    The Ostberg Survey Suffered from Demand Effects

Disney argues that the Ostberg Survey also suffered from demand effects.  Respondents were first shown a portfolio of photographs of five sets of products, only two of which were T-shirts – the Little Miss or Miss Disney shirts and shirts bearing the "well known children's character Dora the Explorer" – while the other products in the portfolio consisted of "completely disparate products."[87]  They were then specifically pointed to the page in the portfolio with the three THOIP (or Creative Crown) T-shirts and asked leading questions about "shirts" instead of neutral questions about "products."[88]  Thus, Disney contends, respondents were skewed to "match the THOIP 'shirts' that they were pointed to with the only 'shirts' in the first array that looked anything like the THOIP shirts –

---

percent and the Little Miss Disney shirts to 9.7 percent.  *See id.*

[86]    *See* THOIP Opp. Mem. at 11.

[87]    Disney Mem. at 11.

[88]    *See id.*

the Disney shirts."[89]   However, non-T-shirt distractors were also used in the control

arrays, so that any spurious confusion would have been caused there as well, and

eliminated when the control group positives were subtracted out of the final results.

Nonetheless, I agree with Disney that "the Disney shirts 'stood out

like a bearded man in a lineup with four clean-shaven men'" in the test surveys:[90]

> Respondents were not likely to match the THOIP shirts with the
> puzzle boxes bearing images of winged horses in magical settings,
> the "Fancy Nancy" booklets depicting scenes from the stories
> entitled "My Family History," "The Delectable Cupcakes," and
> "Pajama Day," or the pajama pants bearing small repeating
> images of skulls or monkey heads with no words. . . .  Nor were
> respondents likely to match the THOIP shirts with the Dora shirts;
> not only is Dora a very well-known character, but also the Dora
> shirts presented in the array looked nothing like the THOIP shirts.
> Rather, they included the distinct Dora character with the name
> "Dora" without a descriptive term, or included other non-
> descriptive terms such as "totally" or "imagine" in disparate fonts
> amidst a clutter of other images, including hearts and flowers.
> Given the slanted structure of Dr. Ostberg's array, the survey
> "test[s] nothing more than the memory and common sense of a
> respondent" to match the "Little Miss" or "Miss" Disney t-shirts
> with THOIP's "Little Miss" t-shirts.[91]

---

[89]     *Id.*

[90]     *Id.* (quoting *Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp. 625,
634 (E.D. Va. 1986)).

[91]     *Id.* at 11-12 (quoting *Simon Prop. Group L.P. v. Mysimon, Inc.*, 104 F.
Supp. 2d 1033, 1051 (S.D. Ind. 2000), and citing *Starter Corp. v. Converse, Inc.*,
170 F.3d 286, 297 (2d Cir. 1999) (affirming exclusion of survey that "was little
more than a memory test, testing the ability of the participants to remember the
names of the shoes they had just been shown")).

Although the control survey likely suffered from some of these demand effects as well, as mentioned earlier the control T-shirt was much more cluttered than the THOIP or Miss Disney and Little Miss shirts, thereby impeding their ability to control for any such "noise" in the survey design – especially given *their* resemblance to the Dora shirts.

In sum, because the Ostberg Survey failed to replicate actual marketplace conditions, lacked a proper control, improperly counted certain responses as indicating confusion, and suffered from demand effects, it is not a reliable indicator of consumer confusion, and is inadmissible.

### B.   Motions for Summary Judgment

THOIP and Disney move for partial summary judgment on the issue of reverse confusion.

### 1.   Likelihood of Confusion

Applying the *Polaroid* factors in *THOIP II*,[92] I concluded that the strength of THOIP's mark (factor one), the "similarity of the allegedly-infringing elements of Disney's shirts to THOIP's mark" (factor two), the competitive proximity of the parties' shirts (factor three), and their equal quality (factor seven)

---

[92]   Before analyzing the likelihood of confusion under the *Polaroid* factors in *THOIP II*, I first concluded that THOIP's mark was entitled to trademark protection without a showing of "acquired meaning."  736 F. Supp. 2d at 708.

"all weigh in THOIP's favor [on the issue of reverse confusion]."[93]  However, I

held that "[w]hile Disney almost undoubtedly intended to copy THOIP's shirts," "a

trier of fact could not view the evidence as demonstrating that Disney intended to

'exploit the goodwill and reputation' of THOIP by creating shirts 'with the intent

to sow confusion between two companies' products'"[94] – factor six.[95]  Factor four,

I held, was "irrelevant"[96] and factor eight was "neutral."[97]  I reopened discovery to

---

[93]     *Id.* at 715.

[94]     *Id.* at 714 (quoting *Star Indus.*, 412 F.3d at 388).

[95]     Discussing factor six in the context of reverse confusion, Judge
Denise Cote of this Court has opined that

> it is unlikely that a larger and better known junior user intends to
> trade on the reputation of the lesser-known plaintiff.  This factor
> is therefore less relevant in a reverse confusion inquiry, although
> any finding that the defendant adopted its mark with an intent to
> cause any form of confusion should weigh in favor of the plaintiff.

*First Nat'l Bank of Omaha, Inc. v. Mastercard Intern. Inc.*, Nos. 03 Civ. 707, 02
Civ. 3691, 2004 WL 1575396, at *12 (S.D.N.Y. July 15, 2004) (citing *A & H
Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 232 (3d Cir.
2000)).  In any event, the record evidence here also does not "support a reasonable
inference that [Disney] intended to promote such confusion, for example, by
flooding the market with its [Miss and Little Miss] products and causing
consumers to believe erroneously that [THOIP's] goods were produced by
[Disney]." *Black Diamond Sportswear*, 2007 WL 2914452, at *4 (affirming
district court's determination that defendant did not act in bad faith).  Instead, in
developing the Little Miss Disney and Miss Disney shirts, Disney believed that it
was "following a trend" that it perceived in the marketplace. *THOIP II*, 736 F.
Supp. 2d at 713 (quotation marks omitted).

[96]     *THOIP II*, 736 F. Supp. 2d at 712.

[97]     *Id.* at 715.

33

afford THOIP the opportunity to submit evidence of *actual* reverse confusion – the fifth *Polaroid* factor.[98]  Before turning to an analysis of that factor in light of the Ostberg and Helfgott Surveys, however, I revisit my discussion of factor one in light of Disney's argument that "while forward confusion is more likely when the plaintiff's mark is strong, the opposite is true with respect to reverse confusion, as a strong mark is less likely to be swamped by a junior user."[99]

### a.   Strength of Plaintiff's Mark (Revisited)

Evaluating the strength of plaintiff's mark in *THOIP II*, I held that THOIP's mark was "inherently distinctive because it combines a fanciful character, an arbitrary format, and a descriptive phrase."[100]  However, district courts in this Circuit have held that, in a reverse confusion case, the court should look to the *comparative* strength of the *junior user's* (Disney's) mark when assessing the first *Polaroid* factor.[101]

----

[98]    *See id.*

[99]    Disney Opp. Mem. at 3 n.3 (citing *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 521 (S.D.N.Y. 2008)).

[100]   *THOIP II*, 736 F. Supp. 2d at 702.

[101]   *See O'Keefe*, 590 F. Supp. 2d at 521 ("[A] well known mark – one that has a high degree of acquired distinctiveness – is less susceptible to this sort of [reverse] confusion than a mark that is not widely recognized."); *First Nat'l Bank of Omaha*, 2004 WL 1575396, at *12 ("A plaintiff with a mark that is commercially weak . . . is more likely to succeed in establishing reverse confusion, *particularly against a defendant with a far stronger mark*.") (emphasis added)

Although I did not discuss the strength of Disney's mark when

considering the first *Polaroid* factor in *THOIP II*, I did consider it in the context of

the third factor, "similarity of marks":

> The biggest difference between the parties' shirts is
> that THOIP's shirts bear its characters and Disney's shirts feature
> its characters.  Hangtags and neck labels further bore Disney's
> name. The Second Circuit has "repeatedly found that the presence
> of a distinct brand name may weigh against a finding of confusing
> similarity[,]" yet "has also held that, in some circumstances, 'the
> addition of a trade name does not necessarily alleviate the problem
> of confusion of marks, and indeed, can aggravate it, as 'a
> purchaser could well think plaintiff had licensed defendant as a
> second user.'"[102]  The Second Circuit "addressed the tension
> between these two lines of cases and decided that, at least where
> the junior and senior marks are not identical, the presence of a
> trade name will tend to militate against a finding of
> confusion."[103]     Thus, in *Playtex Products, Inc. v.
> Georgia-Pacific Corp.*, the court concluded that the presence of
> the brand "Quilted Northern" on the defendants' product
> ("Moist-Ones" towelettes) served to decrease confusion with the

(citing *A & H Sportswear*, 237 F.3d at 231); *id.* at *13 (discounting the first *Polaroid* factor in reverse confusion inquiry where defendant-junior user's mark was "no stronger [than the senior user's mark] and [wa]s unlikely to attain significant commercial strength"); *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 488 (S.D.N.Y. 2004) ("In a reverse confusion case the court should look to the strength of the junior user's mark 'because the doctrine of reverse confusion properly should focus, not on the senior user's mark, but that of the intervening junior user.'") (quoting *Sunenblick v. Harrell*, 895 F. Supp. 616, 627 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996)).

[102]    *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 164-65 (2d Cir. 2004) (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 395 (2d Cir. 1995)).

[103]    *Id.*

plaintiff's product ("Wet Ones" towelettes).[104]   Similarly, in *Arrow Fastener Co. v. Stanley Works*, the Second Circuit concluded that the presence of defendants' brand ("Stanley-Bostitch") diminished confusion where the marks at issue were not identical.[105]

Whether the Disney characters serve to increase or dispel confusion is a somewhat complex question because the characters are not, as in *Playtex Products* or *Arrow Fastener*, an additional feature apart from the elements of Disney's shirts that THOIP challenges.  Rather, Disney's characters are part of the alleged infringement, just as THOIP's characters are part of its mark.  In any event, it is clear that, despite the strong similarities identified above, the parties' shirts are not identical given that each uses its own characters.  Therefore, the images of Disney's famous characters, along with the presence of Disney's name on the tags and labels, dispel forward confusion.   Indeed, as addressed below, only one out of 1,200 respondents in Disney's confusion survey thought that the allegedly-infringing Disney shirts were in any way connected to THOIP or its characters.  Therefore, this factor favors Disney as to forward confusion.

*The undisputed strength of Disney's characters and the Disney name, however, works against Disney on THOIP's reverse confusion theory.*  Because the face of the parties' shirts are very similar in all respects except the characters, the fame of Disney's characters and its name increases the likelihood that consumers will mistakenly believe that Disney is the source of or approved the Little Miss THOIP shirts.  Therefore, this factor favors THOIP as to reverse confusion.[106]

Indeed, Disney's shirts – which essentially differ from THOIP's *only* in their

substitution of Disney's well-known (and well-branded) characters for THOIP's

---

[104]    *See id.*

[105]    *See Arrow Fastener*, 59 F.3d at 395-96.

[106]    *THOIP II*, 736 F. Supp. 2d at 710-11 (emphasis added).

bubble-shaped and dot-eyed "Little Misses" – possess an "origin-indicating"[107] quality that very few cartoon-bearing T-shirts could rival.  And the Second Circuit has endorsed the view that in reverse confusion cases "the use of a defendant's own name in conjunction with an otherwise similar mark . . . may . . . simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark."[108]

On the other hand, as this Court has recognized, "though public awareness of THOIP's name and that of its parent company is low, there is an appreciable awareness of the Little Miss – and related Mr. Men – characters."[109] Indeed, THOIP has claimed that it has promoted its mark nationwide on books

---

[107]    *Lang*, 949 F.2d at 581 ("'Ultimately, the strength of the mark turns on its origin-indicating quality, in the eyes of the purchasing public'") (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979)).

[108]    *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 638 F. Supp. 652, 656 (S.D.N.Y. 1986) ("*Banff I*"), *remanded to broaden scope of injunction*, *Banff II*, 841 F.2d at 491.  *Accord A & H Sportswear*, 237 F.3d at 230 ("As to the presence of the house mark on the Victoria's Secret product, not only is there the possibility that consumers will fail to remember the mark when encountering A & H's swimwear, but there is also the possibility that the mark will *aggravate*, rather than mitigate, reverse confusion, by reinforcing the association of the word 'miracle' exclusively with Victoria's Secret."); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992) ("[T]he prominence of Russ's housemark may serve to create reverse confusion that Russ, and not [the senior user], is the source of [the senior user's] 'Wedding Bears.'").

[109]    *THOIP I*, 690 F. Supp. 2d at 240 (footnote omitted).

since 1981 and on the T-shirts at issue in this case since 2006.[110]  Nonetheless, while the strength of THOIP's mark may weigh against it for the purposes of assessing the first *Polaroid* factor in the context of reverse confusion, the comparatively greater strength of Disney's mark leads to the conclusion that, on balance, this factor still weighs in THOIP's favor – albeit less heavily than I had previously concluded.

However, notwithstanding the strength of its mark, Disney argues that THOIP cannot meet its burden on its reverse confusion claim because "it does not even attempt to articulate how Disney '*overwhelmed*' THOIP's Little Miss brand."[111]  In making this argument, Disney marshals an impressive number of district court cases from this Circuit plainly supporting its position that THOIP must show – as a "factual predicate" to its claim – that Disney "'saturated' the market with its shirts, 'overwhelmed' the [Little Miss THOIP] brand or 'swamped' THOIP."[112]  Indeed, it is the view of trademark law's leading expert that a "reverse

---

[110]     See *THOIP II*, 736 F. Supp. 2d at 694-95, 696-97.

[111]     Disney Opp. Mem. at 2 (emphasis added) (quoting *First Nat'l Bank of Omaha*, 2004 WL 1575396, at *12).

[112]     *Id.* at 1 (citing *O'Keefe*, 590 F. Supp. 2d at 520-21 (reverse confusion "rests on a theory that the defendant has saturated the marketplace with a mark similar to the plaintiff's less well known mark to such a degree that consumers will be misled into believing that the plaintiff is 'an unauthorized infringer' of the defendant's mark"); *Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 438 (S.D.N.Y. 2007) ("the essence of plaintiff's reverse confusion claim is

confusion case is proven only if the evidence shows that the junior user was able to

swamp the reputation of the senior user with a relatively larger advertising

campaign."[113]   And most other Circuits have endorsed that view.[114]

---

that the junior user . . . overpowers the senior user's mark"); *First Nat'l Bank of Omaha*, 2004 WL 1575396, at *12 ("Reverse confusion occurs when a bigger and better-known 'junior user saturates the market with a similar trademark and overwhelms the senior user.'") (emphasis added) (citation omitted); *M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 106 (E.D.N.Y. 2003) ("[T]he evidence shows that Sony and its retailers do not aggressively advertise the Magic Gate technology thereby defeating the reverse confusion theory.")).

[113]    McCarthy on Trademarks § 23:10 at 23-66 (citing "[t]he seminal precedent" on reverse confusion, *id.* at 23-68, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F. Supp. 1219 (D. Colo. 1976), *aff'd and award modified*, 561 F.2d 1365 (10th Cir. 1977) (reverse confusion found where Goodyear promoted its "BIGFOOT" tire in a six million dollar nationwide marketing campaign, swamping a small, regional tire company's "BIGFOOT" tire mark)).

[114]    *See Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 72 (1st Cir. 2008) ("'A reverse confusion  case is proven only if the evidence shows that the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign.'") (quoting McCarthy on Trademarks § 23:10). *See also Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 630 (6th Cir. 2002) ("Reverse confusion occurs where 'the junior user saturates the market with a similar trademark and overwhelms the senior user.  The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter.  The result is that the senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'") (quoting *Ameritech, Inc. v. American Info. Techs., Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 346 -347 (4th Cir. 2001) ("'[R]everse confusion occurs when the junior user saturates the market with a similar trademark and overwhelms the senior user'") (quoting *A & H Sportswear*, 237 F.3d at 228); *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999) (same); *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1246 (8th Cir. 1994) ("'Reverse confusion occurs

Meanwhile, THOIP maintains that, at least in the Second Circuit, "[t]he test for reverse confusion is likelihood of confusion as determined under the *Polaroid* factors, analyzed in the reverse confusion context; there are no special requirements to [*sic*] reverse confusion," citing a Second Circuit case from 1983.[115] Relying on the Second Circuit's 1988 *Banff II* decision, THOIP urges that "it is simply not a requirement that, for a finding of reverse confusion, the junior user must have already swamped the senior user's mark; the test for reverse confusion is likelihood of confusion."[116]  Indeed, in *Banff* – where reverse confusion was "perhaps the primary type of confusion involved"[117] – the Second Circuit found a sufficient likelihood of confusion between Bloomingdale's junior "B-Wear" mark and Banff's senior "Bee Wear" mark to affirm the issuance of a preliminary injunction against Bloomingdales, where Banff

> demonstrated the likelihood of confusion due to Bloomingdale's use of a similar mark on women's apparel.  In this infringement case, threat of irreparable harm due to consumer confusion is particularly acute due to the identity of the products on which the

---

when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user.'") (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992)).

[115]    THOIP Opp. Mem. at 1 (citing *Plus Prods.*, 722 F.2d at 1003-04).

[116]    *Id.* at 2.

[117]    841 F.2d at 491.

> marks are being employed . . . and the *great ability of Bloomingdale's to dilute the plaintiff's mark through its strong market position*. . . . Banff competes with Bloomingdale's in each of its locations by selling women's apparel to other department stores.[118]

Moreover, Banff (the senior user) had been marketing a successful line of apparel under the unregistered trademark "Bee Wear" to retail stores nationwide for over fifteen years, with aggregate net sales exceeding $75 million.[119]

Having carefully reviewed the parties' arguments and the case law on which they are based, I conclude that a correct statement of the law lies somewhere between the legal positions they advance. Although aggressive advertising efforts by junior users or their ability to "saturate" the market with their mark are undeniably important factors for courts to consider in weighing the relative strength of the junior and senior marks (for the purposes of analyzing the first *Polaroid* factor), they are not "factual predicates" to a reverse confusion claim.[120]

---

[118]   638 F. Supp. at 658 (emphasis added).

[119]   *See id.* at 653.

[120]   *Accord A & H Sportswear*, 237 F.3d at 236 ("[A]lthough economic disparity between the companies and the marks is an important consideration in the evaluation of the marks' commercial strength, the District Court legally erred in fashioning a threshold 'economic disparity' requirement before a reverse confusion claim will even be considered.") (upholding the viability of reverse confusion where the senior user had ten percent of market and had spent over one million dollars in advertising); *id.* at 235-36 ("[A] company need not be all that weak within its market in order to bring a viable reverse confusion claim."); *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 479 (3d Cir. 1994) (finding

41

Thus, I will assess the parties' arguments and evidence showing *why* Disney is or is not likely to "overwhelm" THOIP's Little Miss shirts if its Miss Disney and Little Miss Disney shirts return to the market; but my conclusion will not be determinative as to a finding of reverse confusion.  Rather, it will influence the weight I place on the first factor – the comparative strength of Disney's mark.[121]

THOIP argues that the mere "strength of the Disney brand and characters" is sufficient to support a finding that Disney will overwhelm THOIP's Little Miss brand:

> In the absence of injunctive relief, the overwhelming strength of the Disney brand will overwhelm and undercut the value of the THOIP mark.  THOIP faces one of the strongest brands in the world, in circumstances where Disney's shirts are "strikingly similar in design" to those of THOIP and where Disney "almost

---

viable reverse confusion claim where senior user held twenty-five percent of market and had been using mark for thirty years); *Fuji Photo Film v. Shinohara Shoji Kabushiki*, 754 F.2d 591(5th Cir. 1985) (finding a viable reverse confusion claim where the plaintiff had spent millions of dollars).  *But see First Nat'l Bank of Omaha*, 2004 WL 1575396, at *13 ("As an initial matter, [plaintiff] has failed to establish the relevance of an analysis of the likelihood of reverse confusion between the SMARTONE and ONESMART marks among consumers" because "[plaintiff] has presented no evidence that [defendant] MasterCard is likely to saturate the consumer market with the ONESMART mark."); *id.* ("There is no basis to find that the ONESMART mark is likely to overwhelm FNBO's existing SMARTONE mark, as is required to form the factual predicate on which a claim for reverse confusion is based.").

[121]    *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1089 (9th Cir. 2005) ("[I]n reverse confusion cases, the inquiry focuses on the strength of a junior mark.  The strength of the junior mark is closely related to how much the market is saturated by the junior mark.").

undoubtedly intended to copy THOIP's shirts." . . . [T]he strength of the Disney brand and characters overwhelms even strong brands, not the advertising budget of an individual product. It is the strength of the Disney characters that makes the consumer think that the "Miss" and "Little Miss" formats are Disney formats, thereby capturing THOIP's mark.[122]

Moreover, as I have already noted repeatedly, "the Little Miss THOIP, Little Miss Disney, and Miss Disney lines are within the same narrow category of goods directed at the same set of consumers."[123] Thus, although reverse confusion may not be likely if "the goods or services of the parties are not competitive, the respective markets are separated and the advertising of the parties is directed at different types of purchasers,"[124] that is not this case.

However, as Disney notes, THOIP has proffered no evidence that Disney ever engaged in – or plans to engage in – any advertising or promotion with respect to the Miss Disney and Little Miss Disney shirts.[125] Meanwhile, as noted

---

[122]   THOIP Opp. Mem. at 4-5 (citations omitted) (quoting *THOIP II*, 736 F. Supp. 2d at 39, 48).

[123]   *THOIP I*, 690 F. Supp. 2d at 233.

[124]   McCarthy on Trademarks § 23:10 at 23-74.

[125]   *See* Disney Opp. Mem. at 1. Of course, if Disney ever decided to re-issue the shirts and advertised, promoted, and sold them in a different manner in the future than it had in the past, a court could then consider those changed circumstances at that time. Finding reverse confusion now based on what THOIP posits Disney might do, rather than what the admissible evidence shows Disney has done or intends to do, would constitute an improper advisory opinion.

above, THOIP has claimed that it has promoted its mark nationwide on books since 1981 and on the T-shirts at issue in this case since 2006.[126]  While THOIP has stated that licensees and retailers bear the bulk of the expenses relating to the advertising of the Little Miss brand, THOIP contends that within approximately four years of acquiring the brand, it had spent "over $1.7 million marketing and promoting the MR. MEN and LITTLE MISS brands to U.S. licensees, consumers and retailers."[127]  THOIP claims that it also promoted the Little Miss brand through THOIP's television show, "The Mr. Men Show," which launched in 2008.[128] Indeed, from 2006 through 2008, clothing featuring the Little Miss family of characters alone generated over ten million dollars in wholesale sales.[129]

Moreover, although the Disney and THOIP shirts clearly target the same set of customers, it is undisputed that the Little Miss Disney shirts – undoubtedly the most susceptible to reverse confusion – were only sold in the Disney theme parks and the World of Disney store in New York,[130] which has

---

[126]     *See THOIP II*, 736 F. Supp. 2d at 694-95, 696-97.

[127]     THOIP's Statement of Undisputed Facts Pursuant to Local Rule 56.1 dated March 22, 2010 [Docket No. 103] ¶ 156.

[128]     *See id.* ¶¶ 138, 139.

[129]     *See id.* ¶¶ 199, 201, 203.

[130]     *See THOIP I*, 690 F. Supp. 2d at 238.

since closed.[131]  And there is nothing to indicate that the Miss Disney shirts and the Little Miss THOIP shirts ever appeared in the same stores at the same time.[132]  In the absence of any advertising or promotional efforts on Disney's part, then, the Disney shirts' ability to overwhelm THOIP's mark would derive entirely from customers' encountering Disney's shirts in stores, and then separately encountering the Little Miss THOIP shirts in proximate stores.  Yet THOIP has not shown that it is "more likely that consumers will first encounter the junior user's – rather than the senior user's – goods."[133]

Finally, because "the market for T-shirts is 'fragmented' with thousands of T-shirts put out by numerous manufacturers, retailers and other organizations," it is "extremely difficult for any particular T-shirt to overwhelm another brand."[134]  Along similar lines, the "low involvement" nature of T-shirt buying further reduces "the likelihood that a T-shirt could have a swamping

---

[131]    *See* Disney Opp. Mem. at 6.

[132]    *See THOIP I*, 690 F. Supp. 2d at 237.

[133]    *First Nat'l Bank of Omaha*, 2004 WL 1575396, at *12.

[134]    Disney Mem. at 3 (citing and purportedly quoting Transcript of Deposition of Dr. Yoram Jerry Wind ("Wind Dep."), Ex. 3 to Simonson Decl., at 57:2-58:10).  Disney in fact quoted Dr. Simonson *characterizing* Dr. Wind.  *See* Deposition of Dr. Itmar Simonson ("Simonson Dep."), Ex. 3 to Simonson Decl., at 76:3-7.

effect."[135]  Balancing all of these sub-factors, I conclude that – at least on the record before this Court – Disney's ability "to amass such trademark strength in its imitative mark that [THOIP's] products become associated with [Disney] in the minds of consumers" is relatively low.[136]

### b.   Actual Confusion

As I explained in *THOIP II*,

> This factor examines whether the parties' products have actually confused consumers in the marketplace.[137]   While "actual confusion need not be shown to prevail,"[138] evidence of actual confusion is "highly probative" of the likelihood of confusion.[139] Proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion.
>
> Though THOIP's shirts were available on the market with the Little Miss Disney and Miss Disney shirts for eight months and ten months respectively, THOIP has not presented evidence of actual confusion.[140]

As noted above, the Ostberg Survey – which returned reverse confusion rates of 8 percent for the Miss Disney shirts and 19 percent for the Little Miss Disney shirts –

---

[135]   *Id.* (citing Wind Dep. at 57:2-12).

[136]   *See Star Indus.*, 412 F.3d at 388 n. 3.

[137]   *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987).

[138]   *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 895 (2d Cir. 1986).

[139]   *Sunenblick*, 895 F. Supp. at 630.

[140]   *THOIP II*, 736 F. Supp. 2d at 712 (one footnote omitted).

46

is not a reliable indicator of consumer confusion, and is therefore excluded.  Thus, THOIP presents no (admissible) evidence of reverse confusion.[141]  In contrast, Disney's Helfgott Survey showed a reverse confusion rate of zero percent.  THOIP does not ask the Court to exclude the Helfgott Survey, but argues it has no probative value because "[w]hether Disney's adoption or re-adoption of THOIP's 'trend' using its own famous characters did or would cause the consuming public to associate THOIP's T-shirts with Disney, . . . this could not be tested without participants knowing of Disney's shirts,"[142] which had been off the market for over two years.  I agree.  While an *Eveready* survey may have been appropriate to measure forward confusion – at a time when the Little Miss THOIP shirts were still on the market – the Helfgott Survey, too, fails to replicate actual (past or future) marketplace conditions, rendering its results largely irrelevant.[143]

---

[141]    I find it telling, however, that despite the fact that the Ostberg Survey's flaws likely had a severely inflating effect on the confusion rates reported, it *still* returned a reverse confusion rate of only 8 percent with respect to the Miss Disney shirts.

[142]    THOIP's Memorandum of Law in Support of Motion for Partial Summary Judgment ("THOIP Mem.") at 11.

[143]    Disney argues that "[i]f swamping had occurred so as to give rise to reverse confusion [in 2008], the Disney shirts would have had such an impact that consumers would be able to recall the shirts two years later."  Disney Mem. at 8.  I do not agree.

Thus, the court stands in essentially the same position it did a year ago, with neither party proffering (probative, reliable) evidence of reverse confusion. Because the burden in this case lies with THOIP, I therefore conclude that the *Polaroid* "actual confusion" factor weighs in Disney's favor.

### 2.    Balancing the Factors

The (1) competitive proximity and (2) similar quality of the shirts at issue in this case and the (3) strength of Disney's mark weigh slightly in THOIP's favor on the issue of reverse confusion. Had THOIP submitted strong (probative and reliable) survey evidence of reverse confusion, I would conclude that a reasonable juror *could* find reverse confusion. However, in light of (4) the lack of (probative and reliable) survey evidence suggestive of actual reverse confusion, (5) Disney's lack of bad faith, and (6) the lack of (non-hypothetical) evidence that the Miss and Little Miss Disney shirts are likely to overwhelm THOIP's mark, I conclude that no reasonable juror could find reverse confusion. The clerk of the court is directed to close these motions [Docket Nos. 138 and 141] and this case.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 10, 2011

## - Appearances -

**For Plaintiff:**

Abraham Y. Skoff, Esq.
David Rabinowitz, Esq.
Martin Schwimmer, Esq.
Jordan Daniel Greenberger, Esq.
Moses & Singer LLP
405 Lexington Avenue
New York, New York 10174
(212) 554-7800

**For Defendants:**

Dale M. Cendali, Esq.
Melanie Bradley, Esq.
Courtney Schneider, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800